KEVIN P. RODDY (SBN 128283)
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
E-mail: kroddy@wilentz.com

TRACEY BUCK-WALSH (SBN 131254)
LAW OFFICE OF TRACEY BUCK-WALSH
6 Reyes Court
Sacramento, CA 95831
Telephone: (916) 392-8990
Facsimile: (916) 393-1757
E-mail: tracey@tbwlaw.com

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROB STUTZMAN and JONATHAN WHEELER, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs<br><br>vs.<br><br>LANCE ARMSTRONG; PENGUIN GROUP (USA), INC.; G.P. PUTNAM'S SONS; THE BERKLEY PUBLISHING GROUP; RANDOM HOUSE, INC.; BROADWAY BOOKS; CROWN PUBLISHING GROUP; and DOES 1-50, inclusive,<br><br>            Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE, EQUITABLE AND DECLARATORY RELIEF BASED ON VIOLATIONS OF:**<br>1. Cal. Civ. Code § 1750 *et seq.*;<br>2. Cal. Bus. & Prof. Code § 17200 *et seq.*;<br>3. Cal. Bus. & Prof. Code § 17500 *et seq.*;<br>4. Negligent Misrepresentation; and<br>5. Fraud & Deceit.<br><br>JURY TRIAL DEMANDED |

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 1

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

Plaintiffs, Rob Stutzman and Jonathan Wheeler, by their undersigned counsel and for their Class Action Complaint (the "Complaint") against Defendants, Lance Armstrong, Penguin Group (USA), Inc., G.P. Putnam's Sons, The Berkley Publishing Group, Random House, Inc., Broadway Books, Crown Publishing Group, and Does 1-50, inclusive, hereby allege and say as follows.  All allegations made in this Complaint are based upon information and belief, except those allegations pertaining to Plaintiffs, which are based upon personal knowledge, and facts pertaining to this Court's subject matter jurisdiction.  Plaintiffs' information and belief are based upon, *inter alia,* Plaintiffs' own investigation, review of reliable media sources and the investigation conducted by Plaintiffs' counsel.

## I.   THE NATURE OF THIS CLASS ACTION

1.      Alleging claims under California law, this class action seeks relief against Defendants for monetary, injunctive, equitable and declaratory relief on behalf of Plaintiffs and the statewide Class of California consumers they seek to represent.  Plaintiffs sue on behalf of themselves and other residents of the State of California who have been exposed to and victimized by Defendants' unlawful and/or wrongful business practices in violation of (a) the Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750 *et seq.*; (b) the Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200 *et seq.*; (c) the False Advertising Law ("FAL"), CAL. BUS. & PROF. CODE § 17500 *et seq.*; (d) negligent misrepresentation; and (e) fraud and deceit.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 2

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

2.      This consumer protection class action arises from misrepresentations contained in Lance Armstrong's books, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and EVERY SECOND COUNTS, and advertisements and marketing for these books (including the front and back cover and flyleafs of these books), as true and honest works of nonfiction when, in fact, Defendants knew or should have known that these books were works of *fiction*.  As alleged in this Complaint, Plaintiffs and the members of the Class were misled by Defendants' statements and purchased Defendant Armstrong's books based upon the false belief that they were true and honest works of nonfiction.  Plaintiffs and Class members would not have purchased the books had they known the true facts concerning Armstrong's misconduct and his admitted involvement in a sports doping scandal that has led to his recent and ignominious public exposure and fall from glory.

## II.      JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because the proposed Class consists of more than 100 members, the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, and this is a class action in which Plaintiffs and the members of the Class are citizens and residents of a State different from any of the Defendants.

4.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted by Plaintiffs on

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 3

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

behalf of themselves and the members of the Class, namely, Defendants' marketing and advertising efforts and consumers' purchases of the subject books, occurred in this District and throughout the State of California.

5.      This Court may properly exercise personal jurisdiction over the Defendants because each of them does and conducts substantial business in the State of California. Each of the Defendants has sufficient minimum contacts with the State of California and otherwise intentionally avails himself, herself and/or itself of the laws and markets of the State of California, through the promotion, sale, marketing and distribution of products and services in the State of California, including, but not limited to, the books that are the subject of this class action, so as to render the exercise of personal jurisdiction by this Court permissible, under traditional notions of fair play and substantial justice.

### III.      THE PARTIES

6.      Plaintiff, Rob Stutzman ("Stutzman"), is a resident of the State of California and the County of Sacramento who works as a public affairs consultant. Sometime between 2001 and 2003, Stutzman learned about the book, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, Defendant Armstrong's supposedly truthful and compelling story of overcoming a life-threatening cancer and staging an inspiring comeback to win the Tour de France bicycle race and become one of the best athletes in the world. Stutzman bought the book in California and read it cover to cover. Although Stutzman does not buy or read many books, he found Armstrong's book incredibly compelling and recommended the book to

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 4

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

several friends.  In 2005, while working as Deputy Chief of Staff for Communications for

Governor Arnold Schwarzenegger, Stutzman had the opportunity to privately meet

Armstrong.  At that time, Stutzman thanked Defendant Armstrong for writing his book and

told him it was very inspiring and that he had recommended it to friends who were fighting

cancer.  In response, Armstrong thanked Stutzman.

      7.     Plaintiff, Jonathan Wheeler ("Wheeler"), is a resident of the State of California

and the County of Sacramento.  Wheeler is a professional chef who, after a 20-year career

catering to Indy Car and LeMans auto racing teams and major movie studios, currently

teaches culinary arts as a high school instructor through the County of Sacramento Office of

Education.  Wheeler is a life-long, avid cycling enthusiast and bike racer.  He began riding

bikes in his hometown of Cupertino, California, while in kindergarten and got his first ten-

speed bike, a Peuguot, in the sixth grade whereupon he immediately began riding long

distances with his best friend.  Soon he and his friend would ride over the mountains to Santa

Cruz and back.  Wheeler began hanging out at the renowned Cupertino Bike Shop where he

became friendly with its owner, the legendary Spence Wolfe.  Wheeler has competed in

century and double century rides.  Wheeler followed Defendant Armstrong's early cycling

career and his cancer diagnosis and treatment and, shortly after it was published Wheeler

purchased a copy of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE after learning

through the media about Armstrong's supposedly truthful and inspiring account of his

triumphant return to dominate the world of cycling after his devastating bout with testicular

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 5

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

cancer. Plaintiff Wheeler was so impressed with IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE that he bought Armstrong's follow-up book, EVERY SECOND COUNTS, published in January 2003, which chronicles Armstrong's life after his first Tour de France victory.

8.      Defendant, Lance Armstrong ("Armstrong"), is a resident of Travis County, Texas, whose address is 300 West 6th Street, Suite 2150, Austin, Texas. As set forth herein, Armstrong was the principal author of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and EVERY SECOND COUNTS.

9.      Defendant, Penguin Group (USA) Inc. ("Penguin Group (USA)"), is the U.S. affiliate of Penguin Group, one of the largest English language book publishers in the world. Penguin Group (USA)'s principal place of business is located at 375 Hudson Street, New York, New York 10014. Penguin Group (USA) publishes under a wide range of imprints and trademarks, including G.P. Putnam's Sons ("Putnam"). As set forth herein, Defendants Penguin Group (USA) and Putnam were  the publishers of the hardcover edition of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, which was published in May 2000. Another division of Penguin Group (USA), Defendant, The Berkley Publishing Group ("Berkley"), published the paperback edition of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE in September 2001. Both Putnam and Berkley maintain their principal places of business at 375 Hudson Street, New York, New York 10014.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 6

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

10.     Defendant, Random House, Inc. ("Random House"), is the world's largest English-language general trade book publisher.  Random House's principal place of business is located at 1745 Broadway, New York, New York, 10019.  Random House owns many publishing groups including Defendant, Crown Publishing Group ("Crown"), which publishes under a wide range of imprints and trademarks including that of Defendant, Broadway Books ("Broadway").  As alleged herein, on January 1, 2003, Defendants Random House, Broadway and Crown were the publishers of the hardcover edition of Armstrong's book EVERY SECOND COUNTS.  As alleged herein, in or about June 2004, Defendants Random House, Broadway and Crown were the publishers of the paperback edition of Armstrong's book EVERY SECOND COUNTS.  Both Broadway and Crown maintain their principal places of business at 1745 Broadway, New York, New York 10019.

11.     The true names and capacities, whether individual, corporate, associate or otherwise of Defendants 1-50, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names pursuant to CAL. CODE CIV. PROC. § 474.  Plaintiffs further allege that each of the said Defendants is in some manner responsible for the acts and occurrences alleged in this Complaint.  Plaintiffs will seek leave to amend this Complaint to show their true names and capacities when same are ascertained, as well as the manner in which each of the fictitious Defendants is responsible.

## IV.     FACTUAL ALLEGATIONS

### A.     The Publication And Promotion Of Defendant Armstrong's Books

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 7

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

12.    On or about May 22, 2000, Defendant Putnam, a member of Defendant Penguin Group (USA), published the hardcover edition of Armstrong's book entitled IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE. In September 2001, Defendant Berkley, a division of Defendant Penguin Group (USA), published the paperback edition of this book.

13.    On or about January 1, 2003, Defendant Broadway, a member of Defendants Random House and Crown, published Defendant Armstrong's book entitled EVERY SECOND COUNTS. In or about June 2004, these Defendants filed the paperback edition of EVERY SECOND COUNTS.

14.    Since the dates of publication, throughout the Class Period (as defined in this Complaint) and continuing to the present date, Defendants Armstrong, Penguin Group (USA), Putnam and Berkley have publicly and repeatedly represented Armstrong's book entitled IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE as a "Biography and Autobiography." Since the date of publication, throughout the Class Period and continuing to the present date, Defendants Armstrong, Random House, Crown and Broadway have publicly and repeatedly represented Armstrong's book entitled EVERY SECOND COUNTS as a "Biography and Autobiography." Throughout the Class Period, Defendants have advertised, marketed and sold these books as a works of nonfiction. Such false and misleading representations were made in the books, on the books' cover, on the books' jackets and flyleafs, in media press kits, during television and newspaper interviews, on Internet websites and at personal appearances made by Armstrong. Defendants' misrepresentations to

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 8

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

consumers located throughout the State of California continue to the present day, long after the time that Defendants Armstrong, Penguin Group (USA), Putnam, Berkley, Random House, Broadway and/or Crown knew or should have known that such statements were and are false and misleading.

15.     IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE is the supposed life story of Defendant Armstrong, the world-famous cyclist, and his fight against cancer and comeback to win his first Tour de France race title.  In the book, he shares his journey through triumph, tragedy, transformation and transcendence. It is the story of one of the most talked-about and inspirational sports figures of all time, a world-famous cyclist and his fight against cancer and the will to succeed despite overwhelming odds.  Armstrong was named as *Sports Illustrated* magazine's 2002 Sportsman of the Year and, after his record-shattering string of Tour de France race victories, some proclaimed him as the greatest athlete of all time.

16.     Defendant Armstrong's book, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, spent many weeks on the *The New York Times* bestseller list and was advertised by Defendants Penguin Group (USA) and Putnam as having "legs as strong as its author's."

17.     Defendants Armstrong, Penguin Group (USA), and Putnam and Berkley have profited handsomely from publication of both hardcover and paperback editions of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, reaping millions of dollars in sales and profits.  With his co-authors, Defendant Armstrong also wrote THE LANCE ARMSTRONG

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 9

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

PERFORMANCE PROGRAM, 7 WEEKS TO THE PERFECT RIDE, which was published on September 1, 2000, and in which he sets forth a training program for success in bicycle racing without using performance enhancing drugs.

18. Defendant Armstrong parlayed the success of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE into a subsequent book deal, which resulted in the publication in January 2003 by Defendants Random House, Crown and Broadway of EVERY SECOND COUNTS. This book was advertised by these Defendants as the follow-up story to the best-selling book IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE. EVERY SECOND COUNTS was advertised by Defendants Random House, Crown and Broadway as addressing the equally daunting challenge of living in the aftermath of winning the Tour de France race after beating cancer and making the most of every breath of life, of Armstrong's prickly relationship with the French media and the ultimately disproved accusations of doping within his Tour de France cycling team, and an intimate glimpse into how almost dying taught him to really live. Defendant Armstrong also wrote LANCE ARMSTRONG, IMAGES OF A CHAMPION, published on August 8, 2006, and MY COMEBACK, UP CLOSE AND PERSONAL, which chronicled his record-breaking seventh Tour de France race win, accomplished after successfully battling the testicular cancer that very nearly killed him – to his decision in September 2008 to return to professional cycling for his eighth Tour de France race.

**B.      Misrepresentations Contained In Armstrong's Books**

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 10

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

19.     In his book, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE,

Defendant Armstrong addressed the use of performance enhancing drugs that were and are

banned by the Union Cycliste Internationale ("UCI"), the governing body for sports cycling

which oversees international cycling events, their widespread use in the world of

professional cycling as well as the widespread suspicion that Armstrong's success was due to

his use of banned substances and practices such as blood transfusions.  Throughout the book,

Defendant Armstrong repeatedly denies that he ever used banned substances before or during

his professional cycling career.  Lamenting the use of drugs in cycling, Armstrong wrote in

IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE:

> Doping is an unfortunate fact of life in cycling, or any other endurance sport
> for matter.  Inevitably, some teams and riders feel it's like nuclear weapons –
> that they have to do it to stay competitive within the peloton.  I never felt that
> way, and certainly after chemo the idea of putting anything foreign in my body
> was especially repulsive.  Overall, I had extremely mixed feelings about the
> 1998 Tour [de France race]:  I sympathized with the riders caught in the
> firestorm, some of whom I knew well, but I also felt the Tour [de France race]
> would be a more fair event from then on.

20.     Knowing that the mere claim that his success was due to superior physical

training, proper diet and an extraordinary spirit and drive to succeed was not enough to quell

suspicions and rumors that he doped, Defendant Armstrong wrote lengthy passages in IT'S

NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE that were intended to convince readers

and consumers – including Plaintiffs and the members of the Class – that the rumors of

Armstrong's doping were unfair and untrue because of the extensive drug-testing regime

employed by the UCI and the organizers of the Tour de France:

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 11

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

I was making enemies in the Alps. My newly acquired climbing prowess aroused suspicion in the French press, still sniffing for blood after the scandal of the previous summer. A whispering campaign began: "Armstrong must be on something." Stories in L'Equipe and Le Monde insinuated, without saying it outright, that my comeback was a little too miraculous.

I knew there would be consequences for Sestriere – it was almost a tradition that any rider who wore the yellow jersey was subject to drug speculation. But I was taken aback by the improbable nature of the charges in the French press: some reporters actually suggest that chemotherapy had been beneficial to my racing. They speculated that I had been given some mysterious drug during the treatments that was performance-enhancing. Any oncologist in the world, regardless of nationality, had to laugh himself silly at the suggestion.

I didn't understand it. How could anybody think for a second that somehow the cancer treatments had helped me? Maybe no one but a cancer patient understands the severity of the treatment. For three straight months I was given some of the most toxic substances known to man, poisons that ravaged my body daily. I still felt poisoned – and even now, three years after the fact, I feel that my body isn't quite rid of it yet.

I had absolutely nothing to hide, and the drug tests proved it. It was no coincidence that every time Tour [de France] officials chose a rider from our team for random drug testing, I was their man. Drug testing was the most demeaning aspect of the Tour [de France]: right after I finished a stage I was whisked to an open tent, where I sat in a chair while a doctor wrapped a piece of rubber tubing around my arm, jabbed me with a needle, and drew blood. As I lay there, a battery of photographers flashed their cameras at me. We called the doctors the Vampires. 'Here come the Vampires.' we'd say. But the drug tests became my best friend, because they proved I was clean. I had been tested and checked, and retested.

In front of the media, I said, "My life and my illness and my career are open." As far as I was concerned, that should have been the end of it. There was nothing mysterious about my ride at Sestriere: I had worked for it. I was lean, motivated and prepared. Sestriere was a good climb for me. The gradient suited me, and so did the conditions – cold, wet, and rainy. If there was something unusual in my performance that day, it was the sense of out-of-body effortlessness I rode with – and that I attributed to sheer exultation in

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

being alive to make the climb.  But the press didn't back off, and I decided to take a couple of days off from talking to them.

…

My fellow riders tested me on the bike every single day.  I was tested off the bike, too, as the scrutiny I underwent in the press intensified.

I decided to address the charges outright, and held a press conference in Saint-Gaudens.  "I have been on my deathbed, and I am not stupid," I said.  Everyone knew that use of EPO and steroids by healthy people can cause blood disorders and strokes.  What's more, I told the press, it wasn't so shocking that I won Sestriere; I was an established former world champion.

"I can emphatically say I am not on drugs," I said.  "I thought a rider with my history and my health situation wouldn't be such a surprise.  I'm not a new rider.  I know there's been looking, and prying, and digging, but you've not going to find anything.  There's nothing to find … and once everyone has done their due diligence and realizes they need to be professional and can't print a lot of crap, they'll realize they're dealing with a clean guy."

…

Not long after I cross the finish line, a French TV journalist confronted me: there were reports that I had tested positive for a banned substance.  The report was wrong, of course.  I returned to the team hotel, and pushed through a throng of clamoring media, and called another press conference.  All I could do was assert my innocence each time there was a new wave of speculation in the papers – and there was one every three or four days.

Le Monde had published a story stating that a drug test had turned up minute traces of corticosteroid in my urine.  I was using a cortisone cream to treat a case of saddle sore – and I had cleared the cream with the Tour [de France] authorities before the race ever started.  Immediately, Tour [de France] authorities issued a statement affirming my innocence.  "Le Monde was looking for a drug story, and they got one on skin cream, " I said.

I was hurt and demoralized by the constant barrage from the press.  I put forth such effort, and had paid such a high price to tide again, and now that effort

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 13

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

was being devalued.  I tried to deal with the reports honestly and straightforwardly, but it didn't seem to do any good.

I began to notice something.  The people who whispered and wrote that I was using drugs were the very same ones who, when I was sick, had said, "He's finished.  He'll never race again."  They were the same ones who, when I wanted to come back, said, "No, we don't want to give him a chance.  He'll never amount to anything."

Now that I was in the lead of the Tour de France, wearing the yellow jersey, and looking more and more like the eventual winner, the very same people sent the very same message.  "It's not possible," they said.  "Can't be done.  He can't do it.  What's going on here?  There must be another explanation, something suspicious."  They were consistent, the naysayers.

It's a good thing I didn't listen to them when I was sick.

It hurt me, too, that the French journalists in the particular were so suspicious of me.  I live in France, and I loved the country.  After the previous year's problems during the Tour [de France], a number of top riders had stayed away from France in '99, but not me.  While other riders were afraid of being harassed by the police or investigated by the governmental authorities, I trained there every day.  France was the most severe place in the world to be caught using a performance enhancer, but I did all of my springtime racing in France, and conducted my entire Tour [de France] preparation there.  Under French law, the local police could have raided my house whenever they wanted.  They didn't have to ask, or know.  They could have sorted through my drawers, rifled my pockets, search my car, whatever they wanted, without a warrant or any sort of notice.

I said to the press, "I live in France.  I spent the entire months of May and June in France, racing and training.  If I was trying to hide something, I'd have been in another country."

But they didn't write that, or print that.

...

I cycled through the stage finish and dismounted, thoroughly exhausted but please to have protected my lead.  But after five hours on the bike, I now had

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

to face another two-hour press conference.  I was beginning to feel that the press was trying to break me mentally, because the other riders couldn't do it physically.  The media had become as much of an obstacle as the terrain itself.

That day, the International Cycling Union released all of my drug tests, which were, in fact, clean.  What's more, I had received a wonderful vote of confidence from the race organizer, Jean-Marie Leblanc.  "Armstrong beating his illness is a sign that the Tour [de France] can beat its own illness," he said.

Somehow, we had fended off all the attacks, both on the bike and off, and kept the yellow jersey on my back.

…

I wanted to win the time trial.  I wanted to make a final statement on the bike, to show the press and cycling rumormongers that I didn't care what they said about me.  I was through with press conferences (although not with drug tests; I was random-tested again after stage 17).

…

I was near the end of the journey.  But there had been two journeys, really:  the journey to get to the Tour [de France], and then the journey of the Tour [de France] itself.  In the beginning there was the Prologue and the emotional high, and that first week, uneventful but safe.  Then there were the strange out-of-body experiences at Metz and Sestriere, followed by the demoralizing attacks by the press.  Now to finish with a victory gave me a sweet sense of justification.  I was going to Paris wearing the maillot jaune.

21.  In his follow-up book, EVERY SECOND COUNTS, Armstrong again confronts his critics who suspect he used banned substances.  Again, Armstrong repeatedly denied every doping accusation and repeatedly recited the fact that because he never tested positive for a banned substance during his racing career, he raced "clean" and that the attacks on his character were baseless and without merit.  Armstrong again wrote at length about the doping investigation in the 2000-2001 racing season, devoting almost the entire third chapter

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 15

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

of this book to the topic, including the following passages intended to impress the reader

with his "clean" history and the legitimacy of his victories:

> That year saw the beginning of a long, hard defense of my character. I'm surely the most drug-tested man on the planet. I'm tested anywhere from 30 to 40 times a year, both in and out of competition, and I welcome it, because frankly, it's the only proof I have of my innocence.
>
> …
>
> I've never once failed a test. Not one. Nor do I intend to, ever. You know why? Because the only thing you'll find evidence of is hard work, and there's no test for that.
>
> But no matter how many tests I took, there were still those who considered me guilty, a doper-mastermind who outwitted scientific communities across the globe, and the suspicion reach a height in 2000-2001.
>
> …
>
> On Thanksgiving Day of 2000, shortly after I got back from the Olympics, French authorities announced I was under criminal investigation for doping.
>
> I was dumfounded. I wasn't just being called a cheat, I was being called a felon, under formal investigation.
>
> …
>
> What happened was this: during the Tour [de France], someone surreptitiously videotaped two of our medical staff as they threw away a couple of trash bags. The tape was sent anonymously to a government prosecutor, as well as to the France 3 television station. Now the station was airing the tape while sensationally reporting our "suspicious behavior" as we disposed of "medical waste."
>
> French authorities had responded by launching a full-scale judicial inquiry.
>
> …
>
> The "medical waste consisted of some wrappers and cotton swabs and empty boxes, nothing more.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 16

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

…

I immediately issued an angry denial through our [U.S. Postal Service cycling team] spokesman, Dan Osipow. Our team had "zero tolerance" for any form of doping, we said. It sounded like a clichéd statement, but we meant it. We were absolutely innocent.

…

At first, I tried not to take it personally, and to understand the motives behind the investigation. When an athlete doped, the competitors, spectators, and journalists were defrauded. International cycling had recently been through a drug scandal, and the French were protective of the integrity of the Tour [de France], which was more than just a race, it was a national symbol, and they didn't want it junked up by needles and vials. But I didn't like being accused on no evidence.

…

Suspicion was the permanent state of affairs in the sport, and with reason. Unfortunately, cycling had a long history of doping. It had happened time and again: athletes had lied, had cheated, had stolen. In the 1998 Tour [de France], which I missed while recovering from illness, a drug scandal resulted in multiple arrests and suspensions when a team car was found to be carrying large amounts of the blood-doping agent erythropoietin (EPO). Since then, Tour [de France] officials had worked with the International Cycling Union to develop new drug tests, and to restore public confidence in the race.

Drug inspectors arrived at each team hotel between 7 and 9 A.M. on the day that the Tour [de France] started and drew blood from the crooks of our arms. After that, there were surprise drug tests—you never knew when someone would bang on your hotel-room door and ask for blood. There were also daily urine tests in a mobile trailer after each stage….

Even out of season, I was, and am, tested by the United States Anti-Doping Agency. It's a moment of wearying familiarity: I'm sitting in my kitchen early one Texas morning in the off-season, sipping coffee and whispering so as not to wake assorted children, when there's a loud ringing at the doorbell. Standing on the front step of my home is a representative from USADA, coming on like John Wayne, holding out a piece of paper like a warrant and telling me to take a drug test, or risk being banned from my sport.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 17

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

The drug testers in Austin were the same people every time, a husband and wife. I didn't know their names, and wasn't especially cordial with them, because they were never cordial with me. They would ring the bell, I'd open the door, and they would announce, "Random drug control." And hand me a piece of paper instructing me on my rights. Or lack thereof: if I declined the test it was considered an automatic positive, and I would be banned.

…

The head of the French Sports Ministry, Marie-George Buffet, announced that all of our [U.S. Postal Service cycling] team's urine samples from the 2000 Tour would be turned over to the French judicial investigators and submitted to forensic testing by law enforcement, and so would the garbage that we had thrown away during the 2000 Tour [de France].

That was actually good news. I *wanted* all the tests, because I knew they would come back pure. They were my only means of vindication. "It's the best news in a long time," I said. "Because I know I'm clean."

More good news came when the International Cycling Union announced it would conduct its own tests. The ICU had quietly decided to preserve 91 frozen urine samples taken from the 2000 race, without the cyclists' knowledge, in the hopes of eventually submitting them to a brand-new test for EPO.

…

Anyone who thought I would go through four cycles of chemo just to risk my life by taking EPO was crazy. It was one thing to seek to maximize performance, or explore a pharmacological gray zone. It was another to court death.

I practiced another, more natural way to oxygenate my blood, and that was to train or live at altitude. I stressed altitude training—it was a big part of my regimen, and it was safe, but it was no fun. It was lung-searing, and dizzying, and inconvenient, but it was legal and it worked.

…

Meanwhile, the investigation threatened to seriously mess with my reputation.

…

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 18

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

> We wrote in anti-drug out-clause in our contracts: if I tested positive, I'd give the money back.
>
> …
>
> Finally, April came, and with it, what seemed to be good news. We heard via a reporter from Reuters that all of our tests were clean—exactly as we had insisted all along.

In Chapter 7 of this book, Armstrong wrote:

> Here are just a few things that happened after the summer of 2002. On September 2, 2002, the French doping investigation was finally, officially closed….After 21 months of inquiry, investigators admitted they'd found not a shred of proof, and they issued just a small discourteous announcement from the prosecutor's office. The case was dropped for lack of evidence.

22. Despite Armstrong's, Penguin Group (USA)'s, Putnam's and Berkley's repeated public representations that Armstrong's cycling comeback and successes were due to his innate talent and athletic gifts, training, diet and his extraordinary will to succeed, and not banned performance enhancing drugs, as detailed in IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, and despite Random House's, Crown's, and Broadway's repeated public representations that Armstrong's cycling comeback and successes were due to his innate talent and athletic gifts, training, diet and his extraordinary will to succeed and not banned performance enhancing drugs, as detailed in EVERY SECOND COUNTS, both books have now been exposed as frauds. In fact, as Armstrong now admits, he and his entire U.S. Postal Service ("USPS") cycling team used banned substances. Armstrong now admits that without his use of banned performance enhancing drugs beginning in the mid-1990's, he

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 19

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

would not have won and continued to win cycling races, including seven consecutive Tour de France races.

### C.     The Revelation Of Certain Facts Concerning Defendant Armstrong's Wrongdoing Bring Forth His Steadfast Denials, Attacks Upon Others And Repeated Attempts To Hide The Truth

23.     Suspicions that Armstrong used banned performance enhancing drugs in the Tour de France, which were first mentioned by the French media in 1999, re-emerged in June 2004 with the appearance, right before the start of the Tour de France race, of a book entitled "L.A. Confidentiel," co-authored by David Walsh and Pierre Ballester ("Walsh and Ballester").  In this book, which was never published in the United States, Walsh and Ballester reported that when Armstrong met with his doctors after being diagnosed with testicular cancer, he admitted that he had previously taken banned performance enhancing drugs.  This book also revealed that one of Armstrong's former assistants was asked to remove several used syringes and that Armstrong had asked to borrow her makeup in order to cover up needle marks on his skin.  During this time, Armstrong vehemently denied any charges of doping.  Later that summer, Armstrong won his sixth Tour de France cycling race.

24.     As detailed in Armstrong's book, EVERY SECOND COUNTS, one month after winning his first Tour de France race, Armstrong was accused of testing positive for erythropoietin ("EPO") by *L'Equipe*, the French sports publication.  This French paper reported that there was indisputable evidence of Armstrong's guilt from drug tests performed on six urine samples taken, and later frozen was later testing, during the 1999 Tour de France

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 20

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

race. On his Internet website, Armstrong denied that he had ever taken performance enhancing drugs. Television network CNN reported that Armstrong had been "dogged by a whispering campaign that his remarkable cycling achievements were aided by drugs despite never failing a doping test." Despite *L'Equipe* devoting four full pages to this Armstrong doping scandal, Armstrong described it as a "witch hunt."

25.     Armstrong sued the authors of "L.A. Confidentiel" and *The Sunday Times of London* for £1,000,000 after the newspaper reprinted claims from the "L.A. Confidentiel" book that Armstrong took performance enhancing drugs. Also named in Armstrong's suit was Emma O'Reilly ("O'Reilly"), Armstrong's former masseuse and a major source of information for the authors of "L.A. Confidentiel." *The Sunday Times of London* settled the case in 2006, paying Armstrong £300,000. O'Reilly settled with Armstrong after enduring two and one-half years of litigation. Armstrong reportedly went on a litigation spree against his critics and those who sought to uncover the truth about his doping, boasting in 2006: "I think we're 10-0 in lawsuits right now."

26.     In April 2009, after being accused by France's anti-doping agency of not cooperating with a drug tester, Armstrong again denied any wrongdoing. Nevertheless, Armstrong was subsequently cited for not remaining "under the direct and permanent observation" of those administering the drug test, pursuant to the established rules. A 20-minute delay in administering the drug test occurred when Armstrong declared that he had

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 21

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

been given permission to shower following a race.  While he was showering, Armstrong's assistants checked the credentials of the drug tester.

27.     In June 2009, Walsh and Ballester wrote a second book entitled "le sale tour." They have stated that they purposely did not put the title of their in capital letters because of their disgust with what had happened with the sport of cycling.  When asked why he was always "after" Armstrong, Walsh explained, "If he doped to win the Tour de France, which I believe he did, he's not a genuine champion."

28.     On May 20, 2010, *The New York Times* reported that Armstrong and other team members of the USPS cycling team had been accused of using banned performance enhancing drugs by former team member Floyd Landis ("Landis"). Landis sent this information to cycling officials via electronic mail ("e-mail").  Because Landis had spent the previous four years vehemently denying these very same charges, his admission came as a surprise.  One cycling official confirmed that the information provided by Landis was detailed.  Landis revealed that his own doping had begun in 2002, the first year he became a teammate of Defendant Armstrong.  In response to these revelations, Armstrong vehemently and publicly denied teammate Landis's assertions.

29.     On September 10, 2010, Betsy Andreu ("Andreu"), the wife of former Armstrong cycling teammate Frankie Andreu, advised that she spoke to federal agents regarding the use of banned performance enhancing drugs in professional cycling.  Andreu

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 22

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

stated that while Armstrong was battling cancer, he told her that he had used performance enhancing drugs, including EPO, human growth hormone, steroids and testosterone. Andreu told federal agents that Armstrong was in his hospital room when he made this revelation. On September 11, 2010, it was revealed that Andreu had received several threatening telephone voicemail messages left by an Armstrong friend and it was stated that those voicemail recordings would be used as evidence in a federal investigation into Armstrong's activities.

30.     On January 24, 2011, *Sports Illustrated* magazine reported that in 1995 Armstrong cycling teammate Stephen Swart had called Armstrong "the instigator," and that Armstrong encouraged his cycling teammates to use EPO, which is a banned performance enhancing drug. In response, Armstrong's lawyer publicly denied these accusations. The *Sports Illustrated* article explicated many of the prior doping accusations made against Armstrong. Most importantly, *Sports Illustrated* pointed out that because the cycling team was sponsored by the USPS and involved the use of government resources, a federal investigation into such wrongdoing would be necessary.

31.     On May 23, 2011, the CBS television network aired the show "60 Minutes," which investigated the allegations surrounding Armstrong and included an interview with former Armstrong cycling teammate Tyler Hamilton ("Hamilton"). During the broadcast, Hamilton asserted that he and Armstrong had taken EPO during 1999-2001. The television show also reported that two other teammates had observed Armstrong using EPO. Hamilton

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 23

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

stated that he saw the drug in the refrigerator, that he and other teammates saw Armstrong

use the drug.

**D.    The USADA Brings Charges Against Armstrong And Publishes Its Report Detailing Armstrong's Wrongdoing**

32.    On June 12, 2012, Armstrong was charged with doping and the trafficking of

drugs by the United States Anti-Doping Agency ("USADA").   At the same time, Armstrong

was suspended from competing in any cycling-related events.   Armstrong was also banned

from participating in triathlons.   The 15-page letter sent to Armstrong by the USADA alleged

that his blood samples from 2009 and 2010 were "fully consistent with blood manipulation,

including EPO use and/or blood transfusions."

33.    On July 9, 2012, Armstrong responded to the USADA's letter by filing a

lawsuit against the USADA and its Chief Executive Officer, Travis Tygart, in the U.S.

District Court for the Western District of Texas, entitled *Lance Armstrong v. U.S. Anti-*

*Doping Agency,* Case No. A-12-CA-606-SS.   That same day, Judge Sam Sparks issued an

Order dismissing Armstrong's complaint and motion for temporary restraining order against

the USADA.   In the Order, Judge Sparks stated that "[t]his Court is not inclined to indulge

Armstrong's desire for publicity, self-aggrandizement, or vilification of [the USADA]."   Dkt.

No. 17 at 2-3.   Armstrong responded to Judge Sparks' Order by filing an amended complaint

on July 10, 2012.   In his filings, Armstrong asserted that the USADA did not have the ability

to file charges against him because his contracts were with the UCI.   On August 20, 2012,

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 24

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

Armstrong's lawsuit against the USADA and Tygart was again dismissed, leaving Armstrong three days to decide if he wished to arbitrate his case in accordance with USADA rules. Dkt. Nos. 56-57. On August 23, 2012, Armstrong declined to arbitrate the USADA's charges, stating on his personal LIVESTRONG Internet webpage: "There comes a point in every man's life when he has to say, 'Enough is enough.'" However, Armstrong continued to publicly deny any doping charges, claiming that he was weary of dealing with such accusations. By avoiding USADA arbitration, Armstrong knew he would be banned for life from the sport of cycling and stripped of all of his race wins.

34.     On August 24, 2012, the USADA imposed a lifetime ban on Armstrong and stripped him of all his Tour de France race medals, thereby eliminating all of Armstrong's achievements from the record books.

35.     On October 12, 2012, the USADA forwarded to the UCI, the World Anti-Doping Agency (WADA), and the World Triathlon Corporation (WTC) its 202-page edited version of a report entitled "Reasoned Decision of the United States Anti-Doping Agency on Disqualification and Ineligibility" (the "USADA Report"). The USADA Report concluded that Armstrong had engaged in a sophisticated doping conspiracy "designed in large part to benefit Armstrong," and that Armstrong took various performance enhancing drugs during *all* of his Tour de France race victories.

36.     The USADA Report provided a year-by-year breakdown of Defendant Armstrong's doping, starting in 1998, in a race in Spain where Armstrong's teammate,

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

Jonathan Vaughters ("Vaughters"), alleged that Armstrong injected himself with EPO in front of him and was open about his performance enhancing drug use. According to the USADA Report, seven witnesses (including four riders and a team employee) testified about performance enhancing drug use on Armstrong's USPS cycling team, including the use of EPO, testosterone, human growth hormone and cortisone.

37.     According to the USADA Report, in 1999 Armstrong's USPS cycling team ousted the team doctor, Pedro Celaya, because he "had not been aggressive enough for Armstrong in providing banned products." That same year, according to the USADA Report, Armstrong "got serious" with Italian doping doctor Michele Ferrari ("Dr. Ferrari"). In one instance, according to Andreu (the wife of USPS cycling team rider Frankie Andreu), she, Armstrong and Armstrong's then-wife met Dr. Ferrari on the side of the road outside Milan, Italy, and that on that occasion, Armstrong met alone with Dr. Ferrari for an hour. Hamilton, Armstrong's training partner in 1999, told the USADA that Dr. Ferrari had injected him with EPO that year. During the 1999 Tour de France race, Armstrong tested positive for a cortisone that he didn't have medical authorization to use. A cover-up allegedly ensued; in the words of the USADA report:

> Emma O'Reilly was in the room giving Armstrong a massage when Armstrong and team officials fabricated a story to cover the positive test. Armstrong and the team officials agreed to have Dr. del Moral backdate a prescription for cortisone cream for Armstrong which they would claim had been prescribed in advance of the Tour to treat a saddle sore. O'Reilly understood from Armstrong, however, that the positive had not come from a topical cream but had really come about from a cortisone injection Armstrong

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 26

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

received around the time of the Route du Sud a few weeks earlier. After the meeting between Armstrong and the team officials concluded, Armstrong told O'Reilly, 'Now, Emma, you know enough to bring me down.'"

38.    The USADA Report alleges that the USPS cycling team was delivered EPO during the 1999 Tour de France race by a skilled, drug-smuggling motorcyclist that the team members called "Motoman." Hamilton states that riders also took testosterone in 1999 via an olive oil based solution that was sprayed in their mouths. However, as Defendant Armstrong wrote in his books, IT'S NOT ABOUT THE BIKE, MY JOURNEY BACK TO LIFE and EVERY SECOND COUNTS, he attributed the above-referenced positive drug test to an approved cortisone skin cream used for saddle soreness.

39.    In 2000, when the organizers of the Tour de France race started testing for EPO, Hamilton asserts that the USPS cycling team moved on to blood doping. Hamilton states that he, Armstrong and teammate Livingston went to Valencia, Spain, and had blood extracted and later re-infused to boost their performance. Another Armstrong teammate, George Hincapie ("Hincapie"), asserts that Armstrong also used testosterone in 2000, and that Armstrong dropped out of a cycling race in Spain after Hincapie warned him that there would be drug testing. Hamilton states that USPS cycling team riders were re-infused with blood during the 2000 Tour de France race at a hotel room, and that they joked about whose body was absorbing the blood the fastest.

40.    Hincapie states that Dr. Ferrari visited the USPS team training camp at the beginning of 2001 and his services were offered to any rider who wanted them for $15,000.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 27

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

Also in 2001, Vaughters reports that he went out on a bike ride with Armstrong where Armstrong "demonstrated a detailed knowledge of the EPO test," and told him how to skirt a positive drug test.  Armstrong told Vaughters that he had sources in the testing world who told him how it works.

41.     During the 2001 Tour du Suisse race, Armstrong informed his teammates that he had tested positive for EPO; however, after having a conversation with UCI officials, Armstrong told his teammates "everything was going to be okay."  Cycling teammate Landis stated that Armstrong told him he (Armstrong) had made a "financial agreement" with UCI officials to keep the results from the positive drug test hidden.

42.     During 2002, the USADA Report states that Armstrong become good friends and training partners with cycling teammate Landis, who asserts that he and Armstrong shared doping advice and drugs.  According to the USADA Report, "Armstrong also describe[d] how much he enjoyed Landis' boyish antics, gregarious personality and love for the American rock band ZZ Top."  Landis had keys to Armstrong's apartment.  The USADA Report states that the agency has evidence that $150,000 was paid by Armstrong to Dr. Ferrari during 2002, even though Dr. Ferrari was then under investigation for doping.

43.     After the 2002 Tour de France race, USPS team member Christan Vande Velde ("Vande Velde") states that Armstrong threatened to kick him off the team if he didn't step up his doping program; as the USADA report states:  "Armstrong told Vande Velde that

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 28

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

if he wanted to continue to ride for the [USPS cycling] team he 'would have to use what Dr. Ferrari had been telling [Vande Velde] to use and would have to follow Dr. Ferrari's program to the letter.'" According to the USADA Report, Vande Velde stated that "the conversation left me with no question that I was in the doghouse and that the only way forward with Armstrong's team was to get fully on Dr. Ferrari's doping program." Vande Velde acquiesced to Armstrong's demand.

44.     According to records uncovered by the USADA, during 2003 Armstrong paid Dr. Ferrari the sum of $475,000. Cycling teammate Landis was hurt during 2003, but when Armstrong went out of town he asked Landis to stay at his apartment and keep an eye on his blood-doping equipment. "Landis agreed to babysit the blood," the USADA Report says. Both Landis and Hincapie state that Armstrong blood-doped in 2003, and during every other Tour de France race held from 2001 to 2005. Landis states that Armstrong gave him a box of six pre-measured syringes of EPO after he (Armstrong) got two liters of blood extracted in 2003.

45.     During 2004, Armstrong continued to work with Dr. Ferrari and, on the day before the 2004 Tour de France race, Armstrong wire transferred $100,000 to Dr. Ferrari. Cycling teammate Landis states that he saw Armstrong on a massage table with a testosterone patch on his shoulder. During the 2004 Tour de France race, both Landis and Hincapie assert that the entire USPS cycling team got blood transfusions on the team bus after a stage of the race. In late 2004, Dr. Ferrari was convicted of sporting fraud for

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 29

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

advising a group of Italian riders about EPO and other drugs.  According to the USADA report, it was only at that point that Armstrong publicly broke off his relationship with Dr. Ferrari.

46.    In 2005, Hincapie asserts that Armstrong gave him EPO following the latter's seventh-straight Tour de France race win.  Also in 2005, the USADA Report states that Armstrong's supposedly-finished relationship with Dr. Ferrari was "business as usual." Armstrong and Dr. Ferrari met in Italy and Armstrong wire transferred $100,000 to Dr. Ferrari.

47.    During 2009, the USADA Report states that Armstrong retained a professional relationship with Dr. Ferrari by soliciting advice from him through Dr. Ferrari's son, Stefano. Here is an example of an e-mail exchange between Armstrong, Dr. Ferrari and Stefano ("Schumi" is Ferrari):  On November 4, 2009, Stefano inquires:  "Schumi asks if you'd like [t]o continue the cooperation for next year too – if so, then it [w]ould be good to start thinking about some specifics already (gym + [s]ome bike)."  On November 15, 2009, when Armstrong is looking ahead to the next year's Tour de France race, he writes:  "Yes, let's continue ... what we have started.  I'm curious to know what Schumi [t]hinks for 2010 and what we need to do differently in terms of training…."  Stefano responds, "Great! Schumi says it's obviously a [T]our for light climbers...."  The USADA Report states that the chances that Armstrong's blood levels during the 2009 Tour de France occurred naturally were "less than one in a million."

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 30

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

48.     According to the USADA Report, Armstrong avoided positive drug tests by engaging in a variety of deceptive activities, including:

(a) **Avoiding the testers**. Cycling teammate Hamilton states that they would take the EPO injections at night and never answer the door when the testers came by. Teams commonly had lookouts to inform a rider when a tester was approaching, according to an independent review of the 2010 Tour de France. The USADA Report states that the USPS cycling team also seemed to have inside information on when the tests would come.

(b) **Using undetectable drugs**. From 1998-2005, cycling authorities could not test for blood doping or HGH. In addition, EPO is hard to test for and wasn't even testable until 2000. Testosterone is notoriously hard to detect as well.

(c) **Next-level methods**. The USADA Report states that the USPS cycling team had an understanding of how testing worked, and that team members used methods that would result in negative tests. These included methods like testosterone patches and injecting EPO directly into the vein. The USADA report states that the team "literally smuggled" saline solution into camp in 1998 to water down test results.

49.     As the USADA Report concluded: "The evidence is overwhelming that Lance Armstrong did not just use performance enhancing drugs, he supplied them to his teammates. He did not merely go alone to Dr. Michele Ferrari for doping advice, he expected that others would follow. It was not enough that his teammates give maximum effort on the bike, he

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 31

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

also required that they adhere to the doping program outlined for them or be replaced.  He

was not just a part of the doping culture on his team, he enforced and re-enforced it.

Armstrong's use of drugs was extensive, and the doping program on his team, designed in

large part to benefit Armstrong, was massive and pervasive."

      E.    **Armstrong's Admissions During His Televised Interview With Oprah Winfrey**

      50.     On January 17, 2013, Defendant Armstrong admitted to well-known television

personality Oprah Winfrey ("Winfrey"), in an interview which was broadcast nationwide on

The Oprah Network, that he began using banned performance enhancing drugs in the mid-

1990's, before he was diagnosed with cancer, and used them throughout his cycling career,

including during each of his seven Tour de France race victories.  Armstrong admitted to

Winfrey that his story "was so perfect for so long," that the "myth" of his perfect story was

"not true," and that "a lot of people helped paint that (untrue) picture."  Armstrong admitted

that his cocktail of banned performance enhancing drugs and procedures consisted of "EPO,

transfusions and testosterone," and that he was not afraid of getting caught despite the testing

program because of the testing protocols and because the UCI did not test for EPO until

2006.  Armstrong stated that until 2005, cyclists were tested only at or during the races at

which time the banned performance enhancing drugs were no longer detectable because most

of the use of banned performance enhancing drugs occurred during the off-competition

training season.  Armstrong admitted to Winfrey that he was a "ruthless, relentless, 'win-at-

all-costs' bully" who hid the truth in order to "perpetuate the story" and in order to win.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 32

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

51.     Armstrong admitted in his televised interview with Winfrey that the positive EPO tests from samples of his 1999 blood were, in fact, accurate, despite his prior denials, which had been repeatedly stated both publicly and in his books.  Armstrong also admitted that in 1999 he had  convinced a doctor to back-date a prescription for a cortisone cream in order to explain his positive test result for steroids.  During the interview, Armstrong admitted that the "Motoman" story was true.

### F.     Plaintiffs' Lack Of Knowledge Concerning Armstrong's Fraud And Their Efforts To Learn The Truth

52.     Plaintiff Stutzman remembers seeing news reports shortly after May 2010 regarding Armstrong teammate Landis's allegations.  For the first time, Plaintiff Stutzman began to seriously wonder if Armstrong had lied about never using banned substances.  But Armstrong's continued and vehement protests that he was innocent, the fact that it was widely reported that Armstrong had never tested positive for a banned substance, and the fact that Armstrong had successfully sued accusers for defamation, led Plaintiff Stutzman to believe that Armstrong was telling the truth.  It was not until August to October 2012, when Armstrong was stripped of all seven of his Tour de France race titles and the USADA Report was issued, that Plaintiff Stutzman felt certain that Armstrong had lied all along.  When Armstrong confessed doping to Winfrey during the interview broadcast on television on January 17-18, 2013, Plaintiff Stutzman felt duped, cheated and betrayed.

53.     Plaintiff Wheeler, who had followed Armstrong's cycling career from the beginning, was convinced of Armstrong's veracity because he supposedly continued to test

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 33

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

"clean" for drugs. After all, Plaintiff Wheeler believed that given the fact of widespread

testing for banned substances, if other cyclists were testing "dirty," getting caught and

disciplined by cycling authorities, and Armstrong was not, then surely Armstrong was

"clean." Plaintiff Wheeler even formed the opinion that Greg LeMond ("LeMond"), a three-

time winner of the Tour de France race (and the only previous American winner), was a

"whiner" when LeMond suggested in 2001 that Armstrong was one of the greatest "frauds"

in the history of cycling. Plaintiff Wheeler was so proud of Armstrong's first Tour de France

race win that he purchased a 2000 "maillot jaune" (yellow jersey) symbolizing the race

winner. Plaintiff Wheeler came to believe that Armstrong was probably lying when, during

August-October 2012, the USADA Report was issued and Armstrong was stripped of his

seven Tour de France titles. The disappointed Wheeler felt cheated and betrayed.

## V.  ADDITIONAL FACTS REGARDING DEFENDANTS' UNLAWFUL CONDUCT

54.     Throughout the Class Period, Defendant Armstrong fraudulently represented

his books, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and EVERY SECOND

COUNTS, to be a true and honest works of nonfiction during personal appearances, in print,

on the Internet and on television.

55.     From May 2000 to the present, Defendants Armstrong, Penguin Group (USA),

Putnam and Berkley fraudulently and/or negligently represented and promoted the book, IT'S

NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, to be a true and honest work of

nonfiction, on the book's front and back covers, on the flyleafs, through press kits,

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 34

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

promotions, press releases and communications made via various other media channels including, but not limited to, *The New York Times, USA Today,* Amazon, Borders Books and Barnes & Noble.  Such promotional and marketing efforts continued after January 2011, by which point Defendants Penguin Group (USA), Putnam and Berkley knew or should have known that Armstrong's book was not an honest work of nonfiction.

56.     From January 2003 to the present, Defendants Armstrong, Random House, Broadway and Crown fraudulently and/or negligently represented and promoted the book, EVERY SECOND COUNTS, to be a true and honest work of nonfiction, on the book's front and back covers, on the flyleafs, through press kits, promotions, press releases and communications made by various other media channels including, but not limited to, *The New York Times, USA Today,* Amazon, Borders Books and Barnes & Noble.  Such promotional and marketing efforts continued after January 2011, by which point Defendants Random House, Broadway and Crown knew or should have known that Armstrong's book was not an honest work of nonfiction.

57.     Throughout the Class Period, Defendant Armstrong actively and fraudulently concealed the material fact that he used banned performance enhancing drugs in his cycling career.  Armstrong carried out this concealment and deception by various means, including holding press conferences to declare that he had never failed a drug test and by suing his detractors for defamation and other torts.

## VI.     CLASS ACTION ALLEGATIONS

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

58. Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action. The Class (or subclasses) which Plaintiffs seek to represent is (are) defined as follows: (a) All consumers residing in the State of California who purchased the book, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE from its initial publication date in May 2000 through the present, and (b) all consumers residing in the State of California who purchased the book EVERY SECOND COUNTS from its initial publication date in January 2003 through the present (the "Class" and the "Class Period").

59. Excluded from the Class are each of the Defendants identified in this Complaint, any entity in which Defendants have a controlling interest, any officers or directors of Defendants, their legal representatives, heirs, successors and assigns, and any judicial officer assigned to this case.

60. Plaintiffs reserve the right, upon completion of discovery with respect to the scope of the Class and the Class Period, to amend the definitions set forth above.

61. The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. Plaintiffs allege that there are thousands of members in the Class who reside throughout the State of California.

62. Plaintiffs, who are members of the Class, have suffered monetary injury, are committed to prosecute this case, and have retained competent counsel who are experienced in class action litigation. Accordingly, Plaintiffs are adequate representatives of the Class

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 36

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

because they have the same interests as the members of the Class, their claims are typical of the claims of Class members, and they will fairly and adequately protect the interests of Class members.

63.    There are questions of law or fact common to members of the Class that predominate over any questions affecting individual members including, but not limited to:

(a)    Whether Defendants' false and/or misleading statements of fact and concealment of material facts to Plaintiffs and Class members were likely to deceive them;

(b)    Whether Defendants, by their conduct alleged in this Complaint, have engaged in unfair, deceptive, untrue and/or misleading statements about the truthfulness of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and/or EVERY SECOND COUNTS;

(c)    Whether Defendants' conduct caused damages to Plaintiffs and the members of the Class for which Defendants may be held liable under California law; and

(d)    Whether, as a result of Defendants' misconduct, Plaintiffs and the members of the Class are entitled to recover compensatory damages, restitution, injunctive, equitable and/or other types of relief, and the amount and nature of such relief.

64.    The likelihood that individual members of the Class will prosecute separate and individual actions is remote due to the relatively small – albeit substantial in the aggregate – actual and potential damages sustained by each Class member, when compared to the losses suffered by the Class as a whole compared to the burden and expense of

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 37

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

prosecuting litigation of this nature and magnitude.  Thus, a class action is superior to other

available methods for the fair and efficient adjudication of this controversy.

## VII.  DELAYED DISCOVERY AND/OR FRAUDULENT CONCEALMENT

65.    Plaintiffs' causes of action against Defendants, as alleged in Part VIII of this

Complaint *infra,* did not accrue until Plaintiffs discovered, or had reason to discover, each

such cause of action.  As set forth herein, until at least August 2012, when the USADA

imposed a lifetime ban on Defendant Armstrong and stripped him of all his Tour de France

medals, and/or October 2012, when the USADA Report was published, and/or January 2013,

when Armstrong made his televised disclosures to Winfrey, Plaintiffs did not have

knowledge of the causes of action against Armstrong and the other Defendants.  Until those

public disclosures made during 2012-2013, Plaintiffs lacked means of obtaining such

knowledge; that is, in the exercise of reasonable diligence, Plaintiffs could not have

uncovered the truth about Armstrong's wrongdoing at an earlier date.  As alleged in this

Complaint, until at least August 2012, Plaintiffs were unable to discover the fraudulent

scheme carried out by Armstrong and the other Defendants.

66.    As alleged in this Complaint, from at least May 2000 to January 2013,

Armstrong fraudulently concealed the truth from the American public, including Plaintiffs

and the members of the Class.  As alleged in this Complaint, Plaintiffs did not discover the

truth about Armstrong's fraudulent scheme until July 2012, at the earliest or January 2013, at

the latest.  Plaintiffs gradually discovered the truth when, in August 2012, the USADA

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 38

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

imposed a lifetime ban on Defendant Armstrong and stripped him of all his Tour de France medals, and/or in October 2012, when the USADA Report was published, and/or January 2013, when Armstrong made his televised disclosures to Winfrey.  Prior to this series of public disclosures, Plaintiffs had no actual or presumptive knowledge of facts sufficient to put them on inquiry.

## VIII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violations of the Consumers Legal Remedies Act – Injunctive Relief Only As To Defendants Armstrong, Penguin Group (USA), Putnam And Berkley)

67.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth and further alleges as follows.  This cause of action, which alleges violations of the CLRA, is brought against Defendants Armstrong, Penguin Group (USA), Putnam and Berkley.

68.     The CLRA, CAL. CIV. CODE § 1750 *et seq.*, provides California consumers with a comprehensive procedure for redressing Defendants' violations of various statutory rights.

69.     Defendants' misrepresentations of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, which is a "good" under Section 1761(a), as a true and honest work of non-fiction has violated, and continues to violate, the CLRA in at least the following respects:

(a)     In violation of Section 1770(a)(2) of the CLRA, Defendants have misrepresented the sponsorship, approval, or certification of the goods in question;

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 39

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

(b)     In violation of Section 1770(a)(5) of the CLRA, Defendants' acts and practices constitute representations that the goods in question have approval, characteristics, uses, or benefits which they do not have or that a person has sponsorship, approval, status, affiliation, or connection which he or she does not have;

(c)     In violation of Section 1770(a)(7) of the CLRA, Defendants' acts and practices constitute representations that the goods in question are of a particular standard, quality or grade, when they are not;

(d)     In violation of Section 1770(a)(9) of the CLRA, Defendants' acts and practices constitute the advertisement of goods in questions without the intent to sell them as advertised;

(e)     In violation of Section 1770(a)(16) of the CLRA, Defendants' acts and practices constitute representations that the subject of the transaction has been supplied in accordance with previous representations when it has not.

70.     By reason of the foregoing, Plaintiffs and Class members have been irreparably harmed, entitling them to both injunctive relief and restitution.

71.     Pursuant to Section 1782 of the CLRA, Plaintiffs have notified Defendants in writing of the particular violations of Section 1770 of the CLRA.  Plaintiffs demanded that Defendants rectify the actions described above by providing complete monetary relief, agreeing to be bound by their legal obligations and give notice to all affected customers of

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 40

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

their intent to do so.  Plaintiffs sent this notice by certified mail, return receipt requested, to

Defendants' residence and/or principal places of business.

72.     If Defendants fail to respond to Plaintiffs' demand within 30 days of the letter

pursuant to Section 1782 of the CLRA, Plaintiffs will amend this Complaint to add claims

for actual, punitive and statutory damages.  Plaintiffs are already entitled to the relief set

forth above, along with costs, attorneys' fees and any other relief which the Court deems

proper.

## SECOND CAUSE OF ACTION

### (Violations of the Consumers Legal Remedies Act – Injunctive Relief Only As To Defendants Armstrong, Random House, Broadway And Crown)

73.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as

if fully set forth and further alleges as follows.  This cause of action, which alleges violations

of the CLRA, is brought against Defendants Armstrong, Random House, Broadway and

Crown.

74.     The CLRA, CAL. CIV. CODE § 1750 *et seq.*, provides California consumers

with a comprehensive procedure for redressing Defendants' violations of various statutory

rights.

75.     Defendants' misrepresentations of EVERY SECOND COUNTS, which is a "good"

under Section 1761(a), as a true and honest work of non-fiction has violated, and continues

to violate, the CLRA in at least the following respects:

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 41

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

(a)     In violation of Section 1770(a)(2) of the CLRA, Defendants have misrepresented the sponsorship, approval, or certification of the goods in question;

(b)     In violation of Section 1770(a)(5) of the CLRA, Defendants' acts and practices constitute representations that the goods in question have approval, characteristics, uses, or benefits which they do not have or that a person has sponsorship, approval, status, affiliation, or connection which he or she does not have;

(c)     In violation of Section 1770(a)(7) of the CLRA, Defendants' acts and practices constitute representations that the goods in question are of a particular standard, quality or grade, when they are not;

(d)     In violation of Section 1770(a)(9) of the CLRA, Defendants' acts and practices constitute the advertisement of goods in questions without the intent to sell them as advertised;

(e)     In violation of Section 1770(a)(16) of the CLRA, Defendants' acts and practices constitute representations that the subject of the transaction has been supplied in accordance with previous representations when it has not.

76.     By reason of the foregoing, Plaintiffs and Class members have been irreparably harmed, entitling them to both injunctive relief and restitution.

77.     Pursuant to Section 1782 of the CLRA, Plaintiffs have notified Defendants in writing of the particular violations of Section 1770 of the CLRA.  Plaintiffs demanded that Defendants rectify the actions described above by providing complete monetary relief,

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 42

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

agreeing to be bound by their legal obligations and give notice to all affected customers of their intent to do so.  Plaintiffs sent this notice by certified mail, return receipt requested, to Defendants' residence and/or principal places of business.

78.     If Defendants fail to respond to Plaintiffs' demand within 30 days of the letter pursuant to Section 1782 of the CLRA, Plaintiffs will amend this Complaint to add claims for actual, punitive and statutory damages.  Plaintiffs are already entitled to the relief set forth above, along with costs, attorneys' fees and any other relief which the Court deems proper.

### THIRD CAUSE OF ACTION

**(Violations of the Unfair Competition Law -
Defendants Armstrong, Penguin Group (USA), Putnam And Berkley)**

79.     Plaintiffs' incorporate by reference all previous paragraphs of this Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts violations of the UCL, is brought against Defendants Armstrong, Penguin Group (USA), Putnam and Berkley.

80.     Plaintiffs assert this claim against Defendants for unlawful practices pursuant to the UCL, BUS. & PROF. CODE § 17200 *et seq.,* which prohibits all unlawful or unfair business practices and/or acts.

81.     Plaintiffs assert their claim as a member of an aggrieved Class of persons who have expended funds that Defendants should be required to reimburse under the restitutionary remedy specified in Section 17203 of the UCL.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 43

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

82.     Defendants represented IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, to be a true and honest work of non-fiction, which it is not, rendering Defendants' representations unfair, untrue, misleading and/or likely to deceive Plaintiffs and the members of the Class.

83.     Defendants' practices deceived consumers who trusted Defendants' representations that IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, is a true and honest work of non-fiction, which it is not.  As such, Defendants' representations are unlawful and constitute an "unfair business practice."

84.     By acting as alleged herein, Defendant employed unconscionable commercial practices, deception, false advertising, false promises and misrepresentations to lure consumers to purchase IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.

85.     The practices of the Defendants have injured Plaintiffs and the members of the Class by causing them to spend money on a book they otherwise would not have purchased and/or, in the alternative, by decreasing the value and enjoyment of the purchased book.

86.     The unlawful acts and practices of Defendant as alleged above constitute unlawful business practices within the meaning of Section 17200.

### FOURTH CAUSE OF ACTION

**(Violations of the Unfair Competition Law -
Defendants Armstrong, Random House, Broadway And Crown)**

87.     Plaintiffs' incorporate by reference all previous paragraphs of this Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 44

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

violations of the UCL, is brought against Defendants Armstrong, Random House, Broadway and Crown.

88.     Plaintiffs assert this claim against Defendants for unlawful practices pursuant to the UCL, BUS. & PROF. CODE § 17200 *et seq.,* which prohibits all unlawful or unfair business practices and/or acts.

89.     Plaintiffs assert their claim as a member of an aggrieved Class of persons who have expended funds that Defendants should be required to reimburse under the restitutionary remedy specified in Section 17203 of the UCL.

90.     Defendants represented EVERY SECOND COUNTS to be a true and honest work of non-fiction, which it is not, rendering Defendants' representations unfair, untrue, misleading and/or likely to deceive Plaintiffs and the members of the Class.

91.     Defendants' practices deceived consumers who trusted Defendants' representations that EVERY SECOND COUNTS is a true a honest work of non-fiction, which it is not.  As such, Defendants' representations are unlawful and constitute an "unfair business practice."

92.     By acting as alleged herein, Defendant employed unconscionable commercial practices, deception, false advertising, false promises and misrepresentations to lure consumers to purchase EVERY SECOND COUNTS.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 45

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

93.     The practices of the Defendants have injured Plaintiffs and members of the Class by causing them to spend money on a book they otherwise would not have purchased and/or, in the alternative, by decreasing the value and enjoyment of the purchased book.

94.     The unlawful acts and practices of Defendant as alleged above constitute unlawful business practices within the meaning of Section 17200.

## FIFTH CAUSE OF ACTION

### (Violations of the False Advertising Law - Defendants Armstrong, Penguin Group (USA), Putnam And Berkley)

95.     Plaintiffs incorporate by reference all previous paragraphs of the Complaint as if fully set forth, and further alleges as follows.  This cause of action, which alleges violations of the FAL, is brought against Defendants Armstrong, Penguin Group (USA) and Berkley.

96.     During the Class Period, Defendants have committed acts of untrue and misleading advertising, as defined in the FAL, CAL. BUS. & PROF. CODE § 17500, by engaging in acts and practices with intent to induce consumers to purchase IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.  The following acts and practices, among others, created a likelihood of confusion and misunderstanding in connection with the sale of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE:

(a)     Defendant Armstrong fraudulently represented his book IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE to be a true and honest work of non-fiction at personal appearances, in print and on television; and

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 46

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

(b)     Defendants Penguin Group (USA), Putnam and Berkley  represented and promoted the book IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE to be to be a true and honest work of non-fiction on the book's covers and flyleafs, through press kits, promotions, press releases and various other media channels.  These Defendants have continued to advertise, market and sell the subject book as a work of nonfiction even after they knew or should have known that Armstrong's book contained false and misleading statements.

97.     Plaintiffs and other members of the Class relied on and were deceived by Defendants' false and deceptive advertisements and practices as set forth above, and as a direct and proximate result of the afore-mentioned acts, Defendants received and continue to hold ill-gotten gains belonging to Plaintiffs and members of the Class.

98.     In addition to the relief requested in the Prayer for Relief, Plaintiffs seek the imposition of a constructive trust over, and restitution and disgorgement of, the monies collected and profits realized by Defendants, and each of them, as well as injunctive relief, including an order requiring them to cease from false and misleading advertising of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.

## SIXTH CAUSE OF ACTION

### (Violations of the False Advertising Law - Defendants Armstrong, Random House, Broadway And Crown)

99.     Plaintiffs incorporate by reference all previous paragraphs of the Complaint as if fully set forth, and further alleges as follows.  This cause of action, which alleges

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 47

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

violations of the FAL, is brought against Defendants Armstrong, Random House, Broadway and Crown.

100.   During the Class Period, Defendants have committed acts of untrue and misleading advertising, as defined in the FAL, CAL. BUS. & PROF. CODE § 17500, by engaging in acts and practices with intent to induce consumers to purchase EVERY SECOND COUNTS.  The following acts and practices, among others, created a likelihood of confusion and misunderstanding in connection with the sale of EVERY SECOND COUNTS.

(a)   Defendant Armstrong fraudulently represented his book EVERY SECOND COUNTS to be a true and honest work of non-fiction at personal appearances, in print and on television; and

(b)   Defendants Random House, Broadway and Crown represented and promoted the book EVERY SECOND COUNTS to be to be a true and honest work of non-fiction on the book's covers and flyleafs, through press kits, promotions, press releases and various other media channels.  These Defendants have continued to advertise, market and sell the subject book as a work of nonfiction even after they knew or should have known that Armstrong's book contained false and misleading statements.

101.   Plaintiffs and other members of the Class relied on and were deceived by Defendants' false and deceptive advertisements and practices as set forth above, and as a direct and proximate result of the aforementioned acts, Defendants received and continue to hold ill-gotten gains belonging to Plaintiffs and members of the Class.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 48

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

102.   In addition to the relief requested in the Prayer for Relief, Plaintiffs seek the imposition of a constructive trust over, and restitution and disgorgement of, the monies collected and profits realized by Defendants, and each of them, as well as injunctive relief, including an order requiring them to cease from false and misleading advertising of EVERY SECOND COUNTS.

## SEVENTH CAUSE OF ACTION

### (Negligent Misrepresentation - Defendants Armstrong, Penguin Group (USA), Putnam And Berkley)

103.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts a claim for negligent misrepresentation, is brought against Defendants Armstrong, Penguin Group (USA), Putnam and Berkley.

104.   Defendants recklessly or negligently misrepresented or concealed facts relating to the fictional nature of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and represented it as a true and honest work of nonfiction.

105.   The facts misrepresented or omitted by Defendants were and are material.

106.   Plaintiffs and the members of the Class, believing Defendants' representations that IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE was a true and honest work of nonfiction, and without means to know otherwise, reasonably relied upon Defendants' misrepresentations, omissions and other practices, directly or indirectly, and purchased said book.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 49

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

107.   Plaintiffs and the members of the Class have thereby been damaged, the exact amount of which is presently unknown, but is capable of being ascertained.

108.   As a result of Defendants' practices as set forth herein, Defendants are liable to Plaintiffs and the members of the Class for compensatory damages, interest and costs.

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation - Defendants Armstrong, Random House, Broadway And Crown)

109.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts a claim for negligent misrepresentation, is brought against Defendants Armstrong, Random House, Broadway and Crown.

110.   Defendants recklessly or negligently misrepresented or concealed facts relating to the fictional nature of EVERY SECOND COUNTS and represented it as a true and honest work of nonfiction.

111.   The facts misrepresented or omitted by Defendants were and are material.

112.   Plaintiffs and the members of the Class, believing Defendants' representations that EVERY SECOND COUNTS was a true and honest work of nonfiction, and without means to know otherwise, reasonably relied upon Defendants' misrepresentations, omissions and other practices, directly or indirectly, and purchased said book.

113.   Plaintiffs and the members of the Class have thereby been damaged, the exact amount of which is presently unknown, but is capable of being ascertained.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 50

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

114.   As a result of Defendants' practices as set forth herein, Defendants are liable to Plaintiffs and the members of the Class for compensatory damages, interest and costs.

## NINTH CAUSE OF ACTION

### (Fraud and Deceit - Defendants Armstrong, Penguin Group (USA), Putnam And Berkley)

115.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts a claim for fraud and deceit, is brought against Defendants Armstrong, Penguin Group (USA), Putnam and Berkley.  As set forth herein, this cause of action for fraud and deceit seeks to recover compensatory damages and punitive damages against Defendant Armstrong only; as to Defendants Penguin Group (USA), Putnam and Berkley, which Plaintiffs allege to have aided and abetted Armstrong's fraud and deceit, Plaintiffs seek to recover compensatory damages only.

116.   Defendant Armstrong carried out a fraudulent scheme in which he made representations that IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE was a true and honest work of nonfiction including, but not limited to, through the media.

117.   When Armstrong made such representations he knew them to be false and misleading.

118.   When Armstrong made these false representations he made them with the intention to induce consumers, including Plaintiffs and the members of the Class, to act in reliance on the representations made, or with the expectation that they would so act.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 51

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

119.   Plaintiffs and the members of the Class purchased IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE based upon Defendant Armstrong's representations it was a true and honest work of nonfiction.  As such, Armstrong's representations were material.

120.   Defendant Armstrong had exclusive knowledge of material facts not known to the Plaintiffs or the members of the Class.

121.   Plaintiffs and the members of the Class were ignorant of the falsity of Defendant Armstrong's representations and believed them to be true.  In reliance of these representations, Plaintiffs and Class members were induced to and did purchase IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.  Had Plaintiffs and the members of the Class known the actual facts, they would not have purchased the book.  Plaintiffs' and Class members' reliance on Armstrong's representations was justified because Armstrong, aided and abetted by Defendants Penguin Group (USA), Putnam and Berkley, continued his fraudulent scheme of misrepresenting the true nature of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE throughout the Class Period.  As early as January 2011 and certainly not later than June 2012, Defendants Penguin Group (USA), Putnam and Berkley knew that Defendant Armstrong was engaged in fraudulent activities and violations of California law, yet continued to give him substantial assistance or encouragement by continuing to publish, market, promote and/or sell IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 52

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

122.   As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and the members of the Class have suffered damages and economic loss in an amount to be proven at trial.

123.   In perpetrating the fraud alleged herein, Defendant Armstrong acted in a willful, wanton and malicious manner, in callous, conscious and intentional disregard for the rights of Plaintiffs and members of the Class, and with knowledge that his actions and conduct were substantially likely to vex, annoy and injure Plaintiffs and the members of the Class.   As a result thereof, Plaintiffs and members of the Class are entitled to an award of punitive and exemplary damages against Defendant Armstrong, pursuant to CAL. CIV. CODE § 3294, in an amount according to proof at trial.

## TENTH CAUSE OF ACTION

### (Fraud and Deceit - Defendants Armstrong,  Random House, Broadway And Crown)

124.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts a claim for fraud and deceit, is brought against Defendants Armstrong, Random House, Broadway and Crown.  As set forth herein, this cause of action for fraud and deceit seeks to recover compensatory damages and punitive damages against Defendant Armstrong only; as to Defendants Random House, Broadway and Crown, which Plaintiffs allege to have aided and abetted Defendant Armstrong's fraud and deceit, Plaintiffs seek to recover compensatory damages only.

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

125.    Defendant Armstrong carried out a fraudulent scheme in which he made representations that EVERY SECOND COUNTS WAS a true and honest work of nonfiction including, but not limited to, through the media.

126.    When Armstrong made such representations he knew them to be false and misleading.

127.    When Armstrong made these false representations he made them with the intention to induce consumers, including Plaintiffs and the members of the Class, to act in reliance on the representations made, or with the expectation that they would so act.

128.    Plaintiffs and the members of the Class purchased EVERY SECOND COUNTS based upon Defendant Armstrong's representations it was a true and honest work of nonfiction.  As such, Armstrong's representations were material.

129.    Defendant Armstrong had exclusive knowledge of material facts not known to the Plaintiffs or the members of the Class.

130.    Plaintiffs and the members of the Class were ignorant of the falsity of Defendant Armstrong's representations and believed them to be true.  In reliance of these representations, Plaintiffs and Class members were induced to and did purchase EVERY SECOND COUNTS.  Had Plaintiffs and the members of the Class known the actual facts, they would not have purchased the book.  Plaintiffs' and Class members' reliance on Defendant Armstrong's representations was justified because Armstrong, aided and abetted by Defendants Random House, Broadway and Crown, continued his fraudulent scheme of

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 54

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

misrepresenting the true nature of EVERY SECOND COUNTS throughout the Class Period.  As early as January 2011 and certainly not later than June 2012, Defendants Random House, Broadway and Crown knew that Defendant Armstrong was engaged in fraudulent activities and violations of California law, yet continued to give him substantial assistance or encouragement by continuing to publish, market, promote and/or sell EVERY SECOND COUNTS.

131.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and the members of the Class have suffered damages and economic loss in an amount to be proven at trial.

132.    In perpetrating the fraud alleged herein, Defendant Armstrong acted in a willful, wanton and malicious manner, in callous, conscious and intentional disregard for the rights of Plaintiffs and members of the Class, and with knowledge that his actions and conduct were substantially likely to vex, annoy and injure Plaintiffs and members of the Class.   As a result thereof, Plaintiffs and members of the Class are entitled to an award of punitive and exemplary damages against Defendant Armstrong, pursuant to CAL. CIV. CODE § 3294, in an amount according to proof at trial.

## IX.    PRAYER FOR RELIEF

149.    WHEREFORE, on behalf of themselves and the members of the Class, Plaintiffs demand judgment against Defendants, and each of them as follows:

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 55

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

A.      Ordering that this action be maintained as a class action, certifying the Class, and appointing Plaintiffs and their undersigned counsel of record and any additional Class representatives necessary to adequately represent the Class;

B.      Restoring and awarding Plaintiffs and Class members all ascertainable amounts, losses, refunds, including the purchase price paid for IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and EVERY SECOND COUNTS, any statutorily permissible damages, attorneys' fees, expenses and costs;

C.      Mandating Defendants to disgorge and then restore and/or make restitution of any money to Plaintiffs and to the members of the Class which may have been acquired by Defendants by means of its unlawful conduct alleged in this Complaint;

D.      Enjoining Defendants from engaging in similar unlawful acts or practices in the future.

E.      Awarding Plaintiffs and the members of the Class damages in an amount necessary to compensate them fully for their losses, together with interest;

F.      For an award of attorneys' fees and costs of suit; and

G.      For such other and further relief which the Court deems necessary, just and proper.

## X.      DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 56

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

DATED:  January 22, 2013

WILENTZ, GOLDMAN & SPITZER, P.A.


By____ */s/ Kevin P. Roddy*_____
            KEVIN P. RODDY (SBN 128283)

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
E-mail:  kroddy@wilentz.com

TRACEY BUCK-WALSH (SBN 131254)
LAW OFFICE OF TRACEY BUCK-WALSH
6 Reyes Court
Sacramento, CA  95831
Telephone:  (916) 392-8990
Facsimile:  (916) 393-1757
E-mail:  tracey@tbwlaw.com

**Attorneys for Plaintiffs**

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 57

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6716116.1(144084.002)

## AFFIDAVIT OF ROB STUTZMAN

I, Rob Stutzman, hereby declare as follows based upon personal knowledge. If called as a witness, I could and would testify as follows:

1.     I am a Plaintiff in this class action.

2.     In accordance with Section 1780(d) of the California Consumers Legal Remedies Act, I commenced this action in the U.S. District Court for the Eastern District of California, located in the County of Sacramento, because the Defendants against whom I bring this action do business in the County of Sacramento, or the transaction(s) at issue or a substantial portion of the transaction(s) at issue took place in the County of Sacramento, or at least some members of the Class reside in the County of Sacramento.

Executed this the 2,ᴇᴛ day of January, 2013.


_____          _____
                                                         Rob Stutzman

## AFFIDAVIT OF JONATHAN WHEELER

I, Jonathan Wheeler, hereby declare as follows based upon personal knowledge.  If called as a witness, I could and would testify as follows:

1.      I am a Plaintiff in this class action.

2.      In accordance with Section 1780(d) of the California Consumers Legal Remedies Act, I commenced this action in the U.S. District Court for the Eastern District of California, located in the County of Sacramento, because the Defendants against whom I bring this action do business in the County of Sacramento, or the transaction(s) at issue or a substantial portion of the transaction(s) at issue took place in the County of Sacramento, or at least some members of the Class reside in the County of Sacramento.

Executed this the 21st day of January, 2013.

_____   _____
Jonathan Wheeler

#6716116v1
Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 1

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095