1  KEVIN P. RODDY (SBN 128283)
2  WILENTZ, GOLDMAN & SPITZER, P.A.
   90 Woodbridge Center Drive, Suite 900
3  Woodbridge, NJ 07095
   Telephone: (732) 636-8000
4  E-mail: kroddy@wilentz.com

5
6  TRACEY BUCK-WALSH (SBN 131254)
   LAW OFFICE OF TRACEY BUCK-WALSH
7  6 Reyes Court
   Sacramento, CA 95831
8  Telephone: (916) 392-8990
   E-mail: tracey@tbwlaw.com

9
10 **Attorneys for Plaintiffs**
   **[Additional Counsel Listed on Signature Page]**

11
12          **UNITED STATES DISTRICT COURT**

13          **EASTERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| ROB STUTZMAN, JONATHAN WHEELER, GLORIA LAURIA, DAVID REIMERS and SCOTT ARMSTRONG, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs<br><br>vs.<br><br>LANCE ARMSTRONG; PENGUIN GROUP (USA), INC.; G.P. PUTNAM'S SONS; THE BERKLEY PUBLISHING GROUP; RANDOM HOUSE, INC.; BROADWAY BOOKS; CROWN PUBLISHING GROUP; THOMAS W. WEISEL; WILLIAM J. STAPLETON; and DOES 1-50, inclusive,<br><br>          Defendants | Case No. 2:13-CV-00116-MCE-KJN<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE, EQUITABLE AND DECLARATORY RELIEF BASED ON VIOLATIONS OF:**<br><br>1. CAL. CIV. CODE § 1750 *et seq.*;<br>2. CAL. BUS. & PROF. CODE § 17200 *et seq.*;<br>3. CAL. BUS. & PROF. CODE § 17500 *et seq.*;<br>4. Negligent Misrepresentation; and<br>5. Fraud & Deceit<br><br>**JURY TRIAL DEMANDED** |

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 1

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

Plaintiffs, Rob Stutzman, Jonathan Wheeler, Gloria Lauria, David Reimers and Scott Armstrong, by their undersigned counsel and for their First Amended Class Action Complaint (hereinafter the "Amended Complaint") against Defendants, Lance Armstrong, Penguin Group (USA), Inc., G.P. Putnam's Sons, The Berkley Publishing Group, Random House, Inc., Broadway Books, Crown Publishing Group, Thomas W. Weisel, William J. Stapleton and Does 1-50, inclusive, hereby allege and say as follows.  The allegations made in this Amended Complaint are based upon information and belief, except those allegations pertaining to Plaintiffs, which are based upon personal knowledge, and facts pertaining to this Court's subject matter jurisdiction.  Plaintiffs' information and belief are based upon, *inter alia,* Plaintiffs' own investigation as well as Plaintiffs' counsel's review of public documents (including court filings), reliable media sources and their investigation of the facts and circumstances alleged herein.

## I.    THE NATURE OF THIS CONSUMER PROTECTION CLASS ACTION

1.    Alleging claims under the California consumer protection statutes and common law, this class action seeks damages, injunctive, equitable and declaratory relief against Defendants on behalf of Plaintiffs and the statewide Class of California consumers they seek to represent.  Plaintiffs sue on behalf of themselves and other residents of the State of California who have been exposed to and victimized by Defendants' unlawful, fraudulent and/or wrongful business practices in violation of (a) the Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750 *et seq.*; (b) the Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200 *et seq.*; (c) the False Advertising Law ("FAL"), CAL. BUS. & PROF. CODE § 17500 *et seq.*; (d) negligent misrepresentation; and (e) fraud and deceit.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 2

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

2.     This consumer protection class action arises from misrepresentations contained in and disseminated about Lance Armstrong's books, (a) IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, published beginning in May 2000 and sold throughout the State of California since that date; (b) EVERY SECOND COUNTS, published beginning in January 2003 and sold throughout the State of California since that date; (c) THE LANCE ARMSTRONG PERFORMANCE PROGRAM: 7 WEEKS TO THE PERFECT RIDE, published beginning in September 2000 and sold throughout the State of California since that date; (d) LANCE ARMSTRONG: IMAGES OF A CHAMPION, published beginning in June 2004 and sold throughout the State of California since that date; and (e) COMEBACK 2.0: UP CLOSE AND PERSONAL, published beginning in December 2009 and sold throughout the State of California since that date.  (At certain points in this Amended Complaint, these five (5) books are collectively referred to as "the Armstrong Books.")  During the Class Period, as defined in Paragraph ("¶") 98, the Armstrong Books were sold to consumers in hardback editions, paperback editions, electronic book editions and audio books.  Throughout the Class Period, Defendants' advertising, marketing and publicity and other promotional efforts for the Armstrong Books (including the front and back cover and flyleafs of these books), represented, labeled and sold them as truthful and honest works of nonfiction biography (or autobiography) when, in fact, Defendants knew or should have known that these books were works of *fiction*.  As alleged in this Amended Complaint, Plaintiffs and the members of the Class were misled by Defendants' statements and purchased the Armstrong Books based upon the false belief that they were truthful and honest works of nonfiction biography. Plaintiffs and Class members would not have purchased the Armstrong Books and/or they

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 3

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

would not have paid as much money for the Armstrong Books had they known the true facts concerning Armstrong's years of lies and misconduct and his admitted involvement in a sports doping scandal that has led to his recent and ignominious public exposure and fall from glory.

3.     Prior to and during the Class Period, Defendants engaged in a scheme to defraud consumers, including Plaintiffs and the members of the Class, by creating and perpetuating the Lance Armstrong "brand" so that Defendants, whether they are primary violators, co-conspirators and/or aiders and abettors, could reap millions of dollars in unlawful profits.  Beginning in 1998, if not earlier, the Lance Armstrong "brand" was created by Defendant Armstrong, his financier and cycling team owner, Thomas W. Weisel, and his agent-manager, William J. ("Bill") Stapleton, both of whom are named as Defendants in this Amended Complaint.  To help build and sustain the Lance Armstrong "brand," an integral part of a multi-faceted scheme to defraud Plaintiffs, Class members and other consumers and cheat them out of their money, was the publication, advertising, marketing and sale of the Armstrong Books throughout the State of California (and, indeed, throughout the United States and overseas) while labeling them as truthful works of nonfiction biography rather than fiction.  On the Armstrong Books' covers and flyleafs and in advertisements, marketing and promotional materials, Defendants portrayed and publicized Armstrong as a "regular, hardworking, motivated, complicated, occasionally pissed-off, T-shirt [wearing] guy," and as a devoted advocate for cancer sufferers.  During the period from 1999 through 2012, Defendants knew that if unanswered questions were raised in the public's mind about Armstrong's integrity and his self-proclaimed status as a "clean" professional cyclist who did

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 4

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

not use performance enhancing drugs, they would be unable to sell the Armstrong Books and that they would certainly not be best-sellers.  Thus, another integral part of the scheme to defraud and the growth and maintenance of the multi-million dollar Lance Armstrong "brand" was that whenever it was charged or alleged that Armstrong was engaging or had engaged in "doping" or the use of performance enhancing drugs in order to win a cycling race, Armstrong and/or Stapleton would make vociferous and public denials of such charges. As detailed in this Amended Complaint, Armstrong (and, whenever necessary, Stapleton) made such vociferous and public denials of doping charges on a consistent basis from at least July 1999 through August 2012.  As detailed in ¶ 45, such false and misleading denials were made during interviews broadcast on local, regional, national and even worldwide television, in print media and in sworn testimony in a legal proceeding conducted during 2005-2006. As set forth herein, another part of the scheme was to suppress, quash, or cover up any drug tests of Armstrong that resulted in positive results, so that Armstrong could publicly proclaim that he had never tested "positive" for performance enhancing drugs.

4.     Another part of the scheme was the agreement, tacit or otherwise, on the part of the book publishers who are identified as the Publisher Defendants in ¶¶ 18-20 of this Amended Complaint, to ignore the truth and/or avoid conducting a careful investigation into the merits of the doping charges that were repeatedly leveled against Armstrong during 1999-2012 so that they could continue advertising, marketing and selling IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and EVERY SECOND COUNTS in every available format and thereby continue earning lucrative profits from the scheme.  In fact, even after this class action was filed on January 22, 2013, the Publisher Defendants continued to sell

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 5

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and EVERY SECOND COUNTS using the same advertising and promotional materials, including book covers and flyleafs, and Internet website postings that they had used for years. As alleged herein, Defendants' scheme to defraud worked: Armstrong's first book, IT'S NOT ABOUT THE BIKE, which was a #1 best-seller on *The New York Times* best-seller list, became a worldwide best-seller, spent a total of 24 weeks on the hardcover book best-seller lists and 22 weeks on the trade paperback best-seller lists. Armstrong's second book, EVERY SECOND COUNTS, had a first printing of 386,000 copies and was also a best-seller. As alleged herein, the success of these books permitted Armstrong to publish and sell at least three other profitable books (as identified and described in ¶ 2), which furthered Defendants' scheme and their illicit remuneration.

## II.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because the proposed statewide Class consists of more than 100 members, the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, and this is a class action in which Plaintiffs and the members of the Class are citizens and residents of a State different from any of the Defendants.

6.    Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted by Plaintiffs on behalf of themselves and the members of the Class, namely, Defendants' sales, marketing, advertising and promotional efforts and consumers' purchases of the Armstrong Books, occurred in this District and throughout the State of California. In addition, Plaintiffs

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 6

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

Stutzman and Wheeler satisfied the venue requirements of Section 1780(d) of the CLRA by attaching their affidavits to the original Class Action Complaint that was filed in this Court on January 22, 2013.

7.     This Court may properly exercise personal jurisdiction over the Defendants because each of them does and conducts, and has done and conducted, substantial business in the State of California. Each of the Defendants has sufficient minimum contacts with the State of California and otherwise intentionally avails himself and/or itself of the laws and markets of the State of California, through the promotion, sale, marketing and distribution of products and services in the State of California, including, but not limited to, the Armstrong Books that are the subject of this class action, so as to render the exercise of personal jurisdiction by this Court permissible, under traditional notions of fair play and substantial justice. During the Class Period, Armstrong made personal appearances in the State of California that were intended, at least in part, to promote the sales of the Armstrong Books.

### III.     THE PARTIES

**A.     Plaintiffs**

8.     Plaintiff, Rob Stutzman ("Stutzman"), is a resident of the State of California and the County of Sacramento who works as a public affairs consultant. Sometime between 2001 and 2003, Stutzman learned about the book, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, Armstrong's supposedly truthful and compelling story of overcoming a life-threatening cancer and staging an inspiring comeback to "win" the Tour de France bicycle race and become one of the best-known athletes in the world. Stutzman bought the book in California and read it cover to cover. Stutzman found Armstrong's book incredibly

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 7

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

compelling and recommended the book to several friends.  In 2005, while working as Deputy

Chief of Staff for Communications for Governor Arnold Schwarzenegger, Stutzman had the

opportunity to privately meet with Armstrong.  At that time, Stutzman thanked Defendant

Armstrong for writing his book and told him it was very inspiring and that he had

recommended it to friends who were fighting cancer.  In response, Armstrong thanked

Stutzman.

9.      Plaintiff, Jonathan Wheeler ("Wheeler"), is a resident of the State of California

and the County of Sacramento.  Wheeler is a professional chef who, after a 20-year career

catering to Indy Car and LeMans auto racing teams and major movie studios, currently

teaches culinary arts as a high school instructor through the County of Sacramento Office of

Education.  Wheeler is a life-long, avid cycling enthusiast and bike racer.  He began riding

bikes in his hometown of Cupertino, California, while in kindergarten and got his first ten-

speed bike, a Peuguot, in the sixth grade, whereupon he immediately began riding long

distances with his best friend.  Soon he and his friend would ride over the mountains to Santa

Cruz and back.  Wheeler began hanging out at the renowned Cupertino Bike Shop where he

became friendly with its owner, the legendary Spence Wolfe.  Wheeler has competed in

century and double century rides.  Wheeler followed Defendant Armstrong's early cycling

career and his cancer diagnosis and treatment and, shortly after it was published, Wheeler

purchased a copy of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE after learning

through the media about Armstrong's supposedly truthful and inspiring account of his

triumphant return to dominate the world of cycling after his devastating bout with testicular

cancer.  Wheeler was so impressed with IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 8

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

LIFE that he bought Armstrong's follow-up book, EVERY SECOND COUNTS, first published in January 2003, which chronicles Armstrong's life after his first Tour de France "victory."

10.   Plaintiff, Gloria Lauria ("Lauria"), is a resident of the State of California and Alameda County.  She is currently living with breast cancer, having survived a bilateral mastectomy and she is active in the fight against breast cancer.  She was inspired by advertising featuring reports of Armstrong's successful battle against cancer which moved to her purchase Armstrong's books, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and EVERY SECOND COUNTS.  Lauria has recently learned that Armstrong knowingly took banned substances in order to win his cycling races and it has left her bitterly angry.  Lauria would not have purchased either book had she known Armstrong doped his way to his "victories."

11.     Plaintiff, David Reimers ("Reimers"), is a resident of the State of California and El Dorado County, and is an avid sports enthusiast.  Reimers saw advertisements regarding Armstrong's remarkable comeback to "win" the Tour de France cycling race after conquering testicular cancer and subsequently purchased his own copy of Armstrong's first book, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.  Had Reimers known that Armstrong cheated by using banned substances to "win" his cycling races, he would not have purchased Armstrong's book.

12.     Plaintiff, Scott Armstrong ("S. Armstrong"), is a resident of the State of California and the County of San Francisco.  Beginning in the 1990's, S. Armstrong became actively involved in cycling.  He has regularly ridden long training distances and participated in amateur cycling events, including riding century rides.  He has followed professional

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 9

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

cycling as part of his general interest in cycling and followed in particular the career of Defendant Armstrong, including traveling distances to watch races in which Armstrong rode. S. Armstrong was inspired by Defendant Armstrong's career, believing his claims that he raced drug free. Relying on Defendant Armstrong's representations as to his drug-free life and cycling career, S. Armstrong purchased and read IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE. Believing that Defendant Armstrong had told the truth in his book, S. Armstrong recommended the book to friends and fellow cyclists. S. Armstrong also read EVERY SECOND COUNTS due to his belief in Armstrong's false and misleading representations as to his drug-free life and cycling career. S. Armstrong would not have purchased or read either book or traveled to watch Defendant Armstrong ride had he known that Armstrong's representations as to his drug-free cycling career and life were false.

**B.      Defendants Armstrong, Weisel and Stapleton**

13.     Defendant, Lance Armstrong ("Armstrong"), is a resident of Travis County, Texas, whose address is 300 West 6th Street, Suite 2150, Austin, Texas. As set forth herein, Armstrong was the principal author of the Armstrong Books, as identified in ¶ 2.

14.     Defendant, Thomas W. Weisel ("Weisel"), is a resident of Marin County, California, whose home address is 7 Upper Road, Ross, California, and whose business address is One Montgomery Street, San Francisco, California. Prior to and during the Class Period, Weisel was Armstrong's investment manager and financier. In the recent words of *The New York Times*, Weisel "was Mr. Armstrong's biggest financial backer and the single individual most responsible for the money machine that propelled Mr. Armstrong's career." Andrew Ross Sorkin, "The Banker Who Put His Faith in Armstrong," *New York Times*, Jan.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 10

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

14, 2013.  Weisel was the founder, owner and chairman of the now-defunct Tailwind Sports (and its predecessors-in-interest, Montgomery-Bell, Montgomery Sports and Disson-Furst), the holding company for the U.S. Postal Service cycling team from 1996 until mid-2004. Tyler Hamilton, Armstrong's former U.S. Postal Service cycling teammate, wrote in his book, THE SECRET RACE, that Weisel was "a constant presence at the bigger races, almost another coach."  In 1996, Weisel was instrumental in shaking up the cycling team's management, replacing the team doctor, Dr. Prentice Steffen, an outspoken opponent of doping, with Spanish sports physician Dr. Pedro Celaya.  Upon his removal, Dr. Steffen sent written warnings via facsimile to Weisel asking, "What could a Spanish doctor, completely unknown to the organization, offer that I can't or won't.  Doping is the fairly obvious answer."  Matt Smith & Lance Williams, Center for Investigative Reporting, *Bloomberg Businessweek*, Jan. 15, 2013, and "Glare of Lance Armstrong probe falls on SF financier," *The Bay Citizen,* Jan. 15, 2013.  According to the sworn declarations of Armstrong's former teammates, George Hincapie, Jonathon Vaughters, David Zabriske, Michael Barry and Tyler Hamilton, collected by the U.S. Anti-Doping Agency ("USADA"), during his tenure as team doctor for the U.S. Postal Service cycling team, Dr. Celaya administered EPO, testosterone, human growth hormone (HGH) and blood extractions and transfusions to members of the team, including Armstrong.  In 1998, Weisel was instrumental in hiring Armstrong onto the U.S. Postal Service cycling team, and Weisel personally paid the "bonus" portion of Armstrong's salary, which ended up totaling more than $1 million.  In a recently unsealed amended complaint filed in a *qui tam* (whistleblower) lawsuit pending in the U.S. District Court for the District of Columbia, the relator (plaintiff), Floyd Landis ("Landis"), a former

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 11

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

member of the U.S. Postal Service cycling team, alleges that based on the degree of control

that Weisel exercised over that team and his close relationship with Armstrong, Weisel was

at all relevant times knowledgeable about, and approved of, the well-coordinated doping

program involving the U.S. Postal Service cycling team.  That whistleblower suit alleges that

Weisel, Armstrong and Stapleton, among others, violated the terms of a $30 million

sponsorship agreement with the U.S. Postal Service by using banned drugs and not reporting

drug cheats to anti-doping officials.  According to Landis, Weisel was the architect of

Armstrong's success, the man who supplied the vision and money – and the most

sophisticated doping scheme in sports history – to enable Armstrong to "win" a record seven

Tour de France cycling races.  As alleged herein, during 1997-1999 and working in

conjunction with Stapleton, Weisel helped devise or create the Lance Armstrong "brand."

15.     Defendant, William J. Stapleton ("Stapleton"), is a resident of Travis County,

Texas, whose address is 2406 Pemberton Place, Austin, Texas.  From 1995 to the present,

Stapleton has served as Armstrong's agent and manager.  During 1997-1999, Stapleton,

working together with Weisel and Armstrong, created the Lance Armstrong "brand" and, at

all times thereafter, Stapleton worked tirelessly and ruthlessly to maintain the fiction that

Armstrong was a "clean" professional cyclist.  According to the sworn declaration that

Landis provided to the USADA, in 2002 Stapleton told Landis that "the team could help"

with "further doping to help improve (Landis') performance further."  As alleged herein,

during an arbitration proceeding conducted in 2005-2006 and brought by SCA Promotions,

Inc. ("SCA"), a Texas-based insurance company that suggested that Armstrong may have

cheated in connection with the 2004 Tour de France cycling race, Stapleton knowingly gave

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 12

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

false testimony under oath that Armstrong had not cheated in that race or in any other cycling race.  Stapleton did so in order to carry out the scheme to defraud alleged herein and thereby continue to enrich himself and Armstrong.

16.     Beginning in at least 1997 and continuing to at least 2012, Defendants Armstrong, Weisel and Stapleton entered into a conspiracy to defraud various parties including, but not limited to (a) U.S. consumers, including Plaintiffs and the members of the Class; (b) the U.S. Postal Service; and (c) various corporate entitles that entered into sponsorship (or other commercial) agreements with Armstrong.  The purpose of this conspiracy was to enrich Armstrong, Weisel and Stapleton and/or various corporate or other entities that they own (or owned) by disseminating false and misleading statements concerning Armstrong and thereby reap enormous profits in the form of book advances, royalty payments and/or other remuneration from the Publisher Defendants (as identified in ¶¶ 18-20), as well as multi-million dollar payments received from corporate sponsors and the U.S. Postal Service.  As a result of wrongful acts committed by Armstrong, Weisel and/or Stapleton in furtherance of their conspiracy, Plaintiffs and the members of the Class have suffered damages, as set forth herein.

17.     Beginning in at least 1997 and continuing to at least 2012, Weisel and Stapleton aided and abetted Armstrong in the wrongdoing alleged herein.  Weisel and Stapleton knew that Armstrong was using performance enhancing drugs and knew that the Armstrong books contained false and misleading statements, yet they gave Armstrong substantial assistance or encouragement to write, publish, market, advertise and sell the Armstrong Books.  In addition, Weisel and Stapleton caused false and misleading statements

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 13

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

and requests for multi-million dollar payments to be submitted to the U.S. Postal Service. As alleged herein, Weisel and Stapleton arranged press conferences wherein Armstrong could issue false and misleading statements and emphatic denials to charges and reports that he was using performance enhancing drugs. Above all, Weisel and Stapleton, working together with Armstrong, created, maintained and defended the Lance Armstrong "brand," which enabled the scheme to succeed and create tens of millions of dollars in profits that they shared from 1997 to 2012.

**C.     The Publisher Defendants**

18.     Defendant, Penguin Group (USA) Inc. ("Penguin Group (USA)"), is the U.S. affiliate of Penguin Group, one of the largest English language book publishers in the world. Penguin Group (USA)'s principal place of business is located at 375 Hudson Street, New York, New York 10014. Penguin Group (USA) publishes under a wide range of imprints and trademarks, including G.P. Putnam's Sons ("Putnam"). As set forth herein, Penguin Group (USA) and Putnam were the publishers of the hardcover edition of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, which was published in May 2000. Another division of Penguin Group (USA), The Berkley Publishing Group ("Berkley"), published the paperback edition of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE in September 2001. According to *Publishers Weekly*, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE was a best-seller, reaching #1 on *The New York Times* best-seller list and spending a total of 24 weeks on the hardcover book best-seller charts and 22 weeks on the trade paperback best-seller charts. Both Putnam and Berkley maintain their principal places of business at 375 Hudson Street, New York, New York 10014.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 14

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

19.     Defendant, Random House, Inc. ("Random House"), is the world's largest English-language general trade book publisher.  Random House's principal place of business is located at 1745 Broadway, New York, New York, 10019.  Random House owns many publishing groups including Crown Publishing Group ("Crown"), which publishes under a wide range of imprints and trademarks including that of Broadway Books ("Broadway").  As alleged herein, on January 1, 2003, Random House, Broadway and Crown published the hardcover edition of Armstrong's book EVERY SECOND COUNTS.  As alleged herein, on June 1, 2004, Random House, Broadway and Crown published the paperback edition of Armstrong's book EVERY SECOND COUNTS.  According to *Publishers Weekly*, the first printing of EVERY SECOND COUNTS was 386,000 books and, as of October 2003 – just nine months after initial publication – Random House and Broadway had gone back to press twice, bringing the total copies in print to 420,000.  Random House, Broadway and Crown maintain their principal places of business at 1745 Broadway, New York, New York 10019.

20.     At various places in this Amended Complaint, Penguin, Putnam, Berkley, Random House, Crown and Broadway are collectively referred to as the "Publisher Defendants."

**D.     Allegations As To All Defendants**

21.     Plaintiffs are informed and believe that the Defendants identified in ¶¶ 13-20, in addition to acting for themselves and on their own behalves individually, are and were acting as the agents, servants, employees and representatives of, and with the knowledge, consent and permission of, and in conspiracy with, and/or aided and abetted each and all of the Defendants and within the course, scope and authority of that agency, service,

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 15

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

employment, representation and conspiracy. Plaintiffs further allege on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiffs allege upon information and belief that the actions, failures to act, breaches, unfair business practices, false advertising, conspiracy, aiding and abetting and misrepresentations alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and done with the cooperation and knowledge of each and all of the Defendants.

22.     The true names and capacities, whether individual, corporate, associate, or otherwise of Doe Defendants 1-50, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names pursuant to CAL. CODE CIV. PROC. § 474. Plaintiffs further allege that each of the said Defendants is in some manner responsible for the acts and occurrences alleged in this Amended Complaint. Plaintiffs will seek leave of Court to amend this Amended Complaint to show their true names and capacities when same are ascertained, as well as the manner in which each of the fictitious Defendants is responsible.

## IV.     FACTUAL ALLEGATIONS

### A.     The Publication And Promotion Of Defendant Armstrong's Books

23.     On or about May 22, 2000, Putnam, a member of Penguin Group (USA), published the hardcover edition of Armstrong's book entitled IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE. In September 2001, Berkley, a division of Penguin Group (USA), published the paperback edition of this book. According to *Publishers Weekly*, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE was a best-seller, reaching #1 on *The New York Times* best-seller list and spending a total of 24 weeks on the hardcover book best-

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 16

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

seller charts and 22 weeks on the trade paperback best-seller charts. Both the hardcover and paperback versions of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE represent it to be a nonfiction "Biography."

24.     On January 1, 2003, Broadway, a member of Random House and Crown, published Armstrong's book entitled EVERY SECOND COUNTS. On June 1, 2004, these Defendants published the paperback edition of EVERY SECOND COUNTS. According to *Publishers Weekly*, the first printing of EVERY SECOND COUNTS was 386,000 books and, as of October 2003 – just nine months after initial publication – Random House and Broadway had gone back to press twice, bringing the total copies in print to 420,000. Both the hardcover and paperback versions of EVERY SECOND COUNTS represent it to be a nonfiction "Biography."

25.     Since the date(s) of publication, throughout the Class Period, and continuing to the present date, Armstrong, Penguin Group (USA), Putnam and Berkley have publicly and repeatedly represented Armstrong's book entitled IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE as a nonfiction "Biography." Since the date(s) of publication, throughout the Class Period and continuing to the present date, Armstrong, Random House, Crown and Broadway have publicly and repeatedly represented Armstrong's book entitled EVERY SECOND COUNTS as a "Biography." Throughout the Class Period, Armstrong, Penguin Group (USA), Putnam and Berkley have advertised, marketed and sold IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE as a work of nonfiction biography, representing that Armstrong is a "Tour de France Winner," that the book is a "personal story of Lance Armstrong's life so far, from childhood … [to] more triumph (victory in the 1999 Tour de

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 17

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

France," and that "Champion cyclist Lance Armstrong's Tour de France victory has been hailed as amount 'the most memorable moments in sports history during this century.'" Throughout the Class Period, Armstrong, Random House, Crown and Broadway have advertised, marketed and sold EVERY SECOND COUNTS as a work of nonfiction biography, representing that Armstrong as "the five-time Tour de France winner."  Such false and misleading representations were made in the books, on the books' covers, jackets and flyleafs, in media press kits, during television and newspaper interviews, on Internet websites and at personal appearances made by Armstrong.  Defendants' misrepresentations to consumers located throughout the State of California continue to the present day, long after the time that Armstrong, Penguin Group (USA), Putnam, Berkley, Random House, Broadway and/or Crown knew or should have known that such statements were and are false and misleading.

26. For example, since publishing the paperback edition of EVERY SECOND COUNTS on June 1, 2004, Random House has posted, and continues to post, the following promotional information for the book on its website:  www.randomhouse.com:

**Every Second Counts**

Written by Lance Armstrong and Sally Jenkins

Categories for this book

**Biography & Autobiography – Sports**

Synopsis

The five-time Tour de France winner and Number 1 *New York Times* bestselling author returns with an inspirational account of his recent personal and professional victories – and some failures – and an intimate glimpse into how almost dying taught him to really live.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 18

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

> Since the release of his megabestseller, *It's Not About the Bike,* Lance Armstrong has enjoyed a new series of thrilling rides, culminating with the extension of his string of Tour de France victories to a record-tying fifth in 2003.  Continuing the inspiring story begun in his first book, *Every Second Counts* captures the mind-set of a man who has beaten incredible odds and considers each day an opportunity for excellence.
>
> Armstrong's previous book recounted his journey from a grim diagnosis of testicular cancer to a stunning recovery that culminated in his winning the 1999 Tour de France.  His new book addresses the equally daunting challenge of living in the aftermath of this experience and making the most of every breath of life.
>
> A fresh perspective on the spirit of survivors everywhere, *Every Second Counts* will invigorate and enthrall Armstrong's millions of admirers.

A screenshot of Random House's webpage is attached hereto as ***Exhibit A.***

27.     IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE is and has been advertised, marketed and sold as the nonfiction "biography" of Armstrong, the world-famous cyclist, and his fight against cancer and comeback to "win" his first Tour de France race title. In the book, Armstrong tells "his journey through triumph, tragedy, transformation and transcendence."  As described in the advertisements for the book, "It is the story of one of the most talked-about and inspirational sports figures of all time, a world-famous cyclist and his fight against cancer and the will to succeed despite overwhelming odds."  Armstrong was named as *Sports Illustrated* magazine's 2002 Sportsman of the Year and, after his record-shattering string of Tour de France race "victories," some proclaimed him as the greatest athlete of all time.

28.     Armstrong's book, IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE, spent many weeks on the *The New York Times* bestseller lists and was advertised by Penguin Group (USA) and Putnam as having "legs as strong as its author's."

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 19

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

29.     Defendants Armstrong, Penguin Group (USA), and Putnam and Berkley have profited handsomely from publication of both hardcover, paperback, electronic and audio editions of IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE, reaping millions of dollars in sales and profits.

30.     Based on the success of his first book, Armstrong also wrote several other books, including THE LANCE ARMSTRONG PERFORMANCE PROGRAM, 7 WEEKS TO THE PERFECT RIDE, which was published in September 2000, and in which he sets forth a training program for success in bicycle racing without using performance enhancing drugs.

31.     Defendant Armstrong parlayed the success of IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE into a subsequent book deal, which resulted in the publication in January 2003 by Random House, Crown and Broadway of EVERY SECOND COUNTS.  This book was advertised by these Defendants as the follow-up story to the best-selling book IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE.  EVERY SECOND COUNTS was advertised by Random House, Crown and Broadway as addressing the "equally daunting challenge of living in the aftermath of "winning" the Tour de France race after beating cancer and making the most of every breath of life, of Armstrong's prickly relationship with the French media and the ultimately disproved accusations of doping within his Tour de France cycling team, and an intimate glimpse into how almost dying taught him to really live."

32.     Based on the success of the above-referenced books, which appeared in multiple editions or versions during 2000-2004, Armstrong also wrote LANCE ARMSTRONG, IMAGES OF A CHAMPION, which was published in August 2006, and chronicled his record-

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 20

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

breaking seventh Tour de France race "win," and COMEBACK 2.0, UP CLOSE AND PERSONAL, which was published in December 2009 and features several "candid" photos of Armstrong submitting to blood and urine testing.  Copies of these photographs are attached hereto as *Exhibit B*.

33.     The purpose of publishing these photos was to demonstrate to consumers, including Plaintiffs and the members of the Class, that Armstrong must be a "clean" professional cyclist – as he portrayed himself – because, or so he claimed, he had been subjected to "hundreds" of drug tests and he had always tested "clean."  The accompanying text makes clear Armstrong's assertion:

> During training camp we were paid a visit by the anti-doping inspectors. The
> level of oversight is intense. You are always accompanied to the bathroom by
> at least one inspector – you can't just walk into a bathroom alone with a cup
> and walk out with a sample. And your pants have to be down around your
> knees so they can see that no device was used to somehow switch samples. It's
> humiliating and embarrassing, but it goes with the territory. The inspectors are
> in charge and like to have everything done their way. On this occasion
> [illustrated by the photographs] the inspector wanted to give me tips for
> getting the bottle into the bag. I reminded him that nobody has put that bottle
> in a plastic bag and stuffed it into a Styrofoam container more often than I
> have.

34.     As set forth in the next section of this Amended Complaint, the publication, marketing, advertising and sale of the Armstrong Books, as identified and described in ¶¶ 23-33, was part of a strategy designed and implemented by Armstrong, Weisel and Stapleton to create, maintain and profit from the Lance Armstrong "brand."  During the 15-year period from 1997 to 2012, these Defendants' creation, expansion, maintenance and defense of the Lance Armstrong "brand" was enormously successful, and the enterprise formed by these Defendants, together with various corporate or other business entities that they owned or

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 21

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

controlled, reaped tens of millions of dollars in illicit profits in the form of book royalties,

corporate sponsorship fees, license fees, personal appearance fees, prize money, bonuses and

money derived from the settlement of lawsuits brought by Armstrong against his critics and

detractors.

**B.    Building And Maintaining The Lance Armstrong "Brand" Includes The Making Of False and Misleading Representations To Consumers And Others, Including The Misrepresentations Contained In The Armstrong Books And The False And Misleading Marketing And Advertising Of Those Books**

35.    As part of a multifaceted scheme to defraud unsuspecting consumers,

including Plaintiffs and the members of the Class, in his books and in promotional

appearances Armstrong portrayed himself as a "regular, hardworking, motivated,

complicated, occasionally pissed-off, T-shirt guy," while boasting that he was a "clean"

professional cyclist who did not need to use performance enhancing drugs in order to "win"

cycling races.  Counseled, assisted and encouraged by Weisel and Stapleton, Armstrong

understood that he needed to portray himself as a "clean" professional athlete in order to

develop, build and maintain the Lance Armstrong "brand" that this trio conceived during

1997-1999.  In 1997, Stapleton told *The Austin American-Statesman*:  "Lance isn't just a

cyclist anymore.  Because of the cancer, the Lance Armstrong brand has a much broader

appeal.  Our challenge is to leverage that now.  He's on the verge of being a crossover-type

spokesman."  As Stapleton further explained the Lance Armstrong "brand" in an article

published in 2001 in *TexasMonthly* magazine:

> Lance may be private, but he is a public figure.  As a courageous, gifted, and fair-skinned champion, he's a Madison Avenue dream.  It helps that, although Lance is no people person, he has a rock star's charisma and a cheerleader's smile.  Last year [2000] Lance made $5 million in endorsements.  This year

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 22

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

he'll make twice that from companies like Coke, Nike, and Bristol-Myers. As he has won, says his friend, lawyer, and agent, Bill Stapleton, the Lance Armstrong brand has evolved. "In the beginning we had this brand of brash Texas, interesting European sport, a phenomenon. Then you layered in cancer survivor, which broadened and deepened the brand. But even in 1998 there was very little corporate interest in Lance. And then he won the Tour de France in 1999 and the brand was complete. You layered in family man, hero, comeback of the century, all these things. And then everybody wanted him." Nike was so enamored of Lance that the company signed him before it even had a cycling shoe, then made the famous TV ad that capitalized on all the drug rumors, showing him giving blood to suspicious doctors and riding his bike in the rain. "Everybody wants to know what I'm on," Lance's voice said. "I'm on my bike, busting my ass six hours a day. What are you on?" All the endorsements nicely supplement Lance's US Postal [cycling team] salary, which just got bumped from $2 million to $8 million a year, making him the highest paid cyclist ever.

Michael Hall, "Lance Armstrong Has Something to Get Off His Chest," *TexasMonthly* (July 2001).

36.     Thus, as epitomized by the above-referenced quotation from the television commercial that Armstrong made for athletic clothing manufacturer Nike, an integral part of Armstrong's, Weisel's and Stapleton's multifaceted strategy to build, maintain, defend and profit handsomely from the Lance Armstrong "brand" was to vehemently and publicly deny any allegations that Armstrong was engaged in doping and using performance enhancing drugs of any kind while, at the same time, attacking the veracity and credibility of the person or publication who or that was leveling the allegation against Armstrong. (A timeline of Armstrong's well-publicized denials of doping charges made during 1999-2012 is set forth in ¶ 45, *infra*.)

37.     As Stapleton admitted in his statements to the press quoted in ¶ 35, another important part of the strategy to build, maintain and defend the Lance Armstrong "brand" was to leverage his reputation as a cancer survivor and supporter of cancer victims and

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 23

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

cancer research.  Whenever questions about Armstrong's use of performance enhancing drugs arose during 1999-2012, Armstrong and his supporters often changed the subject to his support for cancer victims, a tactic that has been described by one cycling commentator as "raising the cancer shield."  For example, after the CBS News program "60 Minutes" broadcast a segment in May 2011, complete with claims from ex-cycling teammate Tyler Hamilton that Armstrong had engaged in doping, Armstrong's lawyers denied the allegations and invoked the Livestrong Foundation, which Armstrong had helped to found, in his defense.  In a legal brief filed in 2012, Armstrong's lawyers blasted federal investigators, charging that the latter had leaked information to CBS News and criticized "the government's investigation of a national hero, best known for his role in the fight against cancer."

38.     In 1997, Stapleton helped Armstrong form the Lance Armstrong Foundation, whose stated purpose was to assist cancer patients.  Over the next 15 years, this foundation, now known as the Livestrong Foundation, grew into one of the nation's largest charities, the ostensibly non-profit arm of the multimillion-dollar Lance Armstrong "brand" that Armstrong, Weisel and Stapleton built, expanded, maintained and defended.  During that time, their business interests have been intertwined with the interests of the foundation and, according to some experts, Armstrong has used the foundation's goodwill to generate business deals that have enriched him personally.  While Armstrong's celebrity fed the charity, the charity enhanced his marketability.  "It's a win-win," said Daniel Borochoff, head of the American Institute of Philanthropy, a watchdog group.  "He builds up the foundation, and they build up him."  For example, it has been reported that the foundation

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 24

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

sold the rights to its iconic Livestrong name to a commercial media company, Demand Media, that also hired Armstrong as its spokesman.  Demand Media reached an agreement with the foundation to develop a commercial for-profit health and fitness website called livestrong.com.  According to one expert, such an agreement is unprecedented in the world of nonprofit organizations.  Moreover, the similarity in website addresses between livestrong.org (the site for the nonprofit foundation) and livestrong.com (the site of the for-profit business entity) undoubtedly caused consumer confusion because they feature the same Livestrong logo and design.  As compensation for the use of its name, the foundation received 183,000 shares of stock which it sold for more than $3 million when Demand Media went public in January 2011.  As part of his spokesperson agreement, Armstrong received 156,000 shares.  Only after the deal was criticized in the media did Armstrong donate the sales proceeds he received – about $1.2 million – to the foundation.  According to published reports, Internet traffic to the for-profit livestrong.com website has surged, due to Armstrong's promotional work, while traffic to the foundation's website has remained flat. In addition, Stapleton's company, Capital Sports & Entertainment, of which Armstrong was the key client and a minority shareholder, received fees from the foundation; during 2010-2012, those fees totaled $423,000.  Although the foundation is perceived to have funneled large amounts of money into cancer research, the truth is that the foundation, which has raised more than $500 million since 1997, gave out just $20 million in research grants during 1998-2005; in the latter year, it began phasing out its support of cancer research.

39.     During the Class Period, Armstrong used the Armstrong Books as solicitations or advertisements to raise money for his foundation, thereby intertwining these aspects of the

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 25

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

Lance Armstrong "brand." For example, the flyleaf for the book IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE reads:

>Visit our website at:  www.penguinputnam.com

>Visit Lance Armstrong's website at:  www.lancearmstrong.com

>Visit the Lance Armstrong Foundation website at:  www.laf.org

40.     Publication of the Armstrong Books, as identified and described herein, was an integral part of Armstrong's, Weisel's and Stapleton's scheme to defraud the American public, including Plaintiffs and the members of the Class. The publication, promotion and marketing of the Armstrong Books was an integral part of the plan conceived by Armstrong, Weisel and Stapleton to build and sustain the Lance Armstrong "brand," raise Armstrong's profile with American consumers, receive multi-million dollar payments in the form of book advances and/or royalties, and lead to ever-increasing multi-million dollar corporate sponsorships. Counseled, advised and encouraged by Weisel and Stapleton, as well as his book agent, Esther Newberg, his co-author, Sally Jenkins, and representatives of the Publisher Defendants, Armstrong understood that the Armstrong Books had to be marketed, promoted, advertised and sold as works of truthful nonfiction biography if they were going to find a lucrative place in the increasingly competitive U.S. book market. Moreover, Armstrong understood that if he was going to attract a sizeable readership for the Armstrong Books, and thereby achieve greater sales and profits from book sales, he would have to directly address – and vehemently deny – the charges of widespread doping and use of performance enhancing drugs that were dogging the professional cycling circuit.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 26

#6775218.1(144084.002)

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

41.     Accordingly, in his first book, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, first published in May 2000, Armstrong addressed at length the use of performance enhancing drugs that were and are banned by the Union Cycliste Internationale ("UCI"), the governing body for sports cycling which oversees international cycling events, their widespread use in the world of professional cycling as well as the widespread suspicion that Armstrong's success was due to his use of banned substances and illegal practices such as blood transfusions.  Throughout his first book, Armstrong repeatedly denied that he *ever* used banned substances before or during his professional cycling career.  Lamenting the use of drugs in cycling, Armstrong hoisted his personal cancer shield to deny his personal use of banned drugs, writing in IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE:

> Doping is an unfortunate fact of life in cycling, or any other endurance sport for matter.  Inevitably, some teams and riders feel it's like nuclear weapons – that they have to do it to stay competitive within the peloton.  I never felt that way, and certainly after chemo[therapy] the idea of putting anything foreign in my body was especially repulsive.  Overall, I had extremely mixed feelings about the 1998 Tour [de France race]:  I sympathized with the riders caught in the firestorm, some of whom I knew well, but I also felt the Tour [de France race] would be a more fair event from then on.

42.     Knowing that the mere claim that his cycling success was due to superior physical training, proper diet and an extraordinary spirit and drive to succeed was not enough to quell suspicions and rumors that he doped and used performance enhancing drugs and, in order to enhance book sales, Armstrong wrote lengthy passages in IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE that were intended to convince readers and consumers – including Plaintiffs and the members of the Class – that the rumors and reports of Armstrong's doping were unfair and untrue because, as a cancer-surviving citizen saint he

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 27

#6775218.1(144084.002)

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

would never consider poisoning his body with banned drugs, and because of the extensive

drug-testing regime employed by the UCI and the organizers of the Tour de France:

> I was making enemies in the Alps.  My newly acquired climbing prowess aroused suspicion in the French press, still sniffing for blood after the scandal of the previous summer.  A whispering campaign began: "Armstrong must be on something."  Stories in L'Equipe and Le Monde insinuated, without saying it outright, that my comeback was a little too miraculous.

> I knew there would be consequences for Sestriere – it was almost a tradition that any rider who wore the yellow jersey was subject to drug speculation.  But I was taken aback by the improbable nature of the charges in the French press: some reporters actually suggest that chemotherapy had been beneficial to my racing.  They speculated that I had been given some mysterious drug during the treatments that was performance-enhancing.  Any oncologist in the world, regardless of nationality, had to laugh himself silly at the suggestion.

> I didn't understand it.  How could anybody think for a second that somehow the cancer treatments had helped me?  Maybe no one but a cancer patient understands the severity of the treatment.  For three straight months I was given some of the most toxic substances known to man, poisons that ravaged my body daily.  I still felt poisoned – and even now, three years after the fact, I feel that my body isn't quite rid of it yet.

> I had absolutely nothing to hide, and the drug tests proved it.  It was no coincidence that every time Tour [de France] officials chose a rider from our team for random drug testing, I was their man.  Drug testing was the most demeaning aspect of the Tour [de France]:  right after I finished a stage I was whisked to an open tent, where I sat in a chair while a doctor wrapped a piece of rubber tubing around my arm, jabbed me with a needle, and drew blood.  As I lay there, a battery of photographers flashed their cameras at me.  We called the doctors the Vampires.  'Here come the Vampires.' we'd say.  But the drug tests became my best friend, because they proved I was clean.  I had been tested and checked, and retested.

> In front of the media, I said, "My life and my illness and my career are open."  As far as I was concerned, that should have been the end of it.  There was nothing mysterious about my ride at Sestriere:  I had worked for it.  I was lean, motivated and prepared.  Sestriere was a good climb for me.  The gradient suited me, and so did the conditions – cold, wet, and rainy.  If there was something unusual in my performance that day, it was the sense of out-of-body effortlessness I rode with – and that I attributed to sheer exultation in

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 28

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

being alive to make the climb. But the press didn't back off, and I decided to take a couple of days off from talking to them….

My fellow riders tested me on the bike every single day. I was tested off the bike, too, as the scrutiny I underwent in the press intensified.

[In July 1999,] I decided to address the charges outright, and held a press conference in Saint-Gaudens. "I have been on my deathbed, and I am not stupid," I said. Everyone knew that use of EPO and steroids by healthy people can cause blood disorders and strokes. What's more, I told the press, it wasn't so shocking that I won Sestriere; I was an established former world champion.

"I can emphatically say I am not on drugs," I said. "I thought a rider with my history and my health situation wouldn't be such a surprise. I'm not a new rider. I know there's been looking, and prying, and digging, but you're not going to find anything. There's nothing to find … and once everyone has done their due diligence and realizes they need to be professional and can't print a lot of crap, they'll realize they're dealing with a clean guy…."

Not long after I crossed the finish line, a French TV journalist confronted me: there were reports that I had tested positive for a banned substance. The report was wrong, of course. I returned to the team hotel, and pushed through a throng of clamoring media, and called another press conference. All I could do was assert my innocence each time there was a new wave of speculation in the papers – and there was one every three or four days.

Le Monde had published a story stating that a drug test had turned up minute traces of corticosteroid in my urine. I was using a cortisone cream to treat a case of saddle sore – and I had cleared the cream with the Tour [de France] authorities before the race ever started. Immediately, Tour [de France] authorities issued a statement affirming my innocence. "Le Monde was looking for a drug story, and they got one on skin cream, " I said.

I was hurt and demoralized by the constant barrage from the press. I put forth such effort, and had paid such a high price to ride again, and now that effort was being devalued. I tried to deal with the reports honestly and straightforwardly, but it didn't seem to do any good.

I began to notice something. The people who whispered and wrote that I was using drugs were the very same ones who, when I was sick, had said, "He's finished. He'll never race again." They were the same ones who, when I wanted to come back, said, "No, we don't want to give him a chance. He'll never amount to anything."

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 29

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

Now that I was in the lead of the Tour de France, wearing the yellow jersey, and looking more and more like the eventual winner, the very same people sent the very same message. "It's not possible," they said. "Can't be done. He can't do it. What's going on here? There must be another explanation, something suspicious." They were consistent, the naysayers.

It's a good thing I didn't listen to them when I was sick.

It hurt me, too, that the French journalists in the particular were so suspicious of me. I live in France, and I loved the country. After the previous year's problems during the Tour [de France], a number of top riders had stayed away from France in '99, but not me. While other riders were afraid of being harassed by the police or investigated by the governmental authorities, I trained there every day. France was the most severe place in the world to be caught using a performance enhancer, but I did all of my springtime racing in France, and conducted my entire Tour [de France] preparation there. Under French law, the local police could have raided my house whenever they wanted. They didn't have to ask, or know. They could have sorted through my drawers, rifled my pockets, search my car, whatever they wanted, without a warrant or any sort of notice.

I said to the press, "I live in France. I spent the entire months of May and June in France, racing and training. If I was trying to hide something, I'd have been in another country."

But they didn't write that, or print that....

I cycled through the stage finish and dismounted, thoroughly exhausted but pleased to have protected my lead. But after five hours on the bike, I now had to face another two-hour press conference. I was beginning to feel that the press was trying to break me mentally, because the other riders couldn't do it physically. The media had become as much of an obstacle as the terrain itself.

That day, the International Cycling Union released all of my drug tests, which were, in fact, clean. What's more, I had received a wonderful vote of confidence from the race organizer, Jean-Marie Leblanc. "Armstrong beating his illness is a sign that the Tour [de France] can beat its own illness," he said.

Somehow, we had fended off all the attacks, both on the bike and off, and kept the yellow jersey on my back....

I wanted to win the time trial. I wanted to make a final statement on the bike, to show the press and cycling rumormongers that I didn't care what they said

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 30

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

about me.  I was through with press conferences (although not with drug tests;
I was random-tested again after stage 17)....

I was near the end of the journey.  But there had been two journeys, really:  the
journey to get to the Tour [de France], and then the journey of the Tour [de
France] itself.  In the beginning there was the Prologue and the emotional
high, and that first week, uneventful but safe.  Then there were the strange out-
of-body experiences at Metz and Sestriere, followed by the demoralizing
attacks by the press.  Now to finish with a victory gave me a sweet sense of
justification.  I was going to Paris wearing the maillot jaune.

43.  In his follow-up book, EVERY SECOND COUNTS, first published in January 2003,
Armstrong again aggressively confronted his critics who suspected, alleged and reported that
he used banned substances.  Once again, Armstrong vehemently denied every doping
accusation and repeatedly recited the fact that because he had supposedly never tested
positive for a banned substance during his racing career, he raced "clean" and that the attacks
on his character were baseless and without merit.  Armstrong wrote at length about the
doping investigation carried out during the 2000-2001 racing season, devoting almost the
entire third chapter of this book to the topic, including the following passages intended to
impress the reader with his "clean" history and the legitimacy of his cycling race victories:

That year saw the beginning of a long, hard defense of my character.  I'm
surely the most drug-tested man on the planet.  I'm tested anywhere from 30 to
40 times a year, both in and out of competition, and I welcome it, because
frankly, it's the only proof I have of my innocence....

I've never once failed a test.  Not one.  Nor do I intend to, ever.  You know
why?  Because the only thing you'll find evidence of is hard work, and there's
no test for that.

But no matter how many tests I took, there were still those who considered me
guilty, a doper-mastermind who outwitted scientific communities across the
globe, and the suspicion reach a height in 2000-2001....

On Thanksgiving Day of 2000, shortly after I got back from the Olympics,
French authorities announced I was under criminal investigation for doping.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 31

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

I was dumfounded. I wasn't just being called a cheat, I was being called a felon, under formal investigation....

What happened was this: during the Tour [de France], someone surreptitiously videotaped two of our medical staff as they threw away a couple of trash bags. The tape was sent anonymously to a government prosecutor, as well as to the France 3 television station. Now the station was airing the tape while sensationally reporting our "suspicious behavior" as we disposed of "medical waste."

French authorities had responded by launching a full-scale judicial inquiry....

The medical waste consisted of some wrappers and cotton swabs and empty boxes, nothing more....

I immediately issued an angry denial through our [U.S. Postal Service cycling team] spokesman, Dan Osipow. Our team had "zero tolerance" for any form of doping, we said. It sounded like a clichéd statement, but we meant it. We were absolutely innocent....

At first, I tried not to take it personally, and to understand the motives behind the investigation. When an athlete doped, the competitors, spectators, and journalists were defrauded. International cycling had recently been through a drug scandal, and the French were protective of the integrity of the Tour [de France], which was more than just a race, it was a national symbol, and they didn't want it junked up by needles and vials. But I didn't like being accused on no evidence....

Suspicion was the permanent state of affairs in the sport, and with reason. Unfortunately, cycling had a long history of doping. It had happened time and again: athletes had lied, had cheated, had stolen. In the 1998 Tour [de France], which I missed while recovering from illness, a drug scandal resulted in multiple arrests and suspensions when a team car was found to be carrying large amounts of the blood-doping agent erythropoietin (EPO). Since then, Tour [de France] officials had worked with the International Cycling Union to develop new drug tests, and to restore public confidence in the race.

Drug inspectors arrived at each team hotel between 7 and 9 A.M. on the day that the Tour [de France] started and drew blood from the crooks of our arms. After that, there were surprise drug tests—you never knew when someone would bang on your hotel-room door and ask for blood. There were also daily urine tests in a mobile trailer after each stage....

Even out of season, I was, and am, tested by the United States Anti-Doping Agency. It's a moment of wearying familiarity: I'm sitting in my kitchen early one Texas morning in the off-season, sipping coffee and whispering so as not to wake assorted children, when there's a loud ringing at the doorbell.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 32

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

Standing on the front step of my home is a representative from USADA, coming on like John Wayne, holding out a piece of paper like a warrant and telling me to take a drug test, or risk being banned from my sport.

The drug testers in Austin were the same people every time, a husband and wife. I didn't know their names, and wasn't especially cordial with them, because they were never cordial with me. They would ring the bell, I'd open the door, and they would announce, "Random drug control." And hand me a piece of paper instructing me on my rights. Or lack thereof: if I declined the test it was considered an automatic positive, and I would be banned....

The head of the French Sports Ministry, Marie-George Buffet, announced that all of our [U.S. Postal Service cycling] team's urine samples from the 2000 Tour would be turned over to the French judicial investigators and submitted to forensic testing by law enforcement, and so would the garbage that we had thrown away during the 2000 Tour [de France].

That was actually good news. I *wanted* all the tests, because I knew they would come back pure. They were my only means of vindication. "It's the best news in a long time," I said. "Because I know I'm clean."

More good news came when the International Cycling Union announced it would conduct its own tests. The ICU had quietly decided to preserve 91 frozen urine samples taken from the 2000 race, without the cyclists' knowledge, in the hopes of eventually submitting them to a brand-new test for EPO....

Anyone who thought I would go through four cycles of chemo just to risk my life by taking EPO was crazy. It was one thing to seek to maximize performance, or explore a pharmacological gray zone. It was another to court death.

I practiced another, more natural way to oxygenate my blood, and that was to train or live at altitude. I stressed altitude training—it was a big part of my regimen, and it was safe, but it was no fun. It was lung-searing, and dizzying, and inconvenient, but it was legal and it worked....

Meanwhile, the investigation threatened to seriously mess with my reputation....

We wrote in anti-drug out-clause in our contracts: if I tested positive, I'd give the money back....

Finally, April came, and with it, what seemed to be good news. We heard via a reporter from Reuters that all of our tests were clean—exactly as we had insisted all along.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 33

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

44.     In Chapter 7 of his book, Armstrong wrote:

> Here are just a few things that happened after the summer of 2002.  On September 2, 2002, the French doping investigation was finally, officially closed…. After 21 months of inquiry, investigators admitted they'd found not a shred of proof, and they issued just a small discourteous announcement from the prosecutor's office.  The case was dropped for lack of evidence.

45.     Prior to and during the Class Period, in order to carry out the scheme to defraud that he had devised with the assistance and encouragement of Weisel and Stapleton, and in order to deceive consumers and sell more copies of his books which were advertised, marketed and sold as works of truthful nonfiction, as works of "Biography" written by the "Tour de France Winner," and in order to build, maintain and defend the highly lucrative Lance Armstrong "brand," Armstrong repeatedly and vociferously made public statements in which he denied engaging in doping and using performance enhancing drugs and portrayed himself as a "clean" professional athlete.  In chronological order from 1999 to 2012, here are direct quotations of many of Armstrong's public and well-publicized denials:

- July 1999: "I have been on my deathbed, and I'm not stupid.  I can emphatically say I am not on drugs."

- November 9, 2000 (statements published in the Austin, Texas, newspaper): "We are absolutely innocent.  Our team will stand on its morals and record of being an anti-doping team."

- December 2000: "We are completely innocent.  We run a very clean and professional team that has been singled out due to our success … Before this ordeal I had never heard of [the performance enhancing drug Actovegin]."

- January 2001: "The simple truth is that we outwork everyone.  But when you perform at a higher level in a race, you get questions about doping."

- 2001 (Nike TV ad): "This is my body and I can do whatever I want to it.  I can push it, and study it, tweak it, listen to it.  Everybody wants to know what I'm on.  What am I on?  I'm on my bike, busting my ass six hours a way.  What are you on?"

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 34

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

- January 2004: "I have never had a single positive doping test, and I do not take performance-enhancing drugs."

- June 15, 2004 (during a press conference): "I can absolutely confirm that we don't use doping products ... This is not the first time I've lived through this. I heard it in 1999. I heard it in 2002, again in 2003. It happens all the time ... We don't use doping products and we will sue those who suggest we do."

- July 2004 (during a news conference): "We're sick and tired of these allegations and we're going to do everything we can to fight them. They're absolutely untrue."

- July 24, 2005 (after "winning" his seventh straight Tour de France race): "I'll say to the people who don't believe in cycling, the cynics and the skeptics. I'm sorry for you. I'm sorry that you can't dream big. I'm sorry you don't believe in miracles. But this is one hell of a race. This is a great sporting event and you should stand around and believe it. You should believe in these athletes, and you should believe in these people. I'll be a fan of the Tour de France for as long as I live. And there are no secrets – this is a hard sporting event and hard work wins it. Vive Le Tour."

- August 25, 2005 (during a televised interview broadcast on CNN's "Larry King Live" show): "I've said it for longer than seven years. I have never doped. I can say it again. But I've said it for seven years – it doesn't help. But the fact of the matter is I haven't [doped]."

- August 2005: "Why would I enter into a sport and then dope myself up and risk my life again? That's crazy. I would never do that. No way."

- August 24, 2005: "I will simply restate what I have said many times: I have never taken performance-enhancing drugs."

- November 2005 (in videotaped sworn testimony taken during the SCA arbitration proceeding): "How many times do I have to say it? ... Well, it can't be any clearer than 'I've never taken drugs.'"

- January 2006 (in sworn testimony given before the arbitration panel): "I race the bike straight up fair and square."

- July 3, 2007 (during an interview with CBS News journalist and cancer survivor Bob Schieffer at the Aspen Ideas Festival): "I was on my death bed. You think I'm going to come back into a sport and say, 'OK, OK doctor give me everything you got. I just want to go fast.?' No way. I would never do that."

- February 2009 (during a press conference held in Sacramento, California): Armstrong reacted negatively to a reporter's questions about cyclists who dope; a copy of a photograph of Armstrong taken at that event and the accompanying text

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 35

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

written by Armstrong and published in COMEBACK 2.0: UP CLOSE AND PERSONAL is attached hereto as *Exhibit C*.

- July 2009 (in a Nike "Driven" television commercial): "The critics say I'm arrogant. A doper. Washed up. A fraud. That I couldn't let it go. They can say whatever they want. I'm not back on my bike for them."

- May 2010 (in response to cycling teammate Landis' accusations of systemic doping on the U.S. Postal Service cycling team): "It's our word against his word. I like our word. We like our credibility. Floyd lost his credibility a long time ago."

- May 2010: "I have sued a few people in my day and, you know, been successful there and proved my innocence through that, and I don't need to do that anymore."

- July 2010: "As long as I live, I will deny it. There was absolutely no way I forced people, encouraged people, told people, helped people, facilitated. Absolutely not. One hundred percent."

- January 2011: "If you're trying to hide something, you wouldn't keep getting away with it for 10 years. Nobody is that clever."

- May 2011: "Twenty-plus-year career, 500 drug controls worldwide, in and out of competition. Never a failed test. I rest my case."

- June 13, 2012 (Armstrong's statement when the USADA brought doping charges against him): "I have never doped, and, unlike many of my accusers, I have competed as an endurance athlete for 25 years with no spike in performance, passed more than 500 drug tests and never failed one."

46.     Throughout the Class Period, Armstrong's repeated and vehement denials were successful in convincing consumers, including Plaintiffs and the members of the Class, that Armstrong was a "clean" professional cyclist and that the Armstrong Books, which portrayed him as an athlete who could win without doping and using performance enhancing drugs, were truthful works of nonfiction that were properly labeled "Biography" written by the "Tour de France Winner." The U.S. book market responded accordingly and the Armstrong Books consistently sold well, thereby reaping substantial profits for him and the Publisher Defendants.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 36

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

47. During the Class Period, Armstrong's vociferous denials of doping were supported by false and misleading statements made by Stapleton. Documents recently made public demonstrate that during 2005-2006, Stapleton made such false and misleading statements about Armstrong under oath during a judicial proceeding. In addition, Stapleton has asserted that he made such statements to calm the suspicions of at least one corporate sponsor who raised questions about whether Armstrong was engaged in doping. During a deposition taken in 2005 during the SCA arbitration proceedings and in sworn testimony given to the arbitration panel on January 13, 2006, Stapleton, who was and is Armstrong's agent, confidant, attorney-in-fact, manager and advisor, firmly denied that he had any knowledge of Armstrong using performance enhancing drugs. For example, Stapleton swore under oath that:

> A:     (Bill Stapleton) I don't have any – I don't worry about it [allegations of drug use by Armstrong]. I don't lose any sleep over whether a company is going to cancel a contract because someone's proved that he's a doper, because it's not going to happen, because it's not true.

48. Under oath, Stapleton made it clear to the arbitration panel that he knew Armstrong intimately and had direct, fact-based knowledge that Armstrong had *never* used performance enhancing drugs. For example, Stapleton told the arbitration panel that:

> I've had ten years of experience day-to-day with Lance that confirms it for me [that Armstrong did not do drugs]. I've been inside the circle. I've been inside the team. So my own personal opinion and my own personal investigation is that he's clean.

49. In fact, as Stapleton testified to the arbitration panel, he was so close to Armstrong that it was "impossible for me to believe that that [drug use by Armstrong] could go on without my knowledge." As Stapleton's sworn testimony continued:

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 37

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

I have spent 11 years with Lance. I've seen it all. I'm with him, you know, every public appearance we do. I'm at the Tour [de France] the entire time. I've been to France when he lived over there, many times visited with him and his family. It is inconceivable to me that that would be going on and I wouldn't know about it. It just can't be true.

50.     During the arbitration proceeding, Stapleton testified under oath that he was so confident that Armstrong did not do drugs that he had publicly and privately assured corporate sponsors that Armstrong was totally "clean." He testified before the arbitration panel that he secretly met executives of Coca-Cola and "looked them in the eyes" and "gave them his word" that Armstrong was "clean."

51.     Stapleton's sworn deposition testimony and his sworn testimony before the arbitration panel in 2005-2006 was false and misleading. Stapleton knew that he was giving false testimony and knew that he was misleading others in doing so. Stapleton lied under oath in a legal proceeding in order to further the scheme or artifice to defraud and help maintain the Lance Armstrong "brand."

52.     During the Class Period, Defendant Weisel actively participated in the scheme to defraud consumers, including Plaintiffs and the members of the Class. As alleged herein, Weisel was Armstrong's financier and, during 1997-1999, Weisel worked with Armstrong and Stapleton to create the Lance Armstrong "brand." In the recent words of *The New York Times*, Weisel "was Mr. Armstrong's biggest financial backer and the single individual most responsible for the money machine that propelled Mr. Armstrong's career." Andrew Ross Sorkin, "The Banker Who Put His Faith in Armstrong," *New York Times*, Jan. 14, 2013. Weisel was the founder, owner and chairman of the now-defunct Tailwind Sports, the holding company for the U.S. Postal Service cycling team from 1996 until mid-2004. Tyler

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 38

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

Hamilton, Armstrong's former cycling teammate, wrote in his book, THE SECRET RACE, that

Weisel was "almost another coach" of the U.S. Postal Service cycling team.  In 1996, Weisel

was instrumental in shaking up the cycling team's management, replacing the team doctor,

Dr. Prentice Steffen, an outspoken opponent of doping, with Spanish sports physician Dr.

Pedro Celaya, despite Dr. Steffen's written warnings to Weisel that stated, "What could a

Spanish doctor, completely unknown to the organization, offer that I can't or won't.  Doping

is the fairly obvious answer."

        53.     According to the sworn declarations of Armstrong's former cycling

teammates, George Hincapie, Jonathon Vaughters, David Zabriske, Michael Barry and Tyler

Hamilton, during his tenure as team doctor for the U.S. Postal Service team, Dr. Celaya

administered EPO, testosterone, human growth hormone (HGH), and blood extractions and

transfusions to members of the team, including Armstrong.  In 1998, Weisel was

instrumental in hiring Armstrong onto the U.S. Postal Service team, and Weisel personally

paid the "bonus" portion of Armstrong's salary, which ended up totaling more than $1

million.  In an unsealed amended complaint filed in a *qui tam* (whistleblower) lawsuit

currently pending in the U.S. District Court for the District of Columbia, the relator

(plaintiff), Landis, a former member of the U.S. Postal Service cycling team, alleges that

based on the degree of control that Weisel exercised over that team and his close relationship

with Armstrong, Weisel was at all relevant times knowledgeable about, and approved of, the

well-coordinated doping program involving the U.S. Postal Service cycling team.  That

whistleblower suit alleges that Weisel, Armstrong and Stapleton, among others, violated the

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 39

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

terms of a $30 million sponsorship agreement with the U.S. Postal Service by using banned drugs and not reporting drug cheats to anti-doping officials.

54.     According to Landis, Weisel was the architect of Armstrong's success, the man who supplied the vision and money – and the most sophisticated doping scheme in sports history – to enable Armstrong to "win" a record seven Tour de France cycling races.

55.     According to other credible witnesses, Weisel actively engaged in wrongful efforts to quash or cover up instances when Armstrong tested positive for performance enhancing drugs.  Kathy LeMond, the wife of U.S. cycling champion Greg LeMond, testified under oath in 2006 that Weisel and sports clothing manufacturer Nike wire transferred $500,000 to a Swiss bank account that belonged to former International Cycling Union chief Hein Verbruggen to cover up the results of a 1999 drug test in which Armstrong tested positive for cortisone.  In her sworn deposition, Kathy LeMond testified that Julian Devries, a mechanic for Armstrong's cycling team, had told her and others that Weisel and Nike had wire transferred the hush money to Verbruggen.  Weisel also intervened after Greg LeMond publicly criticized Armstrong in 2001 for his ties to Michele Ferrari, the physician who was banned from cycling for life due to his role in the sport's doping scandal.  According to Greg LeMond, Weisel said to him, "What you are saying about Lance isn't good for you.  You be careful."  As recently reported by Matt Smith and Lance Williams, when Armstrong tested positive for cortisone, a banned substance, during the 1999 Tour de France, Emma O'Reilly, Armstrong's former head soigneur, witnessed Weisel huddling with Armstrong in the cyclist's massage room, "frantic about what to do about the positive test."  In a sworn

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 40

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

declaration, O'Reilly told USADA authorities that a cover story was created and a backdated

prescription for a steroid cream was produced to explain Armstrong's positive test.

56.     Despite Armstrong's, Penguin Group (USA)'s, Putnam's and Berkley's

repeated public representations that Armstrong's cycling comeback and successes were due

to his innate talent and athletic gifts, training, diet and his extraordinary will to succeed, and

not his use of banned performance enhancing drugs, as detailed in IT'S NOT ABOUT THE

BIKE: MY JOURNEY BACK TO LIFE, and despite Random House's, Crown's, and Broadway's

repeated public representations that Armstrong's cycling comeback and successes were due

to his innate talent and athletic gifts, training, diet and his extraordinary will to succeed and

not his use of banned performance enhancing drugs, as detailed in EVERY SECOND COUNTS,

Armstrong, his books and his entire cycling career have now been exposed as a fraud and

deceit.  Contrary to the marketing campaign carried out by Armstrong and the Publisher

Defendants during 2000-2012, the Armstrong Books are a tissue of lies rather than works of

truthful nonfiction biography.

57.     In fact, as Armstrong now admits, he and his entire U.S. Postal Service cycling

team used banned substances.  Armstrong now admits that without his use of banned

performance enhancing drugs, beginning in the mid-1990's, he would not have won and

continued to "win" cycling races, including seven consecutive Tour de France races for

which he has been retroactively disqualified and no longer exist in the record books.  During

an interview with television personality Oprah Winfrey that was broadcast nationwide in

January 2013, Armstrong admitted the following:

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 41

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

- Armstrong had been doping and using performance enhancing drugs since the mid-1990's.

- Armstrong had doped and used performance enhancing drugs during all seven of his Tour de France "winning" races.

- Armstrong had lied under oath about his doping activities during the SCA arbitration proceeding conducted during 2005-2006.

- Armstrong had "bullied" and intimidated anyone and everyone who had challenged him.

### C. The Revelation Of Certain Facts Concerning Armstrong's Wrongdoing Bring Forth His Steadfast Denials, Attacks Upon Others And Repeated Attempts To Hide The Truth

58.     Suspicions that Armstrong used banned performance enhancing drugs in the Tour de France, which were first mentioned by the French media in 1999, and as to which Armstrong issued vociferous denials during 1999-2001 (as detailed in ¶ 45), re-emerged in June 2004 with the publication, right before the start of the Tour de France race, of a book entitled L.A. CONFIDENTIEL, co-authored by journalists David Walsh and Pierre Ballester ("Walsh and Ballester").  In this book, which was not published in the United States but which was the subject of U.S. media reports, Walsh and Ballester reported that when Armstrong met with his doctors in an Indianapolis, Indiana, hospital after being diagnosed with testicular cancer, he admitted to the physicians (within earshot of several members of Armstrong's entourage) that he had previously taken banned performance enhancing drugs. Walsh and Ballester's book also revealed that during a Tour de France race, one of Armstrong's former assistants, Emma O'Reilly, had been asked to remove and dispose of a "small package" containing several used syringes which Armstrong was afraid to dispose of at the team hotel.  Armstrong had asked to borrow her makeup in order to cover up a bruise caused by needle marks on his skin.  During a press conference held in July 2004, Armstrong

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 42

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

vehemently denied any charges of doping, as set forth in ¶ 45.  Later that summer,

Armstrong won his sixth Tour de France cycling race.

59.     As detailed in Armstrong's 2003 book, EVERY SECOND COUNTS, one month

after "winning" his first Tour de France race in 1999, Armstrong had been accused of testing

positive for EPO by *L'Equipe*, the French sports publication.  This French newspaper

reported that there was indisputable evidence of Armstrong's guilt from drug tests performed

on six urine samples taken, and later frozen for later testing, during the 1999 Tour de France

race.  On his Internet website, Armstrong stated that he had never taken performance

enhancing drugs.  Television network CNN reported that Armstrong had been "dogged by a

whispering campaign that his remarkable cycling achievements were aided by drugs despite

never failing a doping test."  Despite *L'Equipe* devoting four full pages to this Armstrong

doping scandal, Armstrong described it as a "witch hunt."

60.     Armstrong sued Walsh and Ballester, the authors of L.A. CONFIDENTIEL, and

*The Sunday Times of London* for £1,000,000 after the newspaper reprinted claims from the

L.A. CONFIDENTIEL book that Armstrong used performance enhancing drugs.  Also named in

Armstrong's suit was Emma O'Reilly, Armstrong's former masseuse and a major source of

information for the authors of L.A. CONFIDENTIEL.  *The Sunday Times of London* settled the

case in 2006, paying Armstrong £300,000.  Ms. O'Reilly settled with Armstrong after

enduring two and one-half years of litigation.  In 2006, Armstrong publicly boasted about his

success in bringing litigation against his critics and those who sought to uncover the truth

about his doping, stating,  "I think we're 10-0 in lawsuits right now."

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 43

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

61.     As set forth in ¶ 45, Armstrong's denials of doping continued during 2005-2009.  In April 2009, after being accused by France's anti-doping agency of not cooperating with a drug tester, Armstrong again denied any wrongdoing.  Nevertheless, Armstrong was subsequently cited for not remaining "under the direct and permanent observation" of those administering the drug test, pursuant to the established rules.  A 20-minute delay in administering the requisite drug test occurred when Armstrong declared that he had been given permission to shower following a race.  While he was showering, Armstrong's assistants checked the credentials of the drug tester.

62.     In June 2009, Walsh and Ballester wrote a second book entitled LE SALE TOUR.  The authors stated that they purposely did not put the title of their book in capital letters because of their disgust with what had happened with the sport of cycling.  When asked why he was always "after" Armstrong, Walsh explained, "If he doped to win the Tour de France, which I believe he did, he's not a genuine champion."

63.     On May 20, 2010, *The New York Times* reported that Armstrong and other team members of the U.S. Postal Service cycling team had been accused of using banned performance enhancing drugs by former team member Floyd Landis ("Landis").  Landis provided this revealing information to USA Cycling, the governing body for cycling in the United States, via electronic mail.  Because Landis had spent the previous four years vehemently denying these very same charges, utilizing at times his "Floyd Fairness Fund," which Weisel helped establish and fund, Landis's admission came as a surprise.  One cycling official confirmed that Landis had provided detailed information concerning the use of performance enhancing drugs.  Landis revealed that his own doping had begun in 2002, the

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 44

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

first year he became Armstrong's cycling teammate.  In response to these revelations, as set forth in ¶ 45, Armstrong vehemently and publicly denied teammate Landis's assertions, calling him a discredited liar.

64.    In June 2010, less than one month after publication of the above-referenced news story, Landis filed his *qui tam* (whistleblower) suit in the U.S. District Court for the District of Columbia.  That whistleblower suite remained under seal until February 22, 2013, when the U.S. Department of Justice announced that it would join the case and assert claims against Armstrong; Johan Bruyneel, the manager of the U.S. Postal Service cycling team; and Tailwind Sports LLC and Tailwind Sports Corporation, entities that were owned by, among others, Armstrong, Weisel and Stapleton.  In a news release concerning its joinder in the case that was issued on February 22, 2013, the Department of Justice stated as follows:

> **United States Joins Lawsuit Alleging Lance Armstrong and Others Caused the Submission of False Claims to the U.S. Postal Service**
>
> The Department of Justice announced today that the government has joined a civil lawsuit alleging that Lance Armstrong, Johan Bruyneel and Tailwind Sports LLC and Tailwind Sports Corporation (Tailwind) submitted or caused the submission of false claims to the U.S. Postal Service (USPS) in connection with its sponsorship of a professional bicycle racing team by regularly employing banned substances and methods to enhance their performance, in violation of the USPS sponsorship agreements.
>
> From 1996 through 2004, the USPS sponsored a professional cycling team owned by Tailwind and its predecessors. Lance Armstrong was the lead rider on the team, and between 1999 and 2004, he won six consecutive Tour de France titles as a member of the USPS-sponsored team. Johan Bruyneel was the *directeur sportif,* or manager, of the cycling team.
>
> The sponsorship agreements gave the USPS certain promotional rights, including the right to prominent placement of the USPS logo on the cycling team's uniform. Each of the agreements required the team to follow the rules of cycling's governing bodies, which prohibited the use of certain performance enhancing substances and methods. Between 2001 and 2004 alone, the Postal Service paid $31 million in sponsorship fees.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 45

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

The lawsuit joined today by the government alleges that riders on the USPS-sponsored team, including Armstrong, knowingly caused the USPS agreements to be violated by regularly employing banned substances and methods to enhance their performance. The lawsuit further alleges that Bruyneel knew that team members were using performance enhancing substances and facilitated the practice.…

"The Postal Service contract with Tailwind required the team to enter cycling races, wear the Postal Service logo, and follow the rules banning performance enhancing substances – rules that Lance Armstrong has now admitted he violated," said Stuart F. Delery, Principal Deputy Assistant Attorney General for the Civil Division of the Department of Justice. "Today's action demonstrates the Department of Justice's steadfast commitment to safeguarding federal funds and making sure that contractors live up to their promises."

"Lance Armstrong and his cycling team took more than $30 million from the U.S. Postal Service based on their contractual promise to play fair and abide by the rules – including the rules against doping," said Ronald C. Machen Jr., U.S. Attorney for the District of Columbia. "The Postal Service has now seen its sponsorship unfairly associated with what has been described as 'the most sophisticated, professionalized, and successful doping program that sport has ever seen.' This lawsuit is designed to help the Postal Service recoup the tens of millions of dollars it paid out to the Tailwind cycling team based on years of broken promises. In today's economic climate, the U.S. Postal Service is simply not in a position to allow Lance Armstrong or any of the other defendants to walk away with the tens of millions of dollars they illegitimately procured."

For many years, including during the USPS sponsorships, Armstrong and others repeatedly denied that the team used performance enhancing substances or methods. Yet on Oct. 10, 2012, the U.S. Anti-Doping Agency (USADA) issued a report concluding that Armstrong used banned performance enhancing substances starting in at least 1998 and continuing throughout his professional career, and that he pressured and helped his teammates to engage in similar conduct. Accordingly, USADA disqualified all of his competitive results since Aug. 1, 1998, including his seven Tour de France victories, and banned him from sport for life pursuant to the World Anti-Doping Code.

In a recently-televised interview with Oprah Winfrey, Armstrong contradicted his earlier denials and admitted that he used banned substances and methods throughout his career, starting in the mid-1990s. In particular, he admitted having engaged in banned practices during each of his seven Tour de France victories, including the six he won as a USPS rider. Armstrong explained that he avoided detection by anti-doping authorities by carefully timing his use of

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 46

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

banned drugs so that they would leave his system prior to his undergoing cycling's required periodic drug testing,

65.     On September 10, 2010, Betsy Andreu ("Andreu"), the wife of former Armstrong cycling teammate Frankie Andreu, acknowledged that she had spoken to federal investigators regarding the use of banned performance enhancing drugs in professional cycling. Ms. Andreu stated that while Armstrong was being treated for cancer, he told his doctors and others, including Ms. Andreu and her husband, Armstrong's cycling teammate Frankie Andreu, that he had used performance enhancing drugs, including EPO, human growth hormone, steroids and testosterone. Andreu told federal agents that Armstrong was in his hospital room in Indianapolis, Indiana, when he made this revelation. On September 11, 2010, it was revealed that Andreu had received several threatening telephone voicemail messages left by an Armstrong friend and it was stated that those voicemail recordings would be used as evidence in a federal investigation into Armstrong's activities.

66.     On January 24, 2011, *Sports Illustrated* magazine reported that in 1995 Armstrong cycling teammate Stephen Swart had called Armstrong "the instigator" of a team-wide doping program and that Armstrong had encouraged his cycling teammates to use EPO, which is a banned performance enhancing drug. In response, Armstrong's lawyer publicly denied these accusations. The *Sports Illustrated* article explicated many of the prior doping accusations made against Armstrong. Most importantly, *Sports Illustrated* pointed out that because the cycling team was sponsored by the U.S. Postal Service and involved the use of government resources, a federal investigation into such wrongdoing would be necessary.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 47

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

67.     On May 23, 2011, the CBS television network aired the show "60 Minutes," which investigated the allegations surrounding Armstrong and included an interview with former Armstrong cycling teammate Tyler Hamilton ("Hamilton").  During the broadcast, Hamilton asserted that he and Armstrong had taken EPO during 1999-2001.  The award-winning television news show also reported that two other teammates had observed Armstrong using EPO.  Hamilton stated that he saw the drug stored in the refrigerator and that he and other teammates saw Armstrong use the drug with the assistance of team physicians Dr. Celaya and, later, Dr. Luis del Moral.

68.     As a result of these public revelations and, in particular, the report published by *The New York Times* in May 2010, the article published by *Sports Illustrated* in January 2011 and the "60 Minutes" television show broadcast in May 2011, Penguin (USA), Putnam, Berkley, Random House, Crown and Broadway were given explicit notice the Armstrong Books that they had published and marketed, advertised and sold as truthful works of nonfiction biography were, in fact, nothing more than a tissue of lies.  Notwithstanding such knowledge and/or notice, the Publisher Defendants took no constructive steps to investigate the serious charges being leveled against Armstrong by credible sources.  The Publisher Defendants took no steps to publish or disseminate corrective notices and advertisements, withdraw the Armstrong Books for which they were responsible from sales channels, or offer consumers, including Plaintiffs and the members of the Class, refunds for the money they had paid to purchase hardcover, paperback, electronic and/or audiobook editions of the Armstrong Books for which they were responsible.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 48

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

### D.    The USADA Brings Charges Against Armstrong And Publishes Its Report Detailing Armstrong's Wrongdoing

69.    The failure of the Publisher Defendants to correct or withdraw the Armstrong Books for which they were responsible from sales channels, or to take other appropriate steps of remediation, was brought into stark relief on June 12, 2012, when Armstrong was formally charged with doping and the trafficking of drugs by the USADA.  At the same time, Armstrong was suspended from competing in any cycling-related events and he was banned from participating in triathlons.  The 15-page letter sent to Armstrong by the USADA alleged that his blood samples from 2009 and 2010 were "fully consistent with blood manipulation, including EPO use and/or blood transfusions."

70.    Consistent with his decade-long pattern of misrepresenting the truth and bullying his accusers (as detailed in ¶ 45), on July 9, 2012, Armstrong responded to the USADA's letter by filing a lawsuit against the USADA and its Chief Executive Officer, Travis Tygart, in the U.S. District Court for the Western District of Texas; the case was entitled *Lance Armstrong v. U.S. Anti-Doping Agency,* Case No. A-12-CA-606-SS.  That same day, U.S. District Judge Sam Sparks issued an order dismissing Armstrong's complaint and motion for temporary restraining order against the USADA.  In the order, Judge Sparks summarized Armstrong's suit as a "lengthy and bitter polemic" and stated that "[t]his Court is not inclined to indulge Armstrong's desire for publicity, self-aggrandizement, or vilification of [the USADA]."  Dkt. No. 17 at 2-3.  Armstrong responded to Judge Sparks' Order by filing an amended complaint on July 10, 2012.  In his court filings, Armstrong frivolously asserted that the USADA did not have the ability to file charges against him because his contracts were with the UCI.  On August 20, 2012, Armstrong's lawsuit against

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 49

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

the USADA and Tygart was again dismissed with the finding that Armstrong's right to due process could not be violated by the USADA before any proceedings had actually occurred. Armstrong was left with three days to decide if he wished to arbitrate his case in accordance with USADA rules. Dkt. Nos. 56-57. On August 23, 2012, Armstrong declined to arbitrate the USADA's charges, stating on his personal LIVESTRONG Internet webpage: "There comes a point in every man's life when he has to say, 'Enough is enough.'" However, Armstrong continued to publicly deny any doping charges, claiming that he was weary of dealing with such accusations. By avoiding USADA arbitration, Armstrong knew he would be banned for life from the sport of cycling and stripped of all of his race "wins."

71.     On August 24, 2012, the USADA imposed a lifetime ban on Armstrong and retroactively disqualified him from, and stripped him of, of all his Tour de France race medals, thereby eliminating all of Armstrong's "achievements" from the record books. Despite these irrevocable steps being taken by the governing authorities, the Publisher Defendants took no steps to correct the lies contained in or about the Armstrong Books for which they are responsible, on the books' front and back covers and flyleafs of the Armstrong Books, on their publisher-sponsored websites, and/or to withdraw the Armstrong Books for which they are responsible from sales channels. Instead, the Publisher Defendants continued to advertise the Armstrong Books for which they are responsible as nonfiction biographies written by the "Tour de France Winner."

72.     On October 12, 2012, the USADA forwarded to the UCI, the World Anti-Doping Agency and the World Triathlon Corporation its 202-page edited version of a report entitled "Reasoned Decision of the United States Anti-Doping Agency on Disqualification

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 50

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

and Ineligibility" (the "USADA Report"). The USADA Report, which received worldwide attention upon its publication, found that Armstrong had engaged in a sophisticated doping conspiracy "designed in large part to benefit Armstrong," and that Armstrong took various performance enhancing drugs during *all* of his Tour de France race victories.

73.     The USADA Report provided a detailed, year-by-year breakdown of Armstrong's doping and use of performance enhancing drugs, starting in 1998, in a race in Spain where Armstrong's teammate, Jonathan Vaughters ("Vaughters"), alleged that Armstrong injected himself with EPO in front of him and was open about his performance enhancing drug use. According to the USADA Report, seven witnesses (including four cyclists and a team employee) testified about performance enhancing drug use on Armstrong's U.S. Postal Service cycling team, including the use of EPO, testosterone, human growth hormone and cortisone.

74.     According to the USADA Report, in 1999 Armstrong's U.S. Postal Service cycling team ousted the team doctor, Pedro Celaya, because he "had not been aggressive enough for Armstrong in providing banned products." That same year, according to the USADA Report, Armstrong "got serious" with Italian doping doctor Michele Ferrari ("Ferrari"). In one instance, according to Ms. Andreu – the wife of USPS cycling team rider Frankie Andreu – she, Armstrong and Armstrong's then-wife met Ferrari on the side of the road outside Milan, Italy, and that on that occasion, Armstrong met alone with Ferrari for an hour. Hamilton, Armstrong's cycling training partner in 1999, told the USADA that Ferrari had injected him with EPO that year. Ferrari was convicted of sports doping charges in Italy in 2004. During the 1999 Tour de France race, Armstrong tested positive for a cortisone that

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 51

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

he didn't have medical authorization to use.  A deliberate cover-up then ensued; in the words

of the USADA report:

> Emma O'Reilly was in the room giving Armstrong a massage when
> Armstrong and team officials fabricated a story to cover the positive test.
> Armstrong and the team officials agreed to have Dr. del Moral backdate a
> prescription for cortisone cream for Armstrong which they would claim had
> been prescribed in advance of the Tour to treat a saddle sore.  O'Reilly
> understood from Armstrong, however, that the positive had not come from a
> topical cream but had really come about from a cortisone injection Armstrong
> received around the time of the Route du Sud a few weeks earlier.  After the
> meeting between Armstrong and the team officials concluded, Armstrong told
> O'Reilly, 'Now, Emma, you know enough to bring me down.'"

75.     The USADA Report stated that the U.S. Postal Service cycling team was

delivered EPO during the 1999 Tour de France race by a skilled, drug-smuggling

motorcyclist whom the team members called "Motoman."  Hamilton stated that riders also

took testosterone in 1999 via an olive oil-based solution that was sprayed in their mouths.

However, as Armstrong wrote in his books, IT'S NOT ABOUT THE BIKE, MY JOURNEY BACK

TO LIFE and EVERY SECOND COUNTS, he attributed the above-referenced positive drug test to

an approved cortisone skin cream used for saddle soreness.

76.     In 2000, when the organizers of the Tour de France race started testing for

EPO, Hamilton asserts that the U.S. Postal Service cycling team moved on to blood doping.

Hamilton states that he, Armstrong and teammate Livingston went to Valencia, Spain, and

had blood extracted and later re-infused to boost their performance.  Another Armstrong

teammate, George Hincapie ("Hincapie"), testified that Armstrong also used testosterone in

2000, and that Armstrong dropped out of a cycling race in Spain after Hincapie warned him

that there would be drug testing.  Hamilton states that U.S. Postal Service cycling team riders

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 52

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

were re-infused with blood during the 2000 Tour de France race at a hotel room, and that they joked about whose body was absorbing the blood the fastest.

77.     According to the USADA Report, Hincapie testified that Ferrari visited the U.S. Postal Service cycling team training camp at the beginning of 2001 and his services were offered to any rider who wanted them for $15,000.  Also in 2001, Vaughters reports that he went out on a bike ride with Armstrong where Armstrong "demonstrated a detailed knowledge of the EPO test," and told him how to skirt a positive drug test.  Armstrong told Vaughters that he had sources in the testing world who told him how it works.

78.     During the 2001 Tour du Suisse race, Armstrong informed his teammates that he had tested positive for EPO; however, after having a conversation with UCI officials, Armstrong told his teammates "everything was going to be okay."  Cycling teammate Landis stated that Armstrong told him he (Armstrong) had made a "financial agreement" with UCI officials to keep the results from the positive drug test hidden.

79.     During 2002, the USADA Report states that Armstrong become good friends and training partners with cycling teammate Landis, who asserts that he and Armstrong shared doping advice and drugs.  According to the USADA Report, "Armstrong also describe[d] how much he enjoyed Landis' boyish antics, gregarious personality and love for the American rock band ZZ Top."  Landis had keys to Armstrong's apartment.  The USADA Report states that the agency has evidence that $150,000 was paid by Armstrong to Ferrari during 2002, even though Dr. Ferrari was then under investigation for doping.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 53

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

80.     After the 2002 Tour de France race, U.S. Postal Service team member Christian Vande Velde ("Vande Velde") states that Armstrong threatened to kick him off the team if he didn't step up his doping program.  As the USADA report states:  "Armstrong told Vande Velde that if he wanted to continue to ride for the [U.S. Postal Service cycling] team he 'would have to use what . . . Ferrari had been telling [Vande Velde] to use and would have to follow . . . Ferrari's program to the letter.'"  According to the USADA Report, Vande Velde stated that "the conversation left me with no question that I was in the doghouse and that the only way forward with Armstrong's team was to get fully on Dr. Ferrari's doping program."  Vande Velde acquiesced to Armstrong's demand.

81.     According to records uncovered by the USADA, during 2003 Armstrong paid Ferrari the sum of $475,000 for services including assistance in maintaining the doping program.  Armstrong's cycling teammate, Landis, was hurt during 2003, but when Armstrong went out of town he asked Landis to stay at his apartment and keep an eye on the bags of blood stored in his refrigerator and to make sure it was continuously refrigerated.  "Landis agreed to babysit the blood," the USADA Report says.  Both Landis and Hincapie state that Armstrong blood-doped in 2003 and during every other Tour de France race held from 2001 to 2005.  Landis states that Armstrong gave him a box of six pre-measured syringes of EPO after he (Armstrong) got two liters of blood extracted in 2003.

82.     During 2004, Armstrong continued to work with Ferrari and, on the day before the 2004 Tour de France race, Armstrong wire transferred $100,000 to Ferrari.  Cycling teammate Landis states that he saw Armstrong on a massage table with a testosterone patch on his shoulder.  During the 2004 Tour de France race, both Landis and Hincapie assert that

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 54

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

the entire U.S. Postal Service cycling team got blood transfusions on the team bus after a stage of the race.  In late 2004, Ferrari was convicted of sporting fraud for advising a group of Italian riders about EPO and other drugs.  According to the USADA Report, it was only at that point that Armstrong publicly claimed that he had severed his relationship with Ferrari.

83.     In 2005, Hincapie asserts that Armstrong gave him EPO following the latter's seventh-straight Tour de France race "win."  Also in 2005, the USADA Report states that Armstrong's supposedly-finished relationship with Ferrari was "business as usual."  Armstrong and Ferrari met in Italy and Armstrong wire transferred $100,000 to Ferrari to pay him for services rendered in connection with Armstrong's doping regimen.

84.     During 2009, the USADA Report states that Armstrong retained a professional relationship with Ferrari by soliciting advice from him through Ferrari's son, Stefano.  As reported in the USADA Report, here is an example of an e-mail exchange between Armstrong, Ferrari and Stefano ("Schumi" refers to Ferrari):  On November 4, 2009, Stefano inquires: "Schumi asks if you'd like [t]o continue the cooperation for next year too – if so, then it [w]ould be good to start thinking about some specifics already (gym + [s]ome bike)."  On November 15, 2009, when Armstrong is looking ahead to the next year's Tour de France race, he writes: "Yes, let's continue ... what we have started.  I'm curious to know what Schumi [t]hinks for 2010 and what we need to do differently in terms of training…."  Stefano responds, "Great! Schumi says it's obviously a [T]our for light climbers...."  The USADA Report states that the chances that Armstrong's blood levels during the 2009 Tour de France occurred naturally were "less than one in a million."  The USADA report revealed that during their association, Armstrong paid a company owned by Ferrari over $ 1 million.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 55

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

85.     According to the USADA Report, during his cycling career Armstrong avoided positive drug tests by engaging in a variety of deceptive activities, including:

(a) **Avoiding the testers**. Cycling teammate Hamilton states that they would take the EPO injections at night and never answer the door when the testers came by. Teams commonly had lookouts to inform a rider when a tester was approaching, according to an independent review of the 2010 Tour de France. The USADA Report states that the U.S. Postal Service cycling team also seemed to have inside information on when the tests would come.

(b) **Using undetectable drugs**. During 1998-2005, cycling authorities could not test for blood doping or HGH. In addition, EPO is hard to test for and wasn't even testable until 2000. Testosterone is notoriously hard to detect as well.

(c) **Next-level methods**. The USADA Report states that the U.S. Postal Service cycling team had an understanding of how testing worked, and that team members used methods that would result in negative tests. These included methods like testosterone patches and injecting EPO directly into the vein. The USADA report states that the team "literally smuggled" saline solution into camp in 1998 to water down test results.

86.     As the USADA Report concluded: "The evidence is overwhelming that Lance Armstrong did not just use performance enhancing drugs, he supplied them to his teammates. He did not merely go alone to . . . Michele Ferrari for doping advice, he expected that others would follow. It was not enough that his teammates give maximum effort on the bike, he also required that they adhere to the doping program outlined for them or be replaced. He

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 56

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

was not just a part of the doping culture on his team, he enforced and re-enforced it. Armstrong's use of drugs was extensive, and the doping program on his team, designed in large part to benefit Armstrong, was massive and pervasive."

**E.    Armstrong's Admissions During His Television Interview With Oprah Winfrey Broadcast In January 2013**

87.    On January 17, 2013, Armstrong admitted to well-known television personality Oprah Winfrey ("Winfrey"), in an interview which was broadcast nationwide on The Oprah Network, that he began using banned performance enhancing drugs in the mid-1990's, before he was diagnosed with cancer, and that he had used them throughout his cycling career, including during each of his seven Tour de France race victories.  Armstrong admitted to Winfrey that his story "was so perfect for so long," that the "myth" of his perfect story was "not true," and that "a lot of people helped paint that (untrue) picture."  Armstrong admitted that his cocktail of banned performance enhancing drugs and procedures consisted of "EPO, transfusions and testosterone," and that he was not afraid of getting caught despite the testing program because of the testing protocols and because the UCI did not test for EPO until 2006.  Armstrong stated that until 2005, cyclists were tested only at or during the races at which time the banned performance enhancing drugs were no longer detectable because most of the use of banned performance enhancing drugs occurred during the off-competition training season.  Armstrong admitted to Winfrey that he was a "ruthless, relentless, 'win-at-all-costs' bully" who hid the truth in order to "perpetuate the story" and in order to "win".

88.    Armstrong admitted in his televised interview with Winfrey that the positive EPO tests from samples of his 1999 blood were, in fact, accurate, despite his prior denials

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 57

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

and/or claim that his samples had been "spiked," which had been repeatedly stated both publicly and in his books.  Armstrong also admitted that in 1999 he had convinced a doctor to back-date a prescription for a cortisone cream in order to explain his positive test result for steroids.  During the interview, Armstrong admitted that the "Motoman" story was true.

89.     Despite these well-publicized revelations, which were broadcast on nationwide television and reported by the print media and on the Internet, despite the filing of Plaintiffs' Class Action Complaint in this Court on January 22, 2013, and despite their receipt of demand or notice letters sent by Plaintiffs' counsel pursuant to Section 1782(a) of the CLRA, Defendants – including Armstrong and the Publisher Defendants – have taken no steps whatsoever to identify consumers who purchased the Armstrong Books in the State of California, notify such consumers of the truthful facts that have been revealed, and take appropriate steps to correct and/or cease selling the Armstrong Books in the State of California.  Defendants have not taken appropriate steps to correct and/or discontinue the advertisements for the Armstrong Books contained on the books' jackets, flyleafs and Internet websites, notify sellers of the books that the books are misleading, fraudulent and discredited works of fiction replete with lies, and have not taken any steps to pay refunds to consumers who purchased the Armstrong Books, including Plaintiffs and the members of the Class.  Indeed, Armstrong and the Publisher Defendants did not deign to respond to the CLRA demand or notice letters sent by Plaintiffs' counsel on January 22, 2013.

F.     **Plaintiffs' Lack Of Knowledge Concerning Armstrong's Fraud And Their Efforts To Learn The Truth**

90.     Plaintiff Stutzman remembers seeing news reports shortly after May 2010 regarding Armstrong teammate Landis's allegations.  For the first time, Stutzman began to

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 58

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

seriously wonder if Armstrong had lied about never using banned substances.  But

Armstrong's continued, vehement and well-publicized protests that he was innocent, the fact

that it was widely reported that Armstrong had never tested positive for a banned substance,

and the fact that Armstrong had successfully sued accusers for defamation, led Stutzman to

believe that Armstrong was telling the truth.  It was not until the time period from August to

October 2012, when Armstrong was stripped of all seven of his Tour de France race titles

and the USADA Report was issued, that Stutzman felt certain that Armstrong had lied all

along.  When Armstrong confessed doping to Winfrey during the interview broadcast on

nationwide television on January 17-18, 2013, Stutzman felt duped, cheated and betrayed.

91.     Plaintiff Wheeler, who had followed Armstrong's cycling career from the

beginning, was convinced of Armstrong's veracity because he supposedly continued to test

"clean" for drugs.  After all, Wheeler believed that given the fact of widespread testing for

banned substances, if other cyclists were testing "dirty," getting caught and disciplined by

cycling authorities, and Armstrong was not, then surely Armstrong was "clean."  Plaintiff

Wheeler even formed the opinion that Greg LeMond ("LeMond"), a three-time winner of the

Tour de France race (and the only previous American winner), was a "whiner" when

LeMond suggested in 2001 that Armstrong was one of the greatest "frauds" in the history of

cycling.  Wheeler was so proud of Armstrong's first Tour de France race "win" that he

purchased a 2000 "maillot jaune" (yellow jersey) symbolizing the race winner.  Wheeler

came to believe that Armstrong was probably lying when, during August-October 2012, the

USADA Report was issued and Armstrong was stripped of his seven Tour de France titles.

The disappointed Wheeler felt cheated and betrayed.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 59

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

92.     Plaintiff Lauria is not a cyclist, but a person living with breast cancer, a fight she did not ask for. She was inspired by media accounts about Armstrong's successful battle against testicular cancer. But when she later learned of the possibility that Armstrong use of EPO may have caused or contributed to the severity of his condition she became outraged.

93.     Plaintiff Reimers also feels he was duped by Armstrong and Armstrong's well-orchestrated machine of denials that he used performance enhancing drugs. Plaintiff S. Armstrong also believes that he was deceived by Armstrong and the other Defendants into believing Armstrong's false and misleading statements to the extent that he was induced, among other things, to purchase IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and other Armstrong-sponsored or Armstrong-approved products, recommended the Armstrong Books to friends, and traveled to view Armstrong's cycling races.

## V.     ADDITIONAL FACTS REGARDING DEFENDANTS' UNLAWFUL CONDUCT

94.     Throughout the Class Period, Armstrong fraudulently represented the Armstrong Books, including IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE and EVERY SECOND COUNTS, to be a truthful works of nonfiction biography during personal appearances, in print, on the Internet and on television.

95.     From May 2000 to the present, Armstrong, Penguin Group (USA), Putnam and Berkley fraudulently and/or negligently represented and promoted the book, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, to be a truthful work of nonfiction biography, representing that Armstrong is a "Tour de France Winner," that the book is a "personal story of Lance Armstrong's life so far, from childhood … [to] more triumph (victory in the 1999 Tour de France)," and that "Champion cyclist Lance Armstrong's Tour de France victory has

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 60

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

been hailed as amount 'the most memorable moments in sports history during this century,'" on the book's front and back covers, on the flyleafs, through press kits, promotions, press releases and communications made via various other media channels including, but not limited to, *The New York Times, USA Today,* Amazon, Borders Books and Barnes & Noble. Such promotional and marketing efforts continued after January 2011, by which point Penguin Group (USA), Putnam and Berkley knew or should have known that Armstrong's book was not a truthful work of nonfiction biography.

96.     From January 2003 to the present, Armstrong, Random House, Broadway and Crown fraudulently and/or negligently represented and promoted the book, EVERY SECOND COUNTS, to be a truthful work of nonfiction, representing Armstrong as "The five-time Tour de France winner" on the book's front and back covers, on the flyleafs, through press kits, promotions, press releases and communications made by various other media channels including, but not limited to, *The New York Times, USA Today,* Amazon, Borders Books and Barnes & Noble.  Such promotional and marketing efforts continued after January 2011, by which point Random House, Broadway and Crown knew or should have known that Armstrong's book was not a truthful work of nonfiction biography.

97.     Throughout the Class Period, Armstrong, Weisel and Stapleton actively and fraudulently concealed the material fact that Armstrong used banned performance enhancing drugs in his cycling career.  Armstrong, Weisel and Stapleton carried out this concealment and deception by various means, including arranging and holding press conferences to declare that Armstrong had never failed a drug test and by suing Armstrong's accusers and detractors for defamation and other torts.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 61

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

## VI.   CLASS ACTION ALLEGATIONS

98.     Under Rule 23(a) and (b) of the Federal Rules of Civil Procedure and Section 1781 of the CLRA, Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action.  The Class (or subclasses) which Plaintiffs seek to represent is (are) defined as follows:  (a) All consumers residing in the State of California who purchased the book IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE from its initial publication date in May 2000 through the present; and (b) all consumers residing in the State of California who purchased the book EVERY SECOND COUNTS from its initial publication date in January 2003 through the present; and (c) all consumers residing in the State of California who purchased the book THE LANCE ARMSTRONG PERFORMANCE PROGRAM:  7 WEEKS TO THE PERFECT RIDE from its initial publication date in September 2000 through the present; and (d) all consumers residing in the State of California who purchased LANCE ARMSTRONG:  IMAGES OF A CHAMPION from its initial publication date in June 2004 through the present; and (e) all consumers residing in the State of California who purchased the book COMEBACK 2.0:  UP CLOSE AND PERSONAL from its initial publication date in December 2009 through the present (the "Class" and the "Class Period").

99.     Excluded from the Class are each of the Defendants identified in this Amended Complaint, any entity in which Defendants have a controlling interest, any officers or directors of Defendants, their legal representatives, heirs, successors and assigns, and any judicial officer assigned to this case.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 62

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

100.    Plaintiffs reserve the right, upon completion of discovery with respect to the scope of the Class and the Class Period, to amend the definitions of the Class and the Class Period set forth above.

101.    The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable.  Based upon the reported book sales figures set forth herein, Plaintiffs allege that there are thousands of members in the Class who reside throughout the State of California.

102.    Plaintiffs, who are members of the Class, have suffered monetary injury, are committed to prosecute this case and have retained competent counsel who are experienced in complex class action litigation.  Accordingly, Plaintiffs are adequate representatives of the Class because they have the same interests as the members of the Class, their claims are typical of the claims of Class members, and they will fairly and adequately protect the interests of Class members.

103.    There are questions of law or fact common to members of the Class that predominate over any questions affecting individual members including, but not limited to:

(a)     Whether Defendants' false and/or misleading statements of fact and concealment of material facts to Plaintiffs and Class members were likely to deceive them;

(b)     Whether Defendants, by their conduct alleged in this Amended Complaint, have engaged in unfair, deceptive, untrue and/or misleading statements about the truthfulness of the Armstrong Books;

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 63

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

(c)     Whether Defendants' conduct caused damages to Plaintiffs and the members of the Class for which Defendants may be held liable under California law; and

(d)     Whether, as a result of Defendants' misconduct, Plaintiffs and the members of the Class are entitled to recover damages, restitution, injunctive, equitable and/or other types of relief, and the amount and nature of such relief.

104.    The likelihood that individual members of the Class will prosecute separate and individual actions is remote due to the relatively small – albeit substantial in the aggregate – actual and potential damages sustained by each Class member, when compared to the losses suffered by the Class as a whole compared to the burden and expense of prosecuting litigation of this nature and magnitude.  Thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**VII.    DELAYED DISCOVERY AND/OR FRAUDULENT CONCEALMENT**

105.    Plaintiffs' causes of action against Defendants, as alleged in Part VIII of this Amended Complaint *infra,* did not accrue until Plaintiffs discovered, or had reason to discover, each such cause of action.  As set forth herein, until at least August 2012, when the USADA imposed a lifetime ban on Armstrong and stripped him of all his Tour de France medals, and/or October 2012, when the USADA Report was published, and/or January 2013, when Armstrong made his televised confession to Winfrey, Plaintiffs did not have knowledge of the causes of action against Armstrong, Weisel, Stapleton and the Publisher Defendants.  Until those above-referenced public disclosures were made during August 2012 to January 2013, Plaintiffs lacked means of obtaining such knowledge; that is, in the exercise

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 64

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

of reasonable diligence, Plaintiffs could not have uncovered the truth about Armstrong's wrongdoing at an earlier date.  As alleged in this Amended Complaint, until at least August 2012, Plaintiffs were unable to discover the fraudulent scheme carried out by Armstrong and the other Defendants.

106.    As alleged in this Amended Complaint, from at least July 1999 to January 2013, Armstrong, Stapleton and Weisel fraudulently concealed the truth from the public, including Plaintiffs and the members of the Class.  As alleged in this Amended Complaint, Plaintiffs did not discover the truth about Armstrong's fraudulent scheme until August 2012, at the earliest or January 2013, at the latest.  Plaintiffs gradually discovered the truth when, in August 2012, the USADA imposed a lifetime ban on Armstrong and stripped him of all his Tour de France medals, and/or in October 2012, when the USADA Report was published, and/or January 2013, when Armstrong made his televised disclosures to Winfrey.  Prior to this series of public disclosures, Plaintiffs had no actual or presumptive knowledge of facts sufficient to put them on inquiry.

## VIII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violations of the Consumers Legal Remedies Act)

107.    Plaintiffs incorporate by reference all previous paragraphs of this Amended Complaint as if fully set forth and further alleges as follows.  This cause of action, which alleges violations of the CLRA, is brought against (a) Armstrong, Weisel and Stapleton as to each of the Armstrong Books, and against (b) Penguin Group (USA), Putnam and Berkley as to IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 65

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

108.    The CLRA, CAL. CIV. CODE § 1750 *et seq.*, provides California consumers with a comprehensive procedure for redressing Defendants' violations of various statutory rights.

109.    Defendants' misrepresentations in and about the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, which is a "good" under Section 1761(a), as a truthful work of non-fiction biography, and claiming in advertisements and marketing materials that Armstrong is a "Tour de France Winner," that the book is a "personal story of Lance Armstrong's life so far, from childhood … [to] more triumph (victory in the 1999 Tour de France)," that "Champion cyclist Lance Armstrong's Tour de France victory has been hailed as amount 'the most memorable moments in sports history during this century,'" has violated, and continues to violate, the CLRA in at least the following respects:

(a)    In violation of Section 1770(a)(2) of the CLRA, Defendants have misrepresented the sponsorship, approval, or certification of the goods in question;

(b)    In violation of Section 1770(a)(5) of the CLRA, Defendants' acts and practices constitute representations that the goods in question have approval, characteristics, uses, or benefits which they do not have or that Armstrong has sponsorship, approval, status, affiliation, or connection which he does not have;

(c)    In violation of Section 1770(a)(7) of the CLRA, Defendants' acts and practices constitute representations that the goods in question are of a particular standard, quality or grade, when they are not;

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 66

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

(d)     In violation of Section 1770(a)(9) of the CLRA, Defendants' acts and practices constitute the advertisement of goods in question without the intent to sell them as advertised;

(e)     In violation of Section 1770(a)(16) of the CLRA, Defendants' acts and practices constitute representations that the subject of the transaction has been supplied in accordance with previous representations when it has not.

110.    By reason of the foregoing, Plaintiffs and Class members have been harmed, thereby entitling them to recover (a) actual damages; (b) an order enjoining Defendants' above-referenced methods, acts, or practices; (c) restitution of the money spent by Plaintiffs and Class members to purchase the Armstrong Books; (d) punitive damages; and (e) such other relief as this Court deems proper, all in accordance with the provisions of Section 1780(a)(1)-(5) of the CLRA.

111.    In accordance with Section 1782(a) of the CLRA, by letters dated January 22, 2013, Plaintiffs notified Armstrong and the Publisher Defendants in writing of the above-referenced particularized violations of Section 1770 of the CLRA.  In their written notices, Plaintiffs demanded that these Defendants rectify the actions described above by providing complete monetary relief, agreeing to be bound by their legal obligations and give notice to all affected customers of their intent to do so.  Plaintiffs sent such notices by certified mail, return receipt requested, to these Defendants' residence and/or principal places of business.

112.    Within 30 days after their receipt of the letters that were sent pursuant to Section 1782(a) of the CLRA, Armstrong and/or the Publisher Defendants did not agree to provide appropriate correction, replacement, or other remedy to Plaintiffs and the members

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 67

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

of the Class; neither did they agree to provide such appropriate correction, replacement, or other remedy within a reasonable time. Therefore, in accordance with Section 1782(b), (c) and (d) of the CLRA, Plaintiffs are entitled to file this Amended Complaint and seek the remedies enumerated in Section 1780(a)(1)-(5) of the CLRA.

**SECOND CAUSE OF ACTION**

**(Violations of the Consumers Legal Remedies Act)**

113.     Plaintiffs incorporate by reference all previous paragraphs of this Amended Complaint as if fully set forth and further alleges as follows. This cause of action, which alleges violations of the CLRA, is brought against (a) Armstrong, Weisel and Stapleton as to each of the Armstrong Books, and against Random House, Broadway and Crown as to EVERY SECOND COUNTS.

114.     The CLRA, CAL. CIV. CODE § 1750 *et seq.*, provides California consumers with a comprehensive procedure for redressing Defendants' violations of various statutory rights.

115.     Defendants' misrepresentations in and about the Armstrong Books and, in particular, EVERY SECOND COUNTS, which is a "good" under Section 1761(a), as a true and honest work of non-fiction biography and that Armstrong is "the five-time Tour de France winner" has violated, and continues to violate, the CLRA in at least the following respects:

(a)     In violation of Section 1770(a)(2) of the CLRA, Defendants have misrepresented the sponsorship, approval, or certification of the goods in question;

(b)     In violation of Section 1770(a)(5) of the CLRA, Defendants' acts and practices constitute representations that the goods in question have approval,

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 68

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

characteristics, uses, or benefits which they do not have or that Armstrong has

sponsorship, approval, status, affiliation, or connection which he or she does not have;

(c)      In violation of Section 1770(a)(7) of the CLRA, Defendants' acts and

practices constitute representations that the goods in question are of a particular

standard, quality or grade, when they are not;

(d)      In violation of Section 1770(a)(9) of the CLRA, Defendants' acts and

practices constitute the advertisement of goods in questions without the intent to sell

them as advertised;

(e)      In violation of Section 1770(a)(16) of the CLRA, Defendants' acts and

practices constitute representations that the subject of the transaction has been

supplied in accordance with previous representations when it has not.

116.    By reason of the foregoing, Plaintiffs and Class members have been harmed,

thereby entitling them to recover (a) actual damages; (b) an order enjoining Defendants'

above-referenced methods, acts, or practices; (c) restitution of the money spent by Plaintiffs

and Class members to purchase the Armstrong Books; (d) punitive damages; and (e) such

other relief as this Court may deem proper, all in accordance with the provisions of Section

1780(a)(1)-(5) of the CLRA.

117.    In accordance with Section 1782(a) of the CLRA, by letters dated January 22,

2013, Plaintiffs have notified Armstrong and the Publisher Defendants in writing of the

above-referenced particularized violations of Section 1770 of the CLRA.  In their written

notices, Plaintiffs demanded that these Defendants rectify the actions described above by

providing complete monetary relief, agreeing to be bound by their legal obligations and give

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 69

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

notice to all affected customers of their intent to do so. Plaintiffs sent such notices by certified mail, return receipt requested, to these Defendants' residence and/or principal places of business.

118.    Within 30 days after their receipt of the letters that were sent pursuant to Section 1782(a) of the CLRA, Armstrong and/or the Publisher Defendants did not agree to provide appropriate correction, replacement, or other remedy to Plaintiffs and the members of the Class; neither did they agree to provide such appropriate correction, replacement, or other remedy within a reasonable time. Therefore, in accordance with Section 1782(b), (c) and (d) of the CLRA, Plaintiffs are entitled to file this Amended Complaint and seek the remedies enumerated in Section 1780(a)(1)-(5) of the CLRA.

### THIRD CAUSE OF ACTION

### (Violations of the Unfair Competition Law)

119.    Plaintiffs' incorporate by reference all previous paragraphs of this Amended Complaint as if fully set forth, and further alleges as follows. This cause of action, which asserts violations of the UCL, is brought against (a) Armstrong, Weisel and Stapleton as to each of the Armstrong Books, and against (b) Penguin Group (USA), Putnam and Berkley as to IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.

120.    Plaintiffs assert this claim against Defendants for committing unlawful practices pursuant to the UCL, BUS. & PROF. CODE § 17200 *et seq.,* which prohibits all unlawful or unfair business practices and/or acts.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 70

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

121.   Plaintiffs assert their claim as a member of an aggrieved Class of persons who have expended funds that Defendants should be required to reimburse under the restitutionary remedy specified in Section 17203 of the UCL.

122.   Defendants represented the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, to be a true and honest work of non-fiction biography, which it is not, and claimed in advertisements and marketing materials that Armstrong is a "Tour de France Winner," that the book is a "personal story of Lance Armstrong's life so far, from childhood ... [to] more triumph (victory in the 1999 Tour de France)," and that "Champion cyclist Lance Armstrong's Tour de France victory has been hailed as among 'the most memorable moments in sports history during this century,'" none of which is true, rendering Defendants' representations unfair, untrue, misleading and/or likely to deceive Plaintiffs and the members of the Class.

123.   Defendants' practices deceived consumers who trusted Defendants' representations that the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, is a truthful work of non-fiction, which it is not. As such, Defendants' representations are unlawful and constitute an "unfair business practice."

124.   By acting as alleged herein, Defendant employed unconscionable commercial practices, deception, false advertising, false promises and misrepresentations to lure consumers to purchase the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 71

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

125.    The practices of the Defendants have injured Plaintiffs and the members of the Class by causing them to spend money on books they otherwise would not have purchased and/or, in the alternative, by decreasing the value of the purchased books.

126.    The unlawful acts and practices of Defendant as alleged above constitute unlawful business practices within the meaning of Section 17200.

## FOURTH CAUSE OF ACTION

### (Violations of the Unfair Competition Law)

127.    Plaintiffs' incorporate by reference all previous paragraphs of this Amended Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts violations of the UCL, is brought against (a) Armstrong, Weisel and  Stapleton as to each of the Armstrong Books, and against (b) Random House, Broadway and Crown as to EVERY SECOND COUNTS.

128.    Plaintiffs assert this claim against Defendants for committing and/or aiding and abetting unlawful practices pursuant to the UCL, BUS. & PROF. CODE § 17200 *et seq.,* which prohibits all unlawful or unfair business practices and/or acts.

129.    Plaintiffs assert their claims as a members of an aggrieved Class of persons who have expended funds that Defendants should be required to reimburse under the restitutionary remedy specified in Section 17203 of the UCL.

130.    Defendants represented the Armstrong Books and, in particular, EVERY SECOND COUNTS to be a truthful work of non-fiction biography, which it is not, rendering Defendants' representations unfair, untrue, misleading and/or likely to deceive Plaintiffs and the members of the Class.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 72

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

131.   Defendants' practices deceived consumers who trusted Defendants' representations that the Armstrong Books and, in particular, EVERY SECOND COUNTS, to be a truthful work of non-fiction, which it is not and that Armstrong is a "five-time winner of the Tour de France," which he is not.  As such, Defendants' representations are unlawful and constitute an "unfair business practice."

132.   By acting as alleged herein, Defendant employed unconscionable commercial practices, deception, false advertising, false promises and misrepresentations to lure consumers to purchase the Armstrong Books and, in particular, EVERY SECOND COUNTS.

133.   The practices of the Defendants have injured Plaintiffs and members of the Class by causing them to spend money on books they otherwise would not have purchased and/or, in the alternative, by decreasing the value of the purchased books.

134.   The unlawful acts and practices of Defendant as alleged above constitute unlawful business practices within the meaning of Section 17200.

## FIFTH CAUSE OF ACTION

### (Violations of the False Advertising Law)

135.   Plaintiffs incorporate by reference all previous paragraphs of the Amended Complaint as if fully set forth, and further alleges as follows.  This cause of action, which alleges violations of the FAL, is brought against (a) Armstrong, Weisel and  Stapleton as to each of the Armstrong Books, and against (b) Penguin Group (USA) and Berkley as to IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.

136.   During the Class Period, Defendants have committed acts of untrue and misleading advertising, as defined in the FAL, CAL. BUS. & PROF. CODE § 17500, by

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 73

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

engaging in acts and practices with intent to induce consumers to purchase the Armstrong

Books and, in particular, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.  The

following acts and practices, among others, created a likelihood of confusion and

misunderstanding in connection with the sale of the Armstrong Books and, in particular, IT'S

NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE:

     (a)    Defendant Armstrong fraudulently represented his books, including

IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE, to be a truthful work of non-

fiction biography at personal appearances, in print and on television; and

     (b)    Defendants Penguin Group (USA), Putnam and Berkley  represented

and promoted the book IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE to be

to be a truthful work of non-fiction biography, and claimed in advertisements and

marketing materials that Armstrong is a "Tour de France Winner," that the book is the

"personal story of Lance Armstrong's life so far, from childhood through early

success, nearly fatal cancer, recovery, survivorship, [and] more triumph (victory in

the 1999 Tour de France)," and that "Champion cyclist Lance Armstrong's Tour de

France victory has been hailed as amount 'the most memorable moments in sports

history during this century,'" none of which is true, on the book's covers and flyleafs,

through press kits, websites, promotions, press releases and various other media

channels.  Defendants have continued to advertise, market and sell the subject book as

a truthful work of nonfiction even after they knew or should have known that

Armstrong's book contained false and misleading statements and even after

Armstrong was retroactively disqualified from his Tour de France "wins."

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 74

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

137.   Plaintiffs and other members of the Class relied on and were deceived by Defendants' false and deceptive advertisements and practices as set forth above, and as a direct and proximate result of the afore-mentioned acts, Defendants received and continue to hold ill-gotten gains belonging to Plaintiffs and members of the Class.

138.   In addition to the relief requested in the Prayer for Relief, Plaintiffs seek the imposition of a constructive trust over, and restitution and disgorgement of, the monies collected and profits realized by Defendants, and each of them, as well as injunctive relief, including an order requiring them to cease from false and misleading advertising of the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.

## SIXTH CAUSE OF ACTION

### (Violations of the False Advertising Law)

139.   Plaintiffs incorporate by reference all previous paragraphs of the Amended Complaint as if fully set forth, and further alleges as follows.  This cause of action, which alleges violations of the FAL, is brought against (a) Armstrong, Weisel and Stapleton as to each of the Armstrong Books, and against (b) Random House, Broadway and Crown as to EVERY SECOND COUNTS.

140.   During the Class Period, Defendants have committed acts of untrue and misleading advertising, as defined in the FAL, CAL. BUS. & PROF. CODE § 17500, by engaging in acts and practices with intent to induce consumers to purchase the Armstrong Books and, in particular, EVERY SECOND COUNTS.  The following acts and practices, among

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 75

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

others, created a likelihood of confusion and misunderstanding in connection with the sale of the Armstrong Books and, in particular, EVERY SECOND COUNTS.

(a)     Defendant Armstrong fraudulently represented his books, including EVERY SECOND COUNTS, to be a truthful work of non-fiction biography at personal appearances, in print and on television; and

(b)     Defendants Random House, Broadway and Crown represented and promoted the book EVERY SECOND COUNTS to be to be a truthful work of non-fiction biography and that Armstrong is a five-time winner of the Tour de France, which is not true, on the book's covers and flyleafs, through press kits, promotions, websites, press releases and various other media channels.  These Defendants have continued to advertise, market and sell the subject book as a work of nonfiction even after they knew or should have known that Armstrong's book contained false and misleading statements and even after Armstrong was retroactively disqualified from his Tour de France "wins."

141.    Plaintiffs and other members of the Class relied on and were deceived by Defendants' false and deceptive advertisements and practices as set forth above, and as a direct and proximate result of the aforementioned acts, Defendants received and continue to hold ill-gotten gains belonging to Plaintiffs and members of the Class.

142.    In addition to the relief requested in the Prayer for Relief, Plaintiffs seek the imposition of a constructive trust over, and restitution and disgorgement of, the monies collected and profits realized by Defendants, and each of them, as well as injunctive relief,

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 76

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

including an order requiring them to cease from false and misleading advertising of the Armstrong Books, including EVERY SECOND COUNTS.

## SEVENTH CAUSE OF ACTION

### (Negligent Misrepresentation)

143.    Plaintiffs incorporate by reference all previous paragraphs of this Amended Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts a claim for negligent misrepresentation, is brought against (a) Armstrong, Weisel and Stapleton as to each of the Armstrong Books, and against (b) Penguin Group (USA), Putnam and Berkley as to IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE.

144.    Defendants recklessly or negligently misrepresented or concealed facts relating to the fictional nature of the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE, and represented it as a true and honest work of nonfiction.

145.    The facts misrepresented or omitted by Defendants were and are material.

146.    Plaintiffs and the members of the Class, believing Defendants' representations that the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE was a true and honest work of nonfiction, and that Armstrong was a legitimate "Tour de France Winner," and without means to know otherwise, reasonably relied upon Defendants' misrepresentations, omissions and other practices, directly or indirectly, and purchased said book(s).

147.    Plaintiffs and the members of the Class have thereby been damaged, the exact amount of which is presently unknown, but is capable of being ascertained.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 77

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

148.   As a result of Defendants' practices as set forth herein, Defendants are liable to Plaintiffs and the members of the Class for compensatory damages, interest and costs.

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

149.   Plaintiffs incorporate by reference all previous paragraphs of this Amended Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts a claim for negligent misrepresentation, is brought against (a) Armstrong, Weisel and Stapleton as to each of the Armstrong Books, and against (b) Random House, Broadway and Crown as to EVERY SECOND COUNTS.

150.   Defendants recklessly or negligently misrepresented or concealed facts relating to the fictional nature of the Armstrong Books and, in particular, EVERY SECOND COUNTS, and represented it as a true and honest work of nonfiction.

151.   The facts misrepresented or omitted by Defendants were and are material.

152.   Plaintiffs and the members of the Class, believing Defendants' representations that the Armstrong Books and, in particular, EVERY SECOND COUNTS, was a true and honest work of nonfiction, and the Armstrong was a legitimate "five-time winner of the Tour de France" and without means to know otherwise, reasonably relied upon Defendants' misrepresentations, omissions and other practices, directly or indirectly, and purchased said book(s).

153.   Plaintiffs and the members of the Class have thereby been damaged, the exact amount of which is presently unknown, but is capable of being ascertained.

**Wilentz, Goldman & Spitzer, P.A.**
90 Woodbridge Center Drive
Woodbridge, NJ 07095

154.    As a result of Defendants' practices as set forth herein, Defendants are liable to Plaintiffs and the members of the Class for compensatory damages, interest and costs.

## NINTH CAUSE OF ACTION

### (Fraud and Deceit)

155.    Plaintiffs incorporate by reference all previous paragraphs of this Amended Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts a claim for fraud and deceit, is brought against (a) Armstrong, Weisel and Stapleton as to each of the Armstrong Books, and against (b) Penguin Group (USA), Putnam and Berkley as to IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE.  As set forth herein, this cause of action for fraud and deceit seeks to recover punitive damages against Armstrong, Weisel and Stapleton only.

156.    Defendant Armstrong carried out a fraudulent scheme in which he made representations that the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE, was a truthful work of nonfiction biography and that he was a legitimate "Tour de France Winner" including, but not limited to, through the media.

157.    When Armstrong made such representations he knew them to be false and misleading.

158.    When Armstrong made these false representations he made them with the intention to induce consumers, including Plaintiffs and the members of the Class, to act in reliance on the representations made, or with the expectation that they would so act.

159.    Plaintiffs and the members of the Class purchased the Armstrong Books and, in particular, IT'S NOT ABOUT THE BIKE:  MY JOURNEY BACK TO LIFE, based upon

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 79

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

Armstrong's representations it was a truthful work of nonfiction. As such, Armstrong's representations were material.

160.   Defendant Armstrong had exclusive knowledge of material facts not known to the Plaintiffs or the members of the Class.

161.   Plaintiffs and the members of the Class were ignorant of the falsity of Defendant Armstrong's representations and believed them to be true. In reliance on these representations, Plaintiffs and Class members were induced to and did purchase the Armstrong books and, in particular, IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE. Had Plaintiffs and the members of the Class known the actual facts, they would not have purchased the book(s). Plaintiffs' and Class members' reliance on Armstrong's representations was justified because Armstrong, aided and abetted by Defendants Penguin Group (USA), Putnam and Berkley, continued his fraudulent scheme of misrepresenting the true nature of IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE throughout the Class Period. As early as January 2011 and certainly not later than June 2012, Defendants Penguin Group (USA), Putnam and Berkley knew that Armstrong was engaged in fraudulent activities and violations of California law, yet continued to give him substantial assistance or encouragement by continuing to publish, market, promote and/or sell IT'S NOT ABOUT THE BIKE: MY JOURNEY BACK TO LIFE.

162.   As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and the members of the Class have suffered damages and economic loss in an amount to be proven at trial.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 80

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

163.   In perpetrating the fraud alleged herein, Armstrong, Weisel and Stapleton acted in a willful, wanton and malicious manner, in callous, conscious and intentional disregard for the rights of Plaintiffs and members of the Class, and with knowledge that their actions and conduct were substantially likely to vex, annoy and injure Plaintiffs and the members of the Class.   As a result thereof, Plaintiffs and members of the Class are entitled to an award of punitive and exemplary damages against Armstrong, Weisel and Stapleton, pursuant to CAL. CIV. CODE § 3294, in an amount according to proof at trial.

## TENTH CAUSE OF ACTION

### (Fraud and Deceit)

164.   Plaintiffs incorporate by reference all previous paragraphs of this Amended Complaint as if fully set forth, and further alleges as follows.  This cause of action, which asserts a claim for fraud and deceit, is brought against (a) Armstrong, Weisel and Stapleton as to each of the Armstrong books, and against (b) Random House, Broadway and Crown as to EVERY SECOND COUNTS.  As set forth herein, this cause of action for fraud and deceit seeks to recover punitive damages against Defendants Armstrong, Weisel and Stapleton only.

165.   Defendant Armstrong carried out a fraudulent scheme in which he made representations that the Armstrong Books and, in particular, EVERY SECOND COUNTS, was a truthful work of nonfiction biography and that Armstrong was a legitimate "five-time winner of the Tour de France" including, but not limited to, through the media.

166.   When Armstrong made such representations he knew them to be false and misleading.

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

167.   When Armstrong made these false representations he made them with the intention to induce consumers, including Plaintiffs and the members of the Class, to act in reliance on the representations made, or with the expectation that they would so act.

168.   Plaintiffs and the members of the Class purchased the Armstrong Books and, in particular, EVERY SECOND COUNTS, based upon Defendant Armstrong's representations it was a true and honest work of nonfiction.  As such, Armstrong's representations were material.

169.   Defendant Armstrong had exclusive knowledge of material facts not known to the Plaintiffs or the members of the Class.

170.   Plaintiffs and the members of the Class were ignorant of the falsity of Defendant Armstrong's representations and believed them to be true.  In reliance of these representations, Plaintiffs and Class members were induced to and did purchase the Armstrong Books and, in particular, EVERY SECOND COUNTS.  Had Plaintiffs and the members of the Class known the actual facts, they would not have purchased the book(s).  Plaintiffs' and Class members' reliance on Defendant Armstrong's representations was justified because Armstrong, aided and abetted by Defendants Weisel, Stapleton, Random House, Broadway and Crown, continued his fraudulent scheme of misrepresenting the true nature of EVERY SECOND COUNTS throughout the Class Period.  As early as January 2011 and certainly not later than June 2012, Defendants Random House, Broadway and Crown knew that Defendant Armstrong was engaged in fraudulent activities and violations of California law, yet continued to give him substantial assistance or encouragement by continuing to publish, market, promote and/or sell EVERY SECOND COUNTS.

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 82

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

171.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and the members of the Class have suffered damages and economic loss in an amount to be proven at trial.

172.    In perpetrating the fraud alleged herein, Armstrong, Weisel and Stapleton acted in a willful, wanton and malicious manner, in callous, conscious and intentional disregard for the rights of Plaintiffs and members of the Class, and with knowledge that his actions and conduct were substantially likely to vex, annoy and injure Plaintiffs and members of the Class.   As a result thereof, Plaintiffs and members of the Class are entitled to an award of punitive and exemplary damages against Defendants Armstrong, Weisel and Stapleton pursuant to CAL. CIV. CODE § 3294, in an amount according to proof at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, on behalf of themselves and the members of the Class, Plaintiffs demand judgment against Defendants, and each of them as follows:

A.    Ordering that this action be maintained as a class action, certifying the Class, and appointing Plaintiffs and their undersigned counsel of record and any additional Class representatives necessary to adequately represent the Class; and

B.    Restoring and awarding Plaintiffs and Class members all ascertainable amounts, losses and refunds, including the purchase price paid for the Armstrong Books, as well as any statutorily permissible damages, attorneys' fees, expenses and costs; and

C.    Mandating Defendants to disgorge and then restore and/or make restitution of any money to Plaintiffs and to the members of the Class which may have been acquired by

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 83

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

Defendants by means of the unfair, unlawful and/or fraudulent conduct alleged in this Amended Complaint; and

D.      Enjoining Defendants from engaging in similar unlawful acts or practices in the future and publicizing announcements correcting the misrepresentations made by said Defendants; and

E.      Awarding Plaintiffs and the members of the Class damages in an amount necessary to compensate them fully for their losses, together with interest; and

F.      For an award of attorneys' fees and costs of suit; and

G.      For such other and further relief which the Court deems necessary, just and proper.

## X.      DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED:  March 7, 2013

WILENTZ, GOLDMAN & SPITZER, P.A.

By   /s/ Kevin P. Roddy
         KEVIN P. RODDY (SBN 128283)

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
E-mail:  kroddy@wilentz.com

TRACEY BUCK-WALSH (SBN 131254)
LAW OFFICE OF TRACEY BUCK-WALSH
6 Reyes Court
Sacramento, CA  95831
Telephone:  (916) 392-8990
E-mail:  tracey@tbwlaw.com

First Amended Class Action Complaint for Damages and Injunctive, Equitable and Declaratory Relief
Page 84

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)

TAB TURNER (admitted *pro hac vice*)
TURNER & ASSOCIATES, P.A.
4705 Somers Avenue
North Little Rock, AR  72116
Telephone:  (501) 791-2277
E-mail:  tab@tturner.com

HENRY H. ROSSBACHER (SBN 060260)
THE ROSSBACHER FIRM
811 Wilshire Boulevard, Suite 1650
Los Angeles, CA  90017-2666
Telephone:  (213) 895-6500\
E-mail:  h.rossbacher@rossbacherlaw.com

**Attorneys for Plaintiffs**

First Amended Class Action Complaint for Damages and Injunctive, Equitable and
Declaratory Relief
Page 85

Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

#6775218.1(144084.002)