1   Kent J. Schmidt (SBN 195969)
    schmidt.kent@dorsey.com
2   DORSEY & WHITNEY LLP
    600 Anton Boulevard, Ste. 2000
3   Costa Mesa, CA 92626
    Telephone: (714) 800-1445
4   Facsimile: (714) 800-1499

5   Jonathan M. Herman (admitted *pro hac vice*)
    herman.jonathan@dorsey.com
6   DORSEY & WHITNEY LLP
    51 West 52nd Street
7   New York, NY 10019-6119
    Telephone: (212) 415-9247
8   Facsimile: (646) 607-0943

9   F. Matthew Ralph (admitted *pro hac vice*)
    ralph.matthew@dorsey.com
10  DORSEY & WHITNEY LLP
    50 S. Sixth Street, Suite 1500
11  Minneapolis, MN  55402
    Telephone:  (612) 492-6964
12  Facsimile:  (952) 516-5574

13  Attorneys for Defendants Penguin Group (USA) Inc.,
14  G.P. Putnam's Sons, and The Berkley Publishing Group

15              **UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF CALIFORNIA**
16

17  ROB STUTZMAN, JONATHAN WHEELER,     )   CASE No. 2:13-cv-00116-MCE-KJN
    GLORIA LAURIA, DAVID REIMERS and    )
18  SCOTT ARMSTRONG, on behalf of       )   *Assigned for all purposes to the Honorable*
    themselves and all others similarly situated,  )   *Morrison C. England, Jr.*
19                                      )
                Plaintiffs,             )   **REPLY OF DEFENDANT PENGUIN GROUP**
20                                      )   **(USA) INC., G.P. PUTNAM'S SONS, AND**
    vs.                                 )   **THE BERKLEY PUBLISHING GROUP IN**
21                                      )   **FURTHER SUPPORT OF MOTION TO**
    LANCE ARMSTRONG; PENGUIN GROUP      )   **DISMISS PLAINTIFFS' FIRST AMENDED**
22  (USA), INC.; G.P. PUTNAM'S SONS; THE )  **CLASS ACTION COMPLAINT**
    BERKLEY PUBLISHING GROUP;           )
23  RANDOM HOUSE, INC.; BROADWAY        )   [Fed. R. Civ. P. Rule 12(b)(6)]
    BOOKS; CROWN PUBLISHING GROUP;      )
24  THOMAS W. WEISEL; WILLIAM J.        )
    STAPLETON; and DOES 1-50, inclusive, )
25                                      )   **Date/Time:**  August 8, 2013, at 2:00 p.m.
                Defendants.             )   **Judge:**  Honorable Morrison C. England, Jr.
26                                      )   **Courtroom:** 7
                                        )
27                                      )
                                        )
28                                      )
                                        )
                                              1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .......................................................................................................... 1

II.  ARGUMENT .............................................................................................................. 1

    A.  PLAINTIFFS HAVE ABANDONED ANY CLAIMS BASED ON
    MISREPRESENTATIONS "CONTAINED IN" THE BOOK ............................. 1

    B.  PLAINTIFFS' ENTIRE ACTION NOW PURPORTS TO REST ON FALSE
    COMMERCIAL SPEECH, YET PLAINTIFFS FAIL TO IDENTIFY ANY
    FALSE COMMERCIAL SPEECH ...................................................................... 2

        1.  Plaintiffs Do Not Allege That Any Specific Speech Induced Them
        to Buy the Books ...................................................................................... 2

        2.  Penguin's Alleged Speech Is Not Actionable, as It Is Protected by
        the First Amendment ............................................................................... 8

            a.  Penguin Did Not Guaranty the Factual Accuracy of the
            Book ....................................................................................... 11

            b.  Penguin's Alleged Speech Is Inextricably Intertwined with,
            or an Adjunct to, Protected Speech Contained in the Books ........ 13

            c.  Penguin's Alleged Speech Is Not Commercial Speech ................ 14

            d.  *Keimer* Is Neither Controlling Nor Persuasive ............................ 16

        3.  Penguin Is Not Liable for Failing to Retract the Books or Its
        Descriptions of Them .............................................................................. 18

III.  CONCLUSION ........................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. United States,*
    250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) ............................................ 10

*Aldrin v. Topps Company, Inc.,*
    No. CV 10–09939, 2011 WL 4500013 (C.D. Cal. Sept. 27, 2011) ................................. 14, 18

*Animal Legal Defense Fund v. Mendes,*
    160 Cal. App. 4th 136 (2008) .......................................................................... 4

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................... 2

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... 2

*Bolger v. Youngs Drug Products Corp.,*
    463 U.S. 60 (1983) ..................................................................................... 18

*Cardozo v. True,*
    342 So.2d 1053 (Fla. App. 1977) ...................................................................... 8

*Carson v. Bank of Am., N.A.,*
    No. 2:12-cv-01487, 2013 WL 394867 (E.D. Cal. Jan. 30, 2012) .................................. 2

*Central Hudson Gas & Elec. Corp. v. Public Svc. Comm'n of N.Y.,*
    447 U.S. 557 (1980) ............................................................................... 14, 15

*Charles v. City of Los Angeles,*
    697 F.3d 1146 (9th Cir. 2012) .................................................................... 13, 18

*Christoff v. Nestle USA, Inc.,*
    47 Cal. 4th 468 (2009) ................................................................................ 19

*Cohen v. DIRECTV, Inc.,*
    178 Cal. App. 4th 966 (2009) ......................................................................... 3

*Coughlin v. Westinghouse Broad. & Cable, Inc.,*
    689 F.Supp. 483 (E.D.Pa.1988) ..................................................................... 20

*Creative Ventures, LLC v. Jim Ward & Associates,*
    195 Cal. App. 4th 1430 (2011) ........................................................................ 4

*D.A.R.E. America v. Rolling Stone Magazine,*
    101 F.Supp.2d 1270 (C.D. Cal. 2000) ............................................................... 20

*Dex Media West, Inc. v. City of Seattle,*
    696 F.3d 952 (9th Cir. 2012) ............................................................................ 16

*Fink v. Time Warner Cable,*
    714 F.3d 739 (2d Cir. 2013) ................................................................................ 8

*Geiger v. Dell Publishing Co., Inc.,*
    719 F.2d 515 (1st Cir. 1983) .............................................................................. 11

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ........................................................................................... 12

*Gorran v. Atkins Nutritionals, Inc.,*
    464 F.Supp.2d 315 (S.D.N.Y. 2006) .................................................................... 8

*Greenspan v. Random House, Inc.,*
    859 F.Supp.2d 206 (D.Mass.), *aff'd*, 2012 WL 5188792 (1st Cir. 2012), *cert. denied,* 2013
    WL 449782 (2013) ............................................................................................. 12

*Guglielmi v. Spelling-Goldman Productions,*
    25 Cal.3d 860 (1979) ............................................................................. 13, 14, 18

*Hanberry v. Hearst Corp.,*
    276 Cal. App. 2d 680 (1969) .............................................................................. 12

*Hinojos v. Kohl's Corp.,*
    --- F.3d ---, 2013 U.S. App. LEXIS 10185 (9th Cir. May 21, 2013) ................. 5, 7, 8

*Hunt v. City of Los Angeles,*
    638 F.3d 703 (9th Cir. 2011) .............................................................................. 15

*In re Tobacco II Cases,*
    46 Cal. 4th 298 (2009) ..................................................................................... 3, 6

*In re Toyota Motor Corp.,*
    790 F.Supp.2d 1152 (C.D. Cal. 2011).................................................................. 7

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products
    Liability Litig.,*
    826 F.Supp.2d 1180 (C.D. Cal. 2011).............................................................. 7, 8

*In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.,*
    903 F.Supp.2d 880 (C.D. Cal. 2012) ................................................................... 6

*Kasky v. Nike, Inc.,*
    27 Cal. 4th 939 (2002) ................................................................................. 14, 15

*Kearns v. Ford Motor Co.,*
    567 F.3d 1120 (9th Cir. 2009)............................................................................. 6

iii

*Keimer v. Buena Vista Books, Inc.,*
   75 Cal. App. 4th 1220 (1999)............................................................ 16, 17, 18

*Kwikset Corp. v. Superior Court,*
   51 Cal. 4th 310 (2011) ................................................................... 5, 6, 7, 8

*Lacoff v. Buena Vista Publishing, Inc.,*
   183 Misc.2d 600, 705 N.Y.S.2d 183 (N.Y. Sup. Ct. 2000) ............................... 17, 18

*Lohrenz v. Donnelly,*
   223 F.Supp.2d 25 (D.D.C. 2002) ............................................................... 20

*Long v. Hewlett-Packard Co.,*
   No. 06-02816, 2007 WL 2994812 (N.D. Cal. July 27, 2007)................................. 16

*Low v. LinkedIn Corp.,*
   900 F. Supp. 2d 1010 (N.D. Cal. 2012) ..................................................... 3, 4

*McFarlane v. Sheridan Square Press,*
   91 F.3d 1501 (D.C. Cir. 1996) .................................................................. 20

*Nagel v. Twin Labs., Inc.,*
   109 Cal. App. 4th 39 (2003)...................................................................... 13

*Neu v. Terminix Intern., Inc.,*
   No. C 07-6472, 2008 WL 2951390 (N.D. Cal. July 24, 2008) ............................... 11

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ............................................................................. 12

*People ex rel. Harris v. Rizzo,*
   214 Cal. App. 4th 921 (2013)................................................................. 2, 3

*Pfau v. Mortenson,*
   858 F.Supp.2d 1150 (D. Mont. 2012) ............................................................ 4

*Polydoros v. Twentieth Century Fox Film Corp.,*
   67 Cal. App. 4th 318 (1997)..................................................................... 13

*Rezec v. Sony Pictures Entertainment, Inc.,*
   116 Cal. App. 4th 135 (2004)................................................................ 13, 18

*Rice v. Penguin Putnam, Inc.,*
   734 N.Y.S.2d 98, 289 A.D.2d 318 (N.Y. App. Div. 2001)...................................... 4

*Riley v. Nat'l Fed. of the Blind of North Carolina,*
   487 U.S. 781 (1988) .............................................................................. 13

*Roberts v. McAfee, Inc.,*
   660 F.3d 1156 (9th Cir. 2011).............................................................. 19, 20

iv

*Simon & Schuster v. Members of the N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) ..................................................................... 9

*Stanwood v. Mary Kay, Inc.*,
    --- F.Supp.2d ---, 2012 WL 7991231 (C.D. Cal. Sep. 20, 2012) ............ 6

*Traditional Cat Ass'n, Inc. v. Gilbreath*,
    118 Cal. App. 4th 392 (2004) ..................................................... 20

*Tucker v. Pac. Bell Mobile Svcs.*,
    208 Cal. App. 4th 201 (2012) ....................................................... 4

*United States v. Alvarez*,
    132 S.Ct. 2537 (2012) ................................................................ 10

*United States v. Alvarez*,
    638 F.3d 666 (9th Cir. 2011) ....................................................... 10

*Va. Pharmacy Bd. v. Va. Consumer Council*,
    425 U.S. 748 (1976) ............................................................ 15, 16

*West v. JPMorgan Chase Bank, N.A.*,
    214 Cal. App. 4th 780 (2013) ...................................................... 2, 3

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) ....................................... 8, 9, 12, 18

**STATUTES**

15 U.S.C. § 45(a) ........................................................................... 5

Cal. Bus. & Prof. Code § 17200 ..................................................... 2

Cal. Bus. & Prof. Code § 17204 ..................................................... 6

Cal. Bus. & Prof. Code § 17500 ..................................................... 2

Cal. Bus. & Prof. Code § 17501 ..................................................... 5

Cal. Bus. & Prof. Code § 17533.7 .................................................. 5

Cal. Bus. & Prof. Code § 17535 ..................................................... 6

Cal. Civ. Code § 1770(a) ............................................................... 2

Cal. Civ. Code § 3425.3 ................................................................ 19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) .................................................................... 4, 6

v

## I.    INTRODUCTION

Plaintiffs do not even attempt to defend the viability of any of their claims based on alleged misrepresentations contained in the books at issue,[1] including the book published by Penguin,[2] *It's Not About the Bike: My Journey Back to Life* (the "Book").  Instead, Plaintiffs focus all their efforts on defending the viability of claims based on alleged statements about the books purportedly used to promote them.  Plaintiffs argue that this alleged promotional use makes this a "product labeling" case based on false commercial speech that sold the books.  But Plaintiffs fail to allege any specific speech by Penguin that induced them to buy the Book, much less any specific *false commercial* speech by Penguin.  The cases Plaintiffs themselves cite require at least that much.

The only statements that Penguin allegedly made *about* the Book are purported descriptions of the Book as "nonfiction" and "biography."  Such alleged statements are simply not actionable – not merely because Plaintiffs do not claim to have seen or relied upon them when buying the Book (which defect alone is fatal), but also because those statements (1) are inextricably intertwined with, or are adjuncts to, fully protected First Amendment speech, and therefore fully protected as well; (2) do not meet the standard for commercial speech; and (3) are literally true and not rendered misleading merely because Lance Armstrong falsely denied doping in the Book or elsewhere.

## II.    ARGUMENT

### A.    PLAINTIFFS HAVE ABANDONED ANY CLAIMS BASED ON MISREPRESENTATIONS "CONTAINED IN" THE BOOK

The Amended Complaint alleges that this action arises in part from misrepresentations "contained in" the Book.  *See* Dkt. 22, ¶¶ 2, 41-42, 71.  For example, Plaintiffs allege that Armstrong lied in the Book when he described statements he had made publicly in 1999 that he was "not on drugs" and that he was "clean."  *Id.*, ¶ 42.  Penguin's motion to dismiss explained why Plaintiffs' claims based on alleged falsehoods contained in the Book are not viable.  First, Plaintiffs do not allege that they saw or relied upon any statements within the Book before buying it; and reliance is a

---

[1] Although the Amended Complaint identifies five books, the class representatives claim to have bought only two of them and have named as Defendants only the publishers of those two books.
[2] "Penguin" includes Defendants Penguin Group (USA) Inc., G.P. Putnam's Sons, and The Berkley Publishing Group.

1    necessary element of each of their claims. Dkt. 41 at Argument §§ A.2. Second, Plaintiffs do not

2    allege a legal or factual basis for holding Penguin liable for the contents of the Book. Plaintiffs'

3    allegations that Penguin is responsible – as a publisher – for everything Armstrong said in the Book are

4    conclusory, without factual basis, and must be rejected under *Bell Atlantic Corp. v. Twombly*, 550 U.S.

5    544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Dkt. 41 at Argument §§ A.5. Third, any

6    alleged falsehoods within the Book are protected by the First Amendment and not actionable. Dkt. 41

7    at Argument §§ B.1-2.

8         Plaintiffs do not rebut or even address any of these arguments and therefore abandon their

9    claims based on alleged falsehoods contained in the Book. Instead, Plaintiffs' arguments are now

10   predicated solely on allegedly false commercial speech promoting the Book. The problem for

11   Plaintiffs is that they do not allege any false commercial speech by Penguin.

12   **B.**    **PLAINTIFFS' ENTIRE ACTION NOW PURPORTS TO REST ON FALSE**

13   **COMMERCIAL SPEECH, YET PLAINTIFFS FAIL TO IDENTIFY ANY FALSE COMMERCIAL SPEECH**

14        Plaintiffs' opposition brief regurgitates page after page of allegations from the Amended

15   Complaint, but the critical and operative facts are twofold. First, the Amended Complaint does not

16   allege that Penguin made any particular *statements* – much less any *false* statements – and, still less,

17   any false statements *bearing the hallmarks of commercial speech* – that induced them to buy the

18   Book. Second, the only specific words that Plaintiffs attribute to Penguin – descriptions of the Book as

19   "nonfiction" or "biography" – are constitutionally protected, non-commercial speech that is neither

20   false nor misleading.

21       **1.**    __Plaintiffs Do Not Allege That Any Specific Speech Induced Them to Buy the Books__

22        A false or misleading statement is a necessary element of each of Plaintiffs' claims. *E.g.*,

23   *Carson v. Bank of Am., N.A.*, No. 2:12-cv-01487, 2013 WL 394867, at *7 (E.D. Cal. Jan. 30, 2012)

24   (fraud); *People ex rel. Harris v. Rizzo*, 214 Cal. App. 4th 921, 947 (2013) (deceit); *West v. JPMorgan*

25   *Chase Bank, N.A.*, 214 Cal. App. 4th 780, 792 (2013) (negligent misrepresentation); Cal. Civ. Code §§

26   1770(a)(2), (5), (7), (9), (16); Cal. Bus. & Prof. Code §§ 17200 (UCL); 17500 (FAL). Justifiable

27   reliance is also a necessary element of each of Plaintiffs' claims. *Carson*, 2013 WL 394867 at *7

28   (fraud); *Harris*, 2013 WL 1139186 at *14 (deceit); *West*, 2013 WL 1104739 at *5 (negligent

2

1    misrepresentation); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009) (CLRA); *In re*

2    *Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (UCL and FAL).

3         Here, each of the five Plaintiffs devotes a paragraph of the Amended Complaint to alleging

4    how he or she came to purchase the Book. All five Plaintiffs fail to allege that Penguin made any

5    specific false or misleading statements that induced their purchases. Plaintiff Rob Stutzman alleges

6    that he bought the Book after he "learned" that the Book was a "supposedly truthful" account of

7    Armstrong's comeback from cancer to win the Tour de France. Dkt. 22, ¶ 8. Likewise, Plaintiff

8    Jonathan Wheeler alleges that he bought the Book "after learning through the media about

9    Armstrong's supposedly truthful and inspiring account" of dominating cycling post-cancer. Dkt. 22, ¶

10   9. Neither Stutzman nor Wheeler identifies any specific statement or any specific speaker who

11   induced their purchases. Neither alleges he saw or read a statement by Penguin that the Book is

12   "truthful."

13        Plaintiff Gloria Lauria alleges that she bought the Book after viewing "advertising featuring

14   reports of Armstrong's successful battle against cancer." Dkt. 22, ¶ 10. Similarly, Plaintiff David

15   Reimers alleges that he bought the Book after he saw "advertisements regarding Armstrong's

16   remarkable comeback to 'win' the Tour de France cycling race after conquering testicular cancer."

17   Dkt. 22, ¶ 11. Neither Lauria nor Reimers identifies the content or publisher of the advertisements

18   that allegedly induced their purchases. Neither alleges that any Defendant, much less Penguin,

19   authored the advertisements they saw. These defects are fatal. *See Low v. LinkedIn Corp.*, 900 F.

20   Supp. 2d 1010, 1027 (N.D. Cal. 2012) (alleging existence of "advertisements" and "marketing

21   materials" is insufficient when plaintiffs "never alleged reliance on any specific representation or

22   advertising.").

23        Plaintiff Scott Armstrong alleges that he bought the Book after "[r]elying on Defendant

24   Armstrong's representations as to his drug-free life and cycling career" and "[b]elieving that Defendant

25   Armstrong had told the truth" in the Book. Dkt. 22, ¶ 12. Scott Armstrong does not identify any

26   specific statements that induced him to buy the Book. Even if Scott Armstrong's belief about the

27   "truth" of the Book could be said to derive from Armstrong's allegedly false denials of doping, Scott

28

1    Armstrong does not allege any basis for holding Penguin liable for inducing Scott Armstrong's

2    purchase.

3        These pleadings each fail to meet Rule 9(b) standards for alleging false statements and reliance.

4    Elsewhere in the Amended Complaint the Plaintiffs collectively blame Armstrong for inducing their

5    decisions to buy each of the books: "Plaintiffs and members of the Class purchased the Armstrong

6    Books and, in particular, *It's Not About the Bike: My Journey Back to Life*, based upon ***Armstrong's***

7    representations it was a truthful work of nonfiction." *Id.*, ¶ 159; Dkt. 62 at 8 (emphasis added).  This

8    allegation likewise fails to meet Rule 9(b) standards because it does not identify when or where

9    Armstrong made the statements and that Plaintiffs actually saw the statements before buying each of

10   the books; but, even if the Court were to assume this statement is true, it does not allege any

11   misconduct by Penguin.

12       Collectively, Plaintiffs have failed to allege that any specific statements by Penguin induced

13   them to purchase the Book.  While Plaintiffs all allege that they would not have purchased the Book

14   had they known Armstrong doped, this allegation fails to establish that Plaintiffs actually relied on any

15   misleading statement by Penguin at the time of their purchases.  *See Tucker v. Pac. Bell Mobile Svcs.*,

16   208 Cal. App. 4th 201, 227 (2012) (barring claims by persons never exposed to allegedly wrongful

17   business practice or who never suffered damage as a result of it); *Low*, 900 F. Supp. 2d at 1027.

18       Absent facts that Penguin wrongfully induced Plaintiffs to buy the Book, Plaintiffs' only

19   injuries are disappointment and outrage that they were "duped, cheated, and betrayed" by Armstrong.

20   Dkt. 22, §§ 90-91.  "Deception without loss is not actionable," and mere exposure to allegedly false or

21   deceptive representations is not a cognizable injury. *Creative Ventures, LLC v. Jim Ward &*

22   *Associates*, 195 Cal. App. 4th 1430, 1444 (2011); *see also Animal Legal Defense Fund v. Mendes*, 160

23   Cal. App. 4th 136, 146 (2008) (rejecting "moral injury" claims that consumers would not have bought

24   milk had they known the cows that produced it had been mistreated); *Pfau v. Mortenson*, 858

25   F.Supp.2d 1150, 1161 n.30 (D. Mont. 2012) ("the court has found no controlling authority to support

26   the conclusion that a purchaser of a so-called nonfiction memoir based on an actual person, which

27   includes fabrications, suffers a cognizable injury."); *Rice v. Penguin Putnam, Inc.*, 734 N.Y.S.2d 98,

28   289 A.D.2d 318 (N.Y. App. Div. 2001) (rejecting for lack of cognizable injury consumers' claims that

4

1  they "would not have purchased the novel had they known the true facts" that it was partially written

2  by an unidentified co-author).

3        Plaintiffs argue that their allegations meet the standards described in *Hinojos v. Kohl's Corp.*, --

4  - F.3d ---, 2013 U.S. App. LEXIS 10185 (9th Cir. May 21, 2013), and *Kwikset Corp. v. Superior*

5  *Court*, 51 Cal. 4th 310 (2011); but Plaintiffs are wrong. First, both *Hinojos* and *Kwikset* are relevant

6  only to a subset of Plaintiffs' claims in this case. Both cases concerned only statutory claims;[3] the

7  cases are not relevant to Plaintiffs' common law claims. Second, the issue in both cases was whether

8  plaintiffs alleged sufficient facts to establish standing under the statutes. The cases therefore respond

9  specifically to Penguin's argument that Plaintiffs failed to plead cognizable damages. The cases do not

10  rebut Penguin's other arguments that Plaintiffs failed to meet federal pleading standards. Third, and

11  most importantly, the facts in both cases are critically and materially different from the allegations

12  here. The plaintiffs in both *Hinojos* and *Kwikset*, unlike Plaintiffs here, specifically alleged that they

13  saw and relied upon statutorily prohibited[4] representations made by the defendants before purchasing

14  the products at issue.

15        The plaintiffs in *Hinojos* alleged that they "purchased several items of apparel and luggage at a

16  Kohl's department store" in reliance upon "deceptive advertisements" touting discounts of 32% to

17  50% off of "original" or "regular" prices. *Hinojos*, 2013 U.S. App. LEXIS 10185 at *4-*5. The

18  plaintiffs in *Kwikset* alleged that they "saw and read . . . and relied on" the defendant's allegedly false

19  representation that certain "Kwikset locksets" had been "Made in U.S.A." and "would not have

20  purchased them if they had not been so misrepresented." *Kwikset*, 51 Cal. 4th at 319. Based on these

21  facts, the courts in both *Hinojos* and *Kwikset* concluded that a "consumer who ***relies upon*** a product

22  label and challenges a misrepresentation contained therein can satisfy the standing requirement" by

23  alleging that he or she "would not have bought the product but for the misrepresentation." *Hinojos*,

24  2013 U.S. App. LEXIS 10185 at *11; *Kwikset*, 51 Cal. 4th at 330 (emphasis added).

---

26  [3] *Kwikset* concerned UCL and FAL claims; *Hinojos* concerned, UCL, FAL and CLRA claims.
   [4] The alleged conduct in *Hinojos* is specifically prohibited by Cal. Bus. & Prof. Code § 17501

27  (prohibiting selling things at falsely advertised prices), and the alleged conduct in *Kwikset* is
   specifically prohibited by Cal. Bus. & Prof. Code § 17533.7 and 15 U.S.C. § 45(a) (prohibiting selling

28  items with a false country-of-origin designation).

1    Absent such allegations, a plaintiff does not allege cognizable injuries for standing purposes.

2    Here, Plaintiffs do not allege that they saw and relied upon any specific statement or misrepresentation

3    by Penguin, much less one prohibited by a specific statute, when buying the Book.  Plaintiffs therefore

4    fail to allege that Defendants' conduct induced their loss of "money or property," as required by the

5    statutes. Cal. Bus. & Prof. Code §§ 17204, 17535; *Kwikset*, 246 P.3d at 884.  Instead, Plaintiffs allege

6    only that they felt disappointed, "duped, cheated, and betrayed" after learning that Armstrong had lied.

7    Dkt. 22, ¶¶ 90-91.

8    Although Plaintiffs cite *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009), for the proposition that

9    they need not plead and prove reliance upon Penguin's alleged misrepresentations, because such

10   reliance is presumed, in fact *Tobacco II* stands for the proposition that the **named** plaintiffs must each

11   plead and prove actual reliance on the allegedly misleading or deceptive statements, even though the

12   general class members do not have such an obligation. 46 Cal. 4th at 306.  See Random House's reply

13   brief in further support of its motion to dismiss, at 10-12, for a fuller discussion of this issue.[5]

14   Plaintiffs also cite *Tobacco II* for the proposition that their pleadings fall within an exception to

15   the reliance requirement because Plaintiffs allege they were exposed to a "long-term marketing

16   campaign." Dkt. 63 at 13 fn. 5 (citing *Tobacco II*, 46 Cal. 4th at 328).  But it is not sufficient simply to

17   allege exposure to a long-term advertising campaign. A plaintiff must still meet the requirements of

18   Rule 9(b) as to the underlying misrepresentations.  Plaintiffs' allegations here are no different from

19   allegations rejected in numerous other cases. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th

20   Cir. 2009) (affirming dismissal of consumer fraud claims based on plaintiff's failure to "specify what

21   the television advertisements or other sales material specifically state" or "when he was exposed to

22   them or which ones he found material"); *In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*, 903

23   F.Supp.2d 880, 926-27 (C.D. Cal. 2012) (allegations that defendant "advertises, promotes and sell[s

24   its] health plans based on false, widely disseminated representations on its website, SPDs, and other

25   promotional materials fall well short" of satisfying the "advertising campaign" exception); *Stanwood v.*

26   *Mary Kay, Inc.*, --- F.Supp.2d ---, 2012 WL 7991231, *4, *7 (C.D. Cal. Sep. 20, 2012) (dismissing

27

28   [5] Penguin incorporates herein by reference that section of Random House's brief.

1   fraud, UCL, FAL, and CLRA claims for failure to plead "who, what, when, where, and how" of the

2   alleged advertisements); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales*

3   *Practices, and Products Liability Litig.*, 826 F.Supp.2d 1180, 1204 (C.D. Cal. 2011) ("pointing to a

4   long-term advertising campaign does nothing to answer the questions of 'who' or 'where.'").

5        Plaintiffs cite the earlier *Toyota* case in support of their position that reliance is presumed. *In*

6   *re Toyota Motor Corp.*, 790 F.Supp.2d 1152, 1168-69 (C.D. Cal. 2011).  But Plaintiffs misinterpret

7   *Toyota*.  All of the plaintiffs in *Toyota* (as in *Hinojos* and *Kwikset*) alleged "that they saw

8   advertisements *for Toyota vehicles . . . that touted the safety and reliability of the vehicles*" and "that

9   they would have made a different purchasing decision had it been disclosed that Toyota vehicles could

10  accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to

11  overcome this."[6]  *Toyota*, 790 F.Supp.2d at 1169 (emphasis added).  In other words, the *Toyota* court

12  was willing to presume reliance in a situation where plaintiffs alleged specific false statements of fact,

13  by Toyota, about the products at issue, that influenced their purchasing decisions.  A similar

14  combination of facts is missing here.  Plaintiffs allege numerous false statements of fact by Defendant

15  Armstrong, but none of them is about the Book.[7]  Plaintiffs allege two statements[8] by Penguin about

16  the Book (describing the Book as "nonfiction" or "biography"), but Plaintiffs do not allege that they

17  saw, or were influenced by, either statement before they purchased the Book.

18        In sum, the very cases cited by Plaintiffs demonstrate that their allegations fail to meet the

19  relevant pleading standards.  These are not curable defects.  "Plaintiffs brought this lawsuit, and

20  purported to do so based upon the *specific* text of a *specific* advertisement.  They should not need

21  _____

22  [6] *Toyota* elsewhere describes these allegations as follows: "Each Plaintiff (including the non-consumer Plaintiffs) was exposed to Toyota advertising regarding the reliability and safety of Toyota vehicles;

23  this exposure influenced each Plaintiff's decision to buy a Toyota vehicle, and if the SUA defect had been disclosed to them, each Plaintiff would not have purchased a Toyota vehicle and/or would have

24  paid less for the vehicle." 790 F.Supp.2d at 1157.

25  [7] As noted, Plaintiffs collectively allege they bought the books "based upon" Armstrong's descriptions of them as a "truthful work of nonfiction," Dkt. 22, ¶ 159, but this particular allegation is insufficiently

26  specific as to when and where Armstrong made these statements and that Plaintiffs actually saw or heard the statements before buying the books.

27  [8] For reasons discussed in more detail *infra*, the statements about the Book that Plaintiffs attribute to Penguin are literally true and are not rendered misleading because the Book allegedly contained

28  falsehoods.

1   discovery to tell them exactly what that advertisement said."  *Fink v. Time Warner Cable*, 714 F.3d

2   739, 742 (2d Cir. 2013). Indeed, Plaintiffs have already gone on record regarding what motivated

3   them to buy the Book, and it was not what Penguin said. Significantly, Plaintiffs submitted hundreds

4   of pages of materials in opposition to Defendants' anti-SLAPP motions, which appear to be designed

5   in part to show how Plaintiffs could further amend their complaint to state viable claims; yet those

6   supporting materials do not contain any declaration by any Plaintiff identifying specific false

7   statements by Penguin that induced them to purchase the Book. Plaintiffs' claims against Penguin are

8   thus doomed to failure on pleading grounds. But they should also be dismissed with prejudice because

9   the statements attributed to Penguin about the Book are not actionable under the First Amendment.

10      **2.      Penguin's Alleged Speech Is Not Actionable, as It Is Protected by the First Amendment**

11

12   Plaintiffs analogize this case to *Hinojos*, *Kwikset*, and *Toyota* and argue that it is a case about

13   false commercial speech and deceptive "product labeling" that falls outside First Amendment

14   protection; but they are fundamentally wrong. *Hinojos*, *Kwikset*, and *Toyota* involved consumer

15   products, not books. Books are composites. They consist of ideas and expression in a physical

16   medium of paper, ink, binder, and cover. At issue in this case are the ***contents*** of books, not their

17   physical properties.

18   No court has ever held that the content of a book is a product.[9] *Winter v. G.P. Putnam's Sons*,

19   938 F.2d 1033, 1034, 1036 (9th Cir. 1991); *Gorran v. Atkins Nutritionals, Inc.*, 464 F.Supp.2d 315,

20   324 (S.D.N.Y. 2006) ("The intangible qualities of a book, however—the ideas and expressions—are

21   not products for purposes of products liability law. "); *Cardozo v. True*, 342 So.2d 1053, 1056 (Fla.

22   App. 1977) ("The common theme running through these decisions is that ideas hold a privileged

23   position in our society. They are not equivalent to commercial products."). No court has ever held a

24

25

26   _____

27   [9] The only types of published information that courts have treated as "products" are aeronautical charts, because they are "highly technical tools" analogous to a compass. *Winter v. G.P. Putnam's*

28   *Sons*, 938 F.2d at 1035 (citing cases). Autobiographies like the Book bear no resemblance to aeronautical charts.

1   publisher liable for the defective contents of a book.  No court has ever held that a publisher owes a

2   duty to warn that the contents of a book might be inaccurate or even false.  *Winter*, 938 F.2d at 1037.

3        The foregoing statements are applicable to *all* books, but the books at issue here are particular

4   types of books that receive even more protection.  They are not "how to" books that purport to offer

5   purchasers practical advice on which they may presumably rely.  Here, the books at issue are

6   autobiographies.  Publication of autobiographies – even autobiographies by criminals who seek to

7   profit from the notoriety of their crimes – receive maximum First Amendment protection.  *Simon &*

8   *Schuster v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991) (rejecting

9   constitutionality of "Son of Sam" Law as applied to the autobiography of former gangster, Henry Hill,

10  under strict scrutiny standard).  Chief Judge Kozinski has made the following observations about

11  autobiographical statements:

12        Speaking about oneself is precisely when people are most likely to exaggerate,
          obfuscate, embellish, omit key facts or tell tall tales. Self-expression that risks prison if
13        it strays from the monotonous reporting of strictly accurate facts about oneself is no
          expression at all.
14

15        Saints may always tell the truth, but for mortals living means lying. We lie to protect
          our privacy ("No, I don't live around here"); to avoid hurt feelings ("Friday is my study
16        night"); to make others feel better ("Gee you've gotten skinny"); to avoid recrim-
          inations ("I only lost $10 at poker"); to prevent grief ("The doc says you're getting
17        better"); to maintain domestic tranquility ("She's just a friend"); to avoid social stigma
          ("I just haven't met the right woman"); for career advancement ("I'm sooo lucky to
18        have a smart boss like you"); to avoid being lonely ("I love opera"); to eliminate a rival
          ("He has a boyfriend"); to achieve an objective ("But I love you so much"); to defeat an
19        objective ("I'm allergic to latex"); to make an exit ("It's not you, it's me"); to delay the
          inevitable ("The check is in the mail"); to communicate displeasure ("There's nothing
20        wrong"); to get someone off your back ("I'll call you about lunch"); to escape a nudnik
          ("My mother's on the other line"); to namedrop ("We go way back"); to set up a
21        surprise party ("I need help moving the piano"); to buy time ("I'm on my way"); to
          keep up appearances ("We're not talking divorce"); to avoid taking out the trash ("My
22        back hurts"); to duck an obligation ("I've got a headache"); to maintain a public image
          ("I go to church every Sunday"); to make a point ("Ich bin ein Berliner"); to save face
23        ("I had too much to drink"); to humor ("Correct as usual, King Friday"); to avoid
          embarrassment ("That wasn't me"); to curry favor ("I've read all your books"); to get a
24        clerkship ("You're the greatest living jurist"); to save a dollar ("I gave at the office"); or
          to maintain innocence ("There are eight tiny reindeer on the rooftop").

25                                          *     *     *

26        An important aspect of personal autonomy is the right to shape one's public and private
          persona by choosing when to tell the truth about oneself, when to conceal and when to
27        deceive. Of course, lies are often disbelieved or discovered, and that too is part of the
          pull and tug of social intercourse. But it's critical to leave such interactions in private
28        hands, so that we can make choices about who we are.

                                              9

*     *     *

> Even if untruthful speech were not valuable for its own sake, its protection is clearly required to give breathing room to truthful self-expression, which is unequivocally protected by the First Amendment.

*United States v. Alvarez*, 638 F.3d 666, 674-75 (9th Cir. 2011) (Kozinski, C.J., concurring in denial of rehearing en banc). *Alvarez* is particularly applicable because it involved speech that was autobiographical and self-promotional. When the Supreme Court reviewed *Alvarez*, a 4-justice plurality agreed with Chief Judge Kozinski and rejected the argument "that false speech should be in a general category that is presumptively unprotected." *United States v. Alvarez*, 132 S.Ct. 2537, 2546-47 (2012). False speech must, at a minimum, cause some "legally cognizable harm" before it comes outside of First Amendment protection. *Id.* at 2545.

> The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth . . . . The theory of our Constitution is "that the best test of truth is the power of the thought to get itself accepted in the competition of the market," *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting).

*Id.* at 2550. Two justices who concurred in the result believed that "false statements about easily verifiable facts that do not concern such subject matter [as philosophy, religion, history, the social sciences, the arts and the like]" should receive less constitutional protection because "[s]uch false factual statements are less likely than true factual statements to make a valuable contribution to the marketplace of ideas." *Alvarez*, 132 S.Ct. at 2552 (Breyer, J., concurring). In *Alvarez*, however, six justices agreed that false autobiographical statements, which cause no harm and are not easily verifiable, receive First Amendment protection.[10]

These statements have profound implications for the business of publishing autobiographies. The cost of checking the accuracy of every factual statement in an autobiography is impractical and prohibitive, and would chill the publication of such works. The First Circuit recognized precisely this concern in a defamation case:

---

[10] Plaintiffs provide a misleading summary of *Alvarez* by cutting and pasting quotations from the opinion without context.

10

> A nonfiction work often details events that are long past and describes people who are unavailable to verify the author's statements. To require a book publisher to check, as a matter of course, every potentially defamatory reference might raise the price of nonfiction works beyond the resources of the average man. This result would, we think, produce just such a chilling effect on the free flow of ideas as First Amendment jurisprudence has sought to avoid.

*Geiger v. Dell Publishing Co., Inc.*, 719 F.2d 515, 518 (1st Cir. 1983). If these principles are applicable in defamation cases, which arise from allegedly false statements in books, they apply even more strongly in fraud cases like this one. No court has ever sustained a fraud action based on allegedly false statements in a book.

### a. Penguin Did Not Guaranty the Factual Accuracy of the Book

Plaintiffs allege that Penguin's descriptions of the Book as "nonfiction" and "biography" were fraudulent because Armstrong lied in the Book and Penguin knew or should have known about the lies. As Plaintiffs do not allege that Armstrong told Penguin he was lying or that Penguin obtained any information confirming that Armstrong lied, Plaintiffs ask the Court to assume that Penguin acted with scienter by virtue of its activities in publishing the Book.[11] But this assumption is contrary to law. Penguin had no duty to verify the factual accuracy of nondefamatory statements by Armstrong, like his denials of doping. Plaintiffs allege no facts supporting an inference that Penguin assumed such a duty or knew that Armstrong was lying when it published his Book. Indeed, Plaintiffs respond to the Publisher Defendants' anti-SLAPP motions with a declaration of Plaintiffs' counsel, hundreds of pages of documents, and various citations to testimony supporting the conclusion that until 2010, 2011, or 2012, they and everybody else, including the anti-doping authorities, had reason to believe that Armstrong had raced "clean." *See also* Dkt. 22, ¶ 91. They allege no facts to support a conclusion that Penguin was somehow in on Armstrong's alleged scheme, and not deceived by Armstrong like everybody else.

Further, Penguin cannot be presumed to have guaranteed the factual accuracy of the Book as a matter of law. No court has required publishers "to guarantee the accuracy of [its] factual assertions"

---

[11] *See Neu v. Terminix Intern., Inc.*, No. C 07-6472, 2008 WL 2951390, at *4 (N.D. Cal. July 24, 2008) (dismissing CLRA, UCL and FAL claims with prejudice because plaintiff failed to allege facts "to support a finding that Defendants knew that those statements were false when made").

1   because it would risk "intolerable self-censorship," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340

2   (1974).  Under the pressure of such a rule, a publisher would "tend to restrict the books he sells to

3   those he has inspected" and First Amendment activity would be chilled.  *New York Times Co. v.*

4   *Sullivan,* 376 U.S. 254, 278 (1964).

5         This is not to say that a publisher cannot undertake such a guaranty.  *Winter* noted that,

6   although a publisher is generally not a "guarantor of the accuracy of an author's statements of fact," a

7   publisher may "assume such a burden" under California law.  *Winter,* 938 F.2d at 1037 fn. 7, *citing*

8   *Hanberry v. Hearst Corp.,* 276 Cal. App. 2d 680, 683-84 (1969).  In *Hanberry,* the publisher of *Good*

9   *Housekeeping* magazine inspected and tested a product and then imprinted the "Good Housekeeping's

10  Consumer's Guaranty Seal" on an advertisement for the product.  The court in *Hanberry* concluded

11  that, under those circumstances, the publisher had guaranteed the accuracy of the advertisement and

12  could be held liable if the advertised product were defective.  *Winter* and *Hanberry* collectively stand

13  for the proposition that, under California law, if a publisher were to advertise a guaranty of the factual

14  accuracy of a book, the publisher could be held liable if factual inaccuracies in the book caused

15  damages.

16        Plaintiffs allege no facts to bring this case within the scope of *Hanberry*.  Rather, Plaintiffs ask

17  the Court to infer from Penguin's acts of publishing an autobiography – the accuracy of whose

18  contents Penguin had no duty to verify – and describing it as "nonfiction" or "biography" that Penguin

19  thereby guaranteed that 100% of the factual statements in the Book were accurate.  The words

20  "nonfiction" and "biography" are not guaranties, cannot reasonably be construed as such, and never

21  have been construed as such by any court.  To the contrary, at least one federal court has concluded

22  that such terms do not have the meaning that Plaintiffs insist they have.  "The term nonfiction only

23  means that the literature is based on true stories or events, not that every statement is in fact

24  demonstrably true."  *Greenspan v. Random House, Inc.,* 859 F.Supp.2d 206, 220 (D.Mass.), *aff'd,*

25  2012 WL 5188792 (1st Cir. 2012), *cert. denied,* 2013 WL 449782 (2013).

26        Plaintiffs also ask the Court to interpret the word "nonfiction" to mean "truthful" or "honest,"

27  but those are not the ordinary meanings of "nonfiction" and they are not actionable in this context (if

28  ever).  A nonfictional work of autobiography may reasonably be based on memories or perceptions

12

1   that are inaccurate, incomplete, or falsifiable but that are nevertheless "true" for the subject.  Publishers

2   are not in a position to segregate an author's statements into "true" or "false" without investigating

3   both the accuracy of an author's assertions and the author's state of mind.  Nor are courts.  The

4   California Supreme Court has recognized that the First Amendment does not distinguish between

5   "truthful and fictional accounts" of a person's life.  *Guglielmi v. Spelling-Goldman Productions*, 25

6   Cal. 3d 860, 871 (1979) (Bird, C.J., concurring).[12]  Whether a particular biographical work represents

7   a "serious appraisal" or a "mere fantasy" "is a judgment left to the reader or viewer, not the courts."

8   *Id.* at 870 (citing cases).

9                    **b.    Penguin's Alleged Speech Is Inextricably Intertwined with, or an
                           Adjunct to, Protected Speech Contained in the Books**

10

11          Given that books are fundamentally different from consumer products, speech about books is

12   also treated differently under the law from speech about consumer products.  "Speech about speech"

13   receives First Amendment protection when, as here, it is "inextricably intertwined" with, or an adjunct

14   to, other protected speech.

15          When speech is "inextricably intertwined with otherwise fully protected speech" it receives the

16   same protection as the fully protected speech.  *Riley v. Nat'l Fed. of the Blind of North Carolina*, 487

17   U.S. 781, 796 (1988); *Guglielmi*, 25 Cal. 3d at 872-73; *All One God Faith, Inc. v. Organic and*

18   *Sustainable Industry Standards, Inc.*, 183 Cal. App. 4th 1186, 1209 (2010); *Nagel v. Twin Labs., Inc.*,

19   109 Cal. App. 4th 39, 50 (2003).  This doctrine applies even to "speech about speech" that is

20   promotional.  *Charles v. City of Los Angeles*, 697 F.3d 1146, 1154 (9th Cir. 2012) (First Amendment

21   protects "advertisements for expressive works" so as to prevent tort actions from chilling protected

22   speech); *Aldrin v. Topps Company, Inc.*, No. CV 10–09939, 2011 WL 4500013, at *3 (C.D. Cal. Sept.

23   27, 2011) ("To the extent that the 'Visor Shot' image on the cards' cardboard packaging constitutes an

24   advertisement, it is a 'mere adjunct' to the cards themselves, and is also protected.").

25

26   ────────────────────

27   [12] California courts have recognized that, although Chief Justice Bird wrote a "concurring opinion"
     addressing the constitutional issues in *Guglielmi*, her opinion was joined by three justices and thus
     constituted a majority opinion.  *Rezec v. Sony Pictures Entertainment, Inc.*, 116 Cal. App. 4th 135, 338

28   n.2 (2004); *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 324 n.4 (1997).

1     Here, Plaintiffs allege that Penguin described the Book as "nonfiction" and "biography" on the

2  Book's cover, flyleaf, and other materials promoting the Book.  These statements are not materially

3  different from the speech protected in *Guglielmi* and *Aldrin*.  No court has ever permitted a cause of

4  action based on words describing a book as "nonfiction" or "biography."  Such descriptions are

5  "inextricably intertwined" with the content of the Book in at least two ways: (1) the descriptions

6  provide general information about the genre of the Book; and (2) it is impossible to determine whether

7  the descriptions are apt without examining the contents of the Book.  To date, no court has ever

8  permitted a cause of action based on words that have these characteristics.  To do so would be

9  fundamentally inconsistent with the principles described above that publishers have no duty to verify,

10  much less guaranty, the accuracy of the information they publish.

11                    **c.    Penguin's Alleged Speech Is Not Commercial Speech**

12     Given the obvious linkages between the words "nonfiction" and "biography" and the contents

13  of the books to which they refer, Plaintiffs must establish that the words nevertheless deserve "lesser

14  protection" than speech within the Book because they were used as pure commercial speech.  *Central*

15  *Hudson Gas & Elec. Corp. v. Public Svc. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  Plaintiffs fail to

16  meet that standard.

17     Plaintiffs attempt to make their point by citing *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 952-53, 968

18  (2002), and arguing that there is "no protection for false commercial speech."  However, Plaintiffs

19  ignore *Kasky's* standards for determining whether speech is commercial or noncommercial.  *Kasky*, 27

20  Cal. 4th at 954ff; *see also Central Hudson*, 447 U.S. at 564 n.6.  Words such as "nonfiction" or

21  "biography" do not have the features of commercial speech that distinguish it from noncommercial

22  speech and permit regulation of its content.

23     First, *Kasky* notes that "[t]he truth of commercial speech . . . may be ***more easily verifiable by***

24  ***its disseminator*** than . . . news reporting or political commentary, in that ordinarily the advertiser seeks

25  to disseminate information about a specific product or service that he himself provides and presumably

26  knows more about than anyone else."  *Kasky*, 27 Cal. 4th at 955 (quoting *Va. Pharmacy Bd. v. Va.*

27  *Consumer Council*, 425 U.S. at 772, fn. 24 and citing other cases) (emphasis in original).  *Accord*,

28  *Central Hudson*, 447 U.S. at 564 n.6.  This feature does not pertain to Penguin's alleged speech about

1   the Book.  As the contents of books are not products, the law applicable to speech about consumer

2   products does not uniformly (or neatly) apply to books, because commercial speech doctrines assume

3   that the speakers are manufacturers or distributors who have reason to know more about their products

4   than consumers.  Publishers cannot be similarly presumed to have "extensive knowledge" of their

5   books' contents because, as discussed, publishers are not guarantors of their books' accuracy and have

6   no duty to verify the accuracy of what they publish.

7          Second, *Kasky* notes that "commercial speech is ***hardier*** than noncommercial speech in the

8   sense that commercial speakers, because they act from a profit motive, are less likely to experience a

9   chilling effect from speech regulation." *Kasky*, 27 Cal. 4th at 955 (quoting *Va. Pharmacy Bd. v. Va.*

10  *Consumer Council*, 425 U.S. at 771-72, fn. 24 and citing other cases) (emphasis in original).  *Accord*,

11  *Central Hudson*, 447 U.S. at 564 n.6.  The words at issue here – "nonfiction" and "biography" – do not

12  meet this standard.  If such words were interpreted as guaranties of factual accuracy, publishers would

13  likely stop using those words rather than incur the costs and delays of confirming the accuracy of their

14  authors' statements.

15         Even if Plaintiffs could clear these hurdles, Plaintiffs also fail to allege facts establishing that

16  Penguin engaged in "core commercial speech" or actionable advertisements.  Core "[c]ommercial

17  speech is 'defined as speech that does no more than propose a commercial transaction.'" *Hunt v. City*

18  *of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011).  While Plaintiffs argue in their opposition brief that

19  Penguin used "nonfiction" and "biography" to propose a commercial transaction, Dkt. 63 at 12 (citing

20  Dkt. 22, ¶¶ 2-4, 35-57), the Amended Complaint does not identify any specific commercial proposals

21  that incorporate those words.  Plaintiffs allege only that Penguin made these statements in a variety of

22  media to promote the book.  *E.g.*, Dkt. 22, ¶ 2.  Speech does not automatically become commercial

23  speech simply because it promotes or sells something. *Virginia State Bd.*, 425 U.S. at 761.

24         While advertisements will often meet the standards for classification as commercial speech,

25  Plaintiffs do not identify ***any*** specific advertisements for the Book containing the words "nonfiction"

26  or "biography."  Two Plaintiffs (Lauria and Reimers) allege that advertisements indeed induced them

27  to buy the books, but they allege only that the advertisements described inspiring aspects of

28  Armstrong's life. Dkt. 22, ¶¶ 10-11.  Significantly and dispositively, Plaintiffs do not allege that the

1   advertisements contained the words "nonfiction" or "biography," promoted the Book, or were made by

2   Penguin. *Id.*  Plaintiffs also allege that the entire Book is an advertisement because its flyleaf

3   recommends that readers visit the websites of Penguin, Armstrong, and Armstrong's foundation for

4   more information. *Id.*, ¶ 39. This allegation is plainly insufficient. If telephone directories are not

5   considered pure commercial speech, even though substantial portions of their contents are

6   advertisements, *see Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 957-61 (9th Cir. 2012), then

7   autobiographies of famous people, like the Book, cannot possibly be considered pure commercial

8   speech merely because they contain pages referring readers to websites for more information.

9          Regardless of whether Penguin's alleged descriptions of the Books as "nonfiction" or

10   "biography" could be deemed commercial speech, they could not be considered "false" commercial

11   speech for two reasons. First, as noted, the statements are literally true and not misleading. The Book

12   is undeniably a "nonfiction biography" because it is a written work based on the life of Lance

13   Armstrong. Those words are not rendered misleading by virtue of the fact that the Book contains a

14   single deliberate falsehood by the author, because the words cannot be interpreted as an express or

15   implied guaranty that the author told the entire truth about himself.

16          Further, describing the Book as "nonfiction" or "biography" is not an actionable statement of

17   fact, but rather a generic opinion about classification that is intended to guide publishers, booksellers,

18   librarians and readers. *Long v. Hewlett-Packard Co.*, No. 06-02816, 2007 WL 2994812, at *7 (N.D.

19   Cal. July 27, 2007) (describing a computer as a "notebook" is not an actionable representation as to the

20   product's performance attributes).

21                    **d.      *Keimer* Is Neither Controlling Nor Persuasive**

22          Plaintiffs do not address, much less rebut, the foregoing arguments, but they nevertheless argue

23   that Penguin's conduct in this case is even more egregious than the publisher's conduct in *Keimer v.*

24   *Buena Vista Books, Inc.*, 75 Cal. App. 4th 1220 (1999). As *Keimer* is the only case cited by Plaintiffs

25   that addresses falsehoods in a nonfiction book, the Court should look at it closely and critically.

26   *Keimer* sustained the viability of an action under California's consumer protection statutes against a

27   publisher who advertised a "how to invest" book by reprinting on the book's cover the claim made

28   within the book that the method in question had earned a specific rate of return over a specific period

1  of time.  In doing so, *Keimer* reached a result contrary to the later decision by the court in *Lacoff v.*

2  *Buena Vista Publishing, Inc.*, 183 Misc.2d 600, 705 N.Y.S.2d 183 (N.Y. Sup. Ct. 2000), in litigation

3  involving the same book.

4          The main difference between *Keimer* and *Lacoff* is that *Keimer* was willing to treat the

5  investment returns touted on the cover of the book as commercial speech.  *Lacoff* concluded that the

6  statements were not commercial speech but rather "speech about speech" subject to the special rules

7  described above.  *Lacoff*, 183 Misc.2d at 608-610.  *Lacoff* was decided after *Keimer*, had the benefit of

8  its reasoning, and rejected *Keimer* in part because (for reasons not disclosed in the opinions), for

9  purposes of the motion, the publisher conceded the statements at issue were advertisements in *Keimer*

10  but not in *Lacoff*. *Id.* at 610.  Here, of course, *Lacoff* is more applicable because Penguin does not

11  concede that its alleged statements were advertisements or that Plaintiffs have even properly alleged

12  the existence of any specific false advertisements.

13          *Keimer* does not stand for the proposition that all statements on the covers of books are

14  commercial speech, nor is it persuasive authority for concluding that Penguin's alleged descriptions of

15  the Book were false.  The books and statements in *Keimer* and *Lacoff* differ materially from the books

16  and statements here.  In *Keimer* and *Lacoff*, the link between the contents of the book ("how to invest")

17  and the statements about the book ("returns achieved through the book's method") were obviously

18  promotional.  *Keimer* ruled as it did because it found the error on the book's cover "objectively

19  verifiable as true or false."  75 Cal. App. 4th at 1232.  The touted investment returns could be

20  calculated precisely and were, in fact, admitted by the publisher to have been calculated by an

21  unorthodox method – a fact indicating the publisher was aware that the touted returns were

22  misleading.  Indeed, the defendant publisher in *Keimer* conceded that the complaint in that case

23  pleaded facts sufficient to state a cause of action.  Here, the link between the contents of the Book

24  ("Lance Armstrong's life") and the alleged statements about the Book ("nonfiction biography") does

25  no more than generically classify the Book.  Those statements are literally true, not misleading, and (in

26  this context) not susceptible of being proven false.  Plaintiffs allege no facts from which it may be

27  inferred that Penguin knew the descriptions were false or misleading when made.

28

1    To the extent that *Keimer* felt compelled to treat the speech at issue as a type of "speech about a

2  consumer product" controlled by *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), its ruling

3  was contrary to *Winter* (which held that books are not consumer products) and contrary to cases such

4  as *Aldrin* and *Guglielmi* (which held that "speech about speech" is constitutionally protected).[13]   The

5  latter "speech about speech" cases make clear that the doctrine applies even to advertisements.

6  *Charles* clarifies that the "speech about speech" doctrine is not a component of state law inherent in

7  the UCL or FAL, but rather a federal constitutional doctrine applicable to all tort claims implicating

8  the First Amendment.  *Charles*, 697 F.2d at 1155 ("The principle unifying the exceptions to the

9  commercial speech doctrine for advertisements for protected works is the need to protect advertisers

10  from tort actions that would otherwise threaten the ability of publishers to truthfully promote particular

11  works. While lower courts have occasionally used imprecise, overbroad language in describing these

12  exceptions, it is only in the narrow context of this principle that we have recognized that the

13  noncommercial First Amendment status of an underlying expressive work extends to advertisements

14  for that work.").

15    *Charles*  – which, unlike *Keimer*, is binding precedent here – discussed *Lacoff* approvingly as a

16  representative case applying the "speech about speech" doctrine but acknowledged *Keimer* only as an

17  outlier. *Id.* at 1154-55.  Since *Keimer*'s First Amendment analysis directly contradicts *Lacoff*'s

18  analysis regarding the exact same ads, *Charles* therefore strongly suggests that *Keimer*'s First

19  Amendment analysis should not be followed here.

20    **3.    <u>Penguin Is Not Liable for Failing to Retract the Books or Its Descriptions of Them</u>**

21    Plaintiffs argue that Penguin is liable for continuing to offer the Book to the public long after it

22  knew or should have known that it contains falsehoods and that the labels "nonfiction" and

---

[13] *See also Rezec v. Sony Pictures Entm't, Inc.*, 116 Cal.App.4th 135, 142 (2004) ("[J]ust as the films are noncommercial speech, so is an advertisement reflecting their content.").

1  "biography" are false or misleading.[14]  *E.g.*, Dkt. 63 at 5-6, 13 n.5.  This argument fails as a matter of

2  law.  California has adopted the single-publication rule, which provides in pertinent part that:

> No person shall have more than one cause of action for damages for libel or slander or
> invasion of privacy or *any other tort* founded upon any *single publication* or exhibition
> or utterance, such as any *one issue of a* newspaper or *book* or magazine . . . .

6  Cal. Civ. Code § 3425.3 (emphasis added).  "The single-publication rule limits tort claims premised on

7  mass communications to a single cause of action that accrues upon the first publication of the

8  communication, thereby 'spar[ing] the courts from litigation of stale claims' where an offending book

9  or magazine is resold years later."  *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1166-67 (9th Cir. 2011)

10  (applying California law) (quoting *Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468 (2009)).  Information

11  is "published" within the meaning of the single-publication rule when it is first offered to the public.

12  *Roberts*, 660 F.3d at 1167.  A publisher is not deemed to "republish" information if and when the

13  publisher subsequently receives "substantial indications of falsity."  *Id.*

> The fundamental problem with [this] theory—that a mass communication is republished
> when the defendant fails to retract it after receiving notice of its falsity—is that it
> undermines the single-publication rule. That rule is designed to provide repose to de-
> fendants by precluding stale claims based on dated but still-lingering mass
> communications.

---

19  [14] Although Plaintiffs specifically allege that Penguin knew or should have known that Armstrong had
lied about doping "[a]s early as January 2011 and certainly not later than June 2012," Dkt. 22, ¶ 161,
this allegation is simply not plausible.  The January 2011 date apparently derives from a *Sports
Illustrated* article citing a former Armstrong teammate who called Armstrong "the instigator" of a
teamwide doping program.  *Id.*, ¶ 66.  Yet, Plaintiffs also allege that "Armstrong's lawyer publicly
denied these accusations.  *Id.*  The June 2012 date derives from the U.S. Anti-Doping Agency's
decision to charge Armstrong with doping violations on June 12, 2012.  *Id.*, ¶ 69.  But Plaintiffs also
allege that "Armstrong continued to publicly deny any doping charges.  *Id.*, ¶ 70.  At least two of the
Plaintiffs continued to believe that Armstrong was telling the truth even after June 2011 based on
"Armstrong's continued, vehement and well-publicized protests that he was innocent, the fact that it
was widely reported that Armstrong had never tested positive for a banned substance, and the fact that
Armstrong had successfully sued accusers for defamation."  *Id.*, ¶¶ 90-91.  Plaintiffs allege no basis for
concluding that any Defendant other than Armstrong "knew or should have known" that he was lying
by January 2011 or June 2012.  Clearly, however, if one were to accept Plaintiffs' argument that, based
on widely circulated articles in newspapers and magazines, Penguin should have known in 2010, 2011,
or 2012 that Armstrong had lied, then certainly each of the Plaintiffs should also have known the same
thing and cannot claim to have been deceived.

1  *Id.* at 1168 (citing *Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 399-400 (2004).

2  Thus, when the single-publication rule applies, courts have unanimously held that a publisher owes no

3  duty "to retract a statement upon which grave doubt is cast after publication." *D.A.R.E. America v.*

4  *Rolling Stone Magazine*, 101 F.Supp.2d 1270, 1287 (C.D. Cal. 2000). *Accord, Roberts*, 660 F.3d at

5  1167-68; *McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1516 (D.C. Cir. 1996); *Lohrenz v.*

6  *Donnelly*, 223 F.Supp.2d 25, 56 (D.D.C. 2002); *Coughlin v. Westinghouse Broad. & Cable, Inc.*, 689

7  F.Supp. 483, 488 (E.D.Pa.1988). Here, Plaintiffs allege that Penguin published the Book in hardcopy

8  in 2000 and in paperback in 2001. Even if it were true that Penguin's alleged descriptions of the Book

9  as "nonfiction biography" had been rendered false or misleading by events since those publication

10  dates (which Penguin denies), Penguin still cannot be liable as a matter of law for failing to withdraw

11  or retract the Book. Even if such claims were not barred as a matter of law, Plaintiffs do not allege that

12  they themselves purchased the Book after 2011 or 2012. They therefore lack standing to assert a claim

13  based on such continued publication.

14  **III.   CONCLUSION**

15      For these reasons, Plaintiffs' claims against Penguin should be dismissed with prejudice.

16

    Respectfully submitted,

17

18  Dated: July 12, 2013      DORSEY & WHITNEY LLP

19

20  By: */s/  Kent J. Schmidt*
    Kent J. Schmidt (SBN 195969)

21      Jonathan M. Herman (admitted *pro hac vice*)
    F. Matthew Ralph (admitted *pro hac vice*)

22

23      Attorneys for Defendants Penguin Group (USA) Inc.,
    G.P. Putnam's Sons, and The Berkley Publishing Group

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Sarah K. Shaholli, hereby certify and declare as follows:

I am over the age of 18 years and not a party to the within action. My business address is 600 Anton Blvd., Costa Mesa, California 92626. On July 12, 2013, I caused service of the following document(s) on counsel for all parties to this action by electronically filing the document(s) with the Clerk of the District Court using its ECF System which electronically notifies them. The document(s) served include:

**REPLY OF DEFENDANT PENGUIN GROUP (USA) INC., G.P. PUTNAM'S SONS, AND THE BERKLEY PUBLISHING GROUP IN FURTHER SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of July, 2013, in Costa Mesa, California.

SARAH K. SHAHOLLI