1   Kent J. Schmidt (SBN 195969)
    schmidt.kent@dorsey.com
2   DORSEY & WHITNEY LLP
    600 Anton Boulevard, Ste. 2000
3   Costa Mesa, CA 92626
    Telephone: (714) 800-1445
4   Facsimile: (714) 800-1499

5   Jonathan M. Herman (admitted *pro hac vice*)
    herman.jonathan@dorsey.com
6   DORSEY & WHITNEY LLP
    51 West 52nd Street
7   New York, NY 10019-6119
    Telephone: (212) 415-9247
8   Facsimile: (646) 607-0943

9   F. Matthew Ralph (admitted *pro hac vice*)
    ralph.matthew@dorsey.com
10  DORSEY & WHITNEY LLP
    50 S. Sixth Street, Suite 1500
11  Minneapolis, MN  55402
    Telephone:  (612) 492-6964
12  Facsimile:  (952) 516-5574

13  Attorneys for Defendants Penguin Group (USA) Inc.,
    G.P. Putnam's Sons, and The Berkley Publishing Group
14

15                  **UNITED STATES DISTRICT COURT**
                    **EASTERN DISTRICT OF CALIFORNIA**
16

17  ROB STUTZMAN, JONATHAN WHEELER,      ) CASE No. 2:13-cv-00116-MCE-KJN
    GLORIA LAURIA, DAVID REIMERS and     )
18  SCOTT ARMSTRONG, on behalf of        ) *Assigned for all purposes to the Honorable*
    themselves and all others similarly situated,  ) *Morrison C. England, Jr.*
19                                       )
                   Plaintiffs,           ) **REPLY OF DEFENDANT PENGUIN GROUP**
20                                       ) **(USA) INC., G.P. PUTNAM'S SONS, AND**
    vs.                                  ) **THE BERKLEY PUBLISHING GROUP IN**
21                                       ) **FURTHER SUPPORT OF SPECIAL ANTI-**
    LANCE ARMSTRONG; PENGUIN GROUP       ) **SLAPP MOTION TO STRIKE PLAINTIFFS'**
22  (USA), INC.; G.P. PUTNAM'S SONS; THE ) **FIRST AMENDED CLASS ACTION**
    BERKLEY PUBLISHING GROUP;            ) **COMPLAINT (UNDER CCP SEC. 425.16)**
23  RANDOM HOUSE, INC.; BROADWAY         )
    BOOKS; CROWN PUBLISHING GROUP;       )
24  THOMAS W. WEISEL; WILLIAM J.         )
    STAPLETON; and DOES 1-50, inclusive, )
25                                       )
                   Defendants.           ) **Date/Time:**  August 8, 2013, at 2:00 p.m.
26                                       ) **Judge:**  Honorable Morrison C. England, Jr.
                                         ) **Courtroom:** 7
27                                       )
                                         )
28                                       )

                                        1

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................... 1

II. ARGUMENT ......................................................................................................... 2

    A. PENGUIN'S ALLEGED CONDUCT FALLS WITHIN THE HEART OF THE ANTI-SLAPP STATUTE ............................................................................. 2

    B. PLAINTIFFS FAIL TO SHOW THAT PENGUIN'S ALLEGED CONDUCT FALLS OUTSIDE THE SCOPE OF THE ANTI-SLAPP STATUTE ................. 3

        1. Penguin's Alleged Conduct Is Not Illegal ................................................. 3

        2. The Anti-SLAPP Statute Applies to Actions Against Publishers Arising from the Publication and Promotion of Books .............................. 4

            a. Activities Associated with Publishing and Promoting Books Fall Squarely within the Anti-SLAPP Statute ..................... 5

            b. Plaintiffs Fail to Allege Facts That Even Bring Them Within the Class Action or Commercial Speech Exceptions .......... 7

        3. Penguin's Alleged Speech Was Clearly Speech About Matters of Public Interest .......................................................................................... 8

        4. Mere Allegations of False Commercial Speech Do Not Take a Cause of Action Outside the Scope of the Anti-SLAPP Statute ................ 9

    C. PLAINTIFFS HAVE NOT SHOWN A PROBABILITY THAT THEY HAVE STATED OR WILL STATE AND SUBSTANTIATE VIABLE CLAIMS ........ 10

        1. Plaintiffs' Supporting Materials Do Not Overcome Fatal Defects in the Amended Complaint ........................................................................ 11

        2. Discovery Cannot Cure the Fatal Defects in the Amended Complaint ................................................................................................. 12

        3. Penguin's Alleged Speech Is Not Actionable, as It Is Protected by the First Amendment .......................................................................... 13

            a. Penguin Did Not Guarantee the Book's Truth or Accuracy ......... 14

            b. Penguin's Alleged Speech Is Inextricably Intertwined with, or an Adjunct to, Protected Speech Contained in the Books ........ 15

            c. Penguin's Alleged Descriptions of the Book Do Not Meet the Standard for False Commercial Speech ................................. 15

        4. Penguin Is Not Liable for Failing to Retract the Books or Its Descriptions of Them .............................................................................. 17

III. CONCLUSION .................................................................................................. 19

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*All One God Faith, Inc. v. Organic and Sustainable Industry Standards, Inc.*,
   183 Cal. App. 4th 1186 (2010).........................................................................8, 9, 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .........................................................................................12, 13

*Blanchard v. DIRECTV, Inc.*,
   123 Cal. App. 4th 903 (2004).....................................................................................7

*Buzayan v. City of Davis Police Dep't*,
   No. 2:06-CV-1576, 2007 WL 1831139 (E.D. Cal., Jan. 25, 2007) ............................2

*Club Members for an Honest Election v. Sierra Club*,
   45 Cal. 4th 309 (2008) ..............................................................................................3

*Consumer Justice Ctr. v. Trimedica Int'l, Inc.*,
   107 Cal. App. 4th 595 (2003).....................................................................................8

*Dex Media West, Inc. v. City of Seattle*,
   696 F.3d 952 (9th Cir. 2012)....................................................................................12

*Duncan v. Cohen*,
   2008 U.S. Dist. LEXIS 109342 (N.D. Cal. Jul. 22, 2008) ........................................6

*Dyer v. Childress*,
   147 Cal. App. 4th 1273 (2007)...............................................................................6, 7

*Flatley v. Mauro*,
   39 Cal. 4th 299 (Cal. 2006).....................................................................................3, 4

*Foundation for Taxpayer and Consumer Rights v. Garamendi*,
   132 Cal. App. 4th 1375 (2005)...................................................................................6

*Fremont Reorganizing Corp. v. Faigin*,
   198 Cal. App. 4th 1153 (2011)...................................................................................3

*Hilton v. Hallmark Cards*,
   599 F.3d 894 (9th Cir. 2010)...............................................................................2, 10

*Hydrick v. Hunter*,
   669 F.3d 937 (9th Cir. 2012)....................................................................................12

*Ingels v. Westwood One Broadcasting Serv.*,
   129 Cal. App. 4th 1050 (2005)................................................................................5, 6

*Major v. Silna*,
   134 Cal. App. 4th 1485 (2005)...................................................................................6

*Mendoza v. ADP Screening and Selection Services, Inc.*,
    182 Cal. App. 4th 1644 (2010) ................................................................... 3

*Nagel v. Twin Labs., Inc.*,
    109 Cal. App. 4th 39 (2003) ....................................................................... 8

*Price v. Operating Engineers Local Union No. 3*,
    195 Cal. App. 4th 962 (2011) ..................................................................... 3

*Rezec v. Sony Pictures Entertainment, Inc.*,
    116 Cal. App. 4th 135 (2004) ..................................................................... 9

*Rivero v. American Federation of State, County & Municipal Employees*,
    105 Cal. App. 4th 913 (2003) ..................................................................... 2

*Simpson Strong-Tie Co., Inc. v. Gore*,
    49 Cal. 4th 12 (2010) ................................................................................. 3

*Smith v. Payne*,
    No. 12-1732, 2012 U.S. Dist. LEXIS 182345 (N.D. Cal. Dec. 26, 2012) ................ 4

*Stewart v. Rolling Stone LLC*,
    181 Cal. App. 4th 664 (2010) ................................................................... 10

**STATUTES**

Cal. Code Civ. Proc. § 425.16(a) ....................................................................... 3

Cal. Code Civ. Proc. § 425.16(b) ................................................................ 2, 10

Cal. Code Civ. Proc. § 425.16(e) .................................................................. 2, 8

Cal. Code Civ. Proc. § 425.17(b) .................................................................. 4, 7

Cal. Code Civ. Proc. § 425.17(c) ............................................................... 4, 7, 8

Cal. Code Civ. Proc. § 425.17(d) ......................................................... 3, 5, 6, 7, 9

**OTHER AUTHORITIES**

*Anti-SLAPP Motions: Appropriate Use of the Procedure* 2 (Bill Analysis 2003) ................ 5

Fed. R. Civ. P. 8 ................................................................................... 12, 13

Fed. R. Civ. P. 9(b) .................................................................................... 11

TABLE OF AUTHORITIES
CASE NO. 2:13-CV-00116-MCE-KJN

## I.   **INTRODUCTION**

Plaintiffs devote most of their opposition to arguing that the anti-SLAPP statute does not apply to Penguin, even though Plaintiffs' claims against Penguin arise from conduct plainly in furtherance of free speech on a matter of public interest – namely, Penguin's publication and alleged promotion of *It's Not About the Bike: My Journey Back to Life* (the "Book"), an autobiography by the world famous cyclist Lance Armstrong. Plaintiffs' opposition gives scant attention to the far more important issue whether, as required by the anti-SLAPP statute, they have demonstrated a probability that they have already stated, or can state and substantiate, viable claims. Indeed, Plaintiffs betray a great deal of anxiety about the merits of their claims, as pleaded, because they (1) introduce hundreds of pages of supporting materials that are apparently intended to show how Plaintiffs could amend their claims based on information currently available, and (2) submit a declaration of counsel claiming that discovery is necessary to respond to Defendants' dispositive motions.

These supporting materials do not alter the analysis of Plaintiffs' claims against Penguin by one iota. The Amended Complaint does not identify any specific statements, by Penguin or any Defendant, that induced them to purchase the Book; and Plaintiffs do *not* allege that they saw and relied upon the only statements attributed to Penguin – namely, that Penguin described the Book as "nonfiction" and "biography." Significantly, Plaintiffs' supporting materials contain no declarations by Plaintiffs explaining that they could allege such facts if given another opportunity. The Court may now safely assume that such facts cannot be alleged, and this alone is fatal. Discovery could not possibly enable Plaintiffs to overcome this defect, or the fact that Plaintiffs' claims against Penguin are not viable under the First Amendment.

Plaintiffs' attempts to show that Penguin falls outside the scope of the anti-SLAPP statute fare no better. Plaintiffs' argument that Penguin's "false commercial speech" is not protected by the statute improperly asks the Court to evaluate the merits issues (ordinarily the second step of anti-SLAPP analysis) to determine whether the statute even applies (ordinarily the first step of anti-SLAPP analysis). This is a blatant attempt by Plaintiffs' to avoid their burden to demonstrate a "probability" that they will prevail on the merits.

1    Plaintiffs' remaining arguments similarly lack merit.  Their argument that the "illegality"

2   exception applies to Penguin ignores that Plaintiffs have not alleged or made any showing, and

3   Penguin has not conceded, that ***Penguin*** engaged in any criminal wrongdoing.  Plaintiffs' argument

4   that this case falls within the class action or commercial speech exceptions further ignores the fact that

5   the statute contains an "exception to the exceptions" for the publication and promotion of books – the

6   very conduct at issue here.  Their contention that Penguin's descriptions of the Book as "nonfiction"

7   and "biography" are not speech about matters of public interest is incorrect because, first, Plaintiffs do

8   not even allege where or when Penguin described the Book as "nonfiction" and offer no evidence of

9   that description by Penguin and, second, even if Penguin had so described the Book, such statements

10   would be descriptive of the contents of the Book, and the contents of the Book are indisputably matters

11   of public interest.  Penguin's anti-SLAPP motion should be granted, and the claims against Penguin

12   should be dismissed with prejudice.

## II.   ARGUMENT

### A.   PENGUIN'S ALLEGED CONDUCT FALLS WITHIN THE HEART OF THE ANTI-SLAPP STATUTE

16    Plaintiffs' cause of action against Penguin arises from Penguin's publication and alleged

17   promotion of the Book, an autobiography by world-famous cyclist, Lance Armstrong.  *E.g.*, Dkt. 22, ¶

18   2; Dkt. 65 at 2-3.  Each of Plaintiffs' claims against Penguin is based on "misrepresentations contained

19   in and disseminated about" the Book.  Dkt. 22, ¶ 2.  As Penguin's alleged acts were in furtherance of

20   its right of free speech on a matter of public interest, Penguin's acts fall squarely within the scope of

21   California's anti-SLAPP statute.  CCP § 425.16(b)(1), (e)(3) & (e)(4); *Hilton v. Hallmark Cards,* 599

22   F.3d 894, 904 (9th Cir. 2010) (any "communicative" act is "in furtherance" of free speech rights);

23   *Buzayan v. City of Davis Police Dep't*, No. 2:06-CV-1576, 2007 WL 1831139, *7 (E.D. Cal., Jan. 25,

24   2007) (a matter of "public interest" is one in which a substantial number of people are interested);

25   *Rivero v. American Federation of State, County & Municipal Employees,* 105 Cal. App. 4th 913, 924

26   (2003) (famous people are matters of "public interest").

27    If there were ever any question whether the anti-SLAPP statute covered publishers who publish

28   and promote books, the California legislature resolved that issue by amendments to the statute in 2004.

2

1  Section 425.17(d) clarifies that the anti-SLAPP statute applies with full force to "*any person engaged*

2  *in the dissemination of ideas or expression in any book*," CCP § 425.17(d)(1) (emphasis added), or to

3  "*any person or entity based upon the creation, dissemination, exhibition, advertisement, or other*

4  *similar promotion of any* dramatic, *literary*, musical, political, or artistic *work*." CCP § 425.17(d)(2)

5  (emphasis added).  Plaintiffs argue that Penguin's conduct should be exempted from anti-SLAPP

6  coverage for various reasons, but this is a losing battle for Plaintiffs.

7  **B.**     **PLAINTIFFS FAIL TO SHOW THAT PENGUIN'S ALLEGED CONDUCT**
          **FALLS OUTSIDE THE SCOPE OF THE ANTI-SLAPP STATUTE**
8

9         The scope of the anti-SLAPP statute "shall be construed broadly," CCP § 425.16(a); *Club*

10  *Members for an Honest Election v. Sierra Club*, 45 Cal. 4th 309, 318 (2008), and exceptions to the

11  statute "should be narrowly construed." *Id.* at 316 (citing *City and County of San Francisco v.*

12  *Ballard*, 136 Cal. App. 4th 381, 400 (2006)).  Plaintiffs bear the burden of proving that Penguin falls

13  within an exception.  *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 26 (2010).  Plaintiffs argue

14  that Penguin falls within four exceptions to anti-SLAPP coverage, but each argument lacks merit and

15  Plaintiffs fail to carry their burden.

16                    **1.**     <u>**Penguin's Alleged Conduct Is Not Illegal**</u>

17         Plaintiffs argue that Penguin is not covered by the anti-SLAPP statute because the statute does

18  not apply to illegal activity and Armstrong engaged in illegal activity. Dkt. 65 at 6. This exception is

19  based on *Flatley v. Mauro*, 39 Cal. 4th 299, 316 (Cal. 2006), and applies in the very narrow

20  circumstance when "the defendant concedes the illegality of its conduct or the illegality is conclusively

21  shown by the evidence." *Id.* at 316. "Illegal," in this context, means criminally illegal. *Price v.*

22  *Operating Engineers Local Union No. 3*, 195 Cal. App. 4th 962, 971 (2011) ("The term 'illegal' in

23  *Flatley* means criminal, not merely violative of a statute.").[1]

24

_____

25  [1] *See also Fremont Reorganizing Corp. v. Faigin*, 198 Cal. App. 4th 1153, 1169 (2011) (same);

26  *Mendoza v. ADP Screening and Selection Services, Inc.*, 182 Cal. App. 4th 1644, 1654 (2010) ("a
   plaintiff's complaint always alleges a defendant engaged in illegal conduct in that it violated some

27  common law standard of conduct or statutory prohibition, giving rise to liability, and we decline to
   give plaintiffs a tool for avoiding the application of the anti-SLAPP statute merely by showing any

28  statutory violation").

1      The *Flatley* exception does not apply to Penguin for several reasons.  First, while Plaintiffs

2   argue that Armstrong engaged in "drug trafficking and criminal conspiracy," Dkt. 65 at 6, Plaintiffs do

3   not even allege (much less introduce conclusive evidence to prove) that Penguin engaged in any

4   criminal activity.  Plaintiffs argue halfheartedly that Penguin's alleged speech was "in furtherance of

5   Armstrong's illegal activity," but Plaintiffs do not allege any facts to support an inference that Penguin

6   aided and abetted Armstrong's doping activities or otherwise functioned as a co-conspirator, principal,

7   or agent of Armstrong.  Absent such allegations of complicity or joint liability, Penguin cannot be

8   excluded from the statute's coverage simply because a co-defendant allegedly engaged in criminal

9   wrongdoing.

10     Second, the relevant conduct, from which the action arises and on which it is based, is not

11  Armstrong's use and concealment of drugs while racing but rather the authorship, publication, and

12  promotion of the books.  In other words, this case is not about Armstrong's cycling career; rather, it is

13  about his publishing career.  The *Flatley* exception may only be applied when "the ***assertedly protected***

14  ***speech or petition activity*** was illegal as a matter of law." *Smith v. Payne*, No. 12-1732, 2012 U.S.

15  Dist. LEXIS 182345, *15 n.6 (N.D. Cal. Dec. 26, 2012) (quoting *Flatley*, 39 Cal. 4th at 317-20)

16  (emphasis added).  Here, the assertedly protected speech activity was the publication and promotion of

17  Armstrong's books, not his statements to avoid doping liability or detection.  Plaintiffs simply allege

18  no criminal wrongdoing by Penguin in connection with its publication and purported promotion of the

19  Book.

20     Third, a plaintiff must do much more than simply allege that the otherwise protected conduct is

21  unlawful or unethical. *Smith*, 2012 U.S. Dist. LEXIS 182345 at *15 n.6 (citing *Birkner v. Lam*, 156

22  Cal. App. 4th 274, 285 (2007)).  A plaintiff must show that "a defendant concedes, or the evidence

23  conclusively establishes" that a defendant engaged in criminal wrongdoing. *Smith*, 2012 U.S. Dist.

24  LEXIS at *15 n.6 (citing *Flatley*, 39 Cal. 4th at 317).  No such concessions or evidence exist here.

       **2.**     **The Anti-SLAPP Statute Applies to Actions Against Publishers Arising**
            **from the Publication and Promotion of Books**

27     In 2004, the anti-SLAPP statute was amended to remove from its coverage certain class actions

28  in the public interest, *see* CCP § 425.17(b), and certain types of commercial speech, *see* CCP §

4

1   425.17(c).  *See also Ingels v. Westwood One Broadcasting Serv.*, 129 Cal. App. 4th 1050, 1065-66

2   (2005) (discussing 2004 amendments).  Plaintiffs argue that their action falls within these exceptions to

3   anti-SLAPP statute, but this argument lacks merit for two reasons.  The class action and commercial-

4   speech exceptions do not apply to Penguin's alleged conduct, and Plaintiffs fail, in any event, to plead

5   facts that bring them within the exceptions.

6           **a.     Activities Associated with Publishing and Promoting Books Fall**
                     **Squarely within the Anti-SLAPP Statute**
7

8           First, Plaintiffs overlook that publishers who publish books fall within "exceptions to the

9   exceptions."  The class action and commercial speech exceptions do not apply to "***any person engaged***

10  ***in the dissemination of ideas or expression in any book***," CCP § 425.17(d)(1) (emphasis added), or to

11  "***any person or entity based upon the creation, dissemination, exhibition, advertisement, or other***

12  ***similar promotion of any*** dramatic, ***literary***, musical, political, or artistic ***work***."  CCP § 425.17(d)(2)

13  (emphasis added).

14          The legislative history of these "exceptions to the exceptions" plainly indicates that the

15  California legislature intended that all book publishers be protected by the anti-SLAPP statute with

16  respect to any acts arising from publishing and promoting books.  The Assembly Committee on the

17  Judiciary prepared an analysis of the 2004 anti-SLAPP amendments, which stated that "[t]he bill

18  exempts – and thereby continue[s] to allow the anti-SLAPP motion to be used by – all persons and

19  entities engaged in the press or broadcast media, ***publishing of books*** and journals, and all those who

20  are sued for protected activities based upon the creative ***and promotional activities*** regarding dramatic,

21  ***literary***, musical, political or artistic ***works***."  Staff of Assembly Comm. on the Judiciary, *Anti-SLAPP*

22  *Motions: Appropriate Use of the Procedure* 2 (Bill Analysis 2003)(emphasis added).[2]

23

24

----

25  [2] The Assembly Committee's analysis further states that the bill "[p]ermits, as an exception to the
26  foregoing prohibitions, the anti-SLAPP motion to be employed against claims arising from gathering,
    receiving or processing information for communication to the public by a publisher . . . or a person
27  engaged in the dissemination of ideas or expression ***in any book*** or academic journal, or an action
    based upon the creation or promotion of a dramatic, literary, musical, political or artistic work."  *Id.* at
28  2-3 (emphasis added).

1    Plaintiffs argue that Subsection (d) is limited to those engaged in "the gathering and

2   dissemination of news," citing *Ingels,* 129 Cal. App. 4th at 1068; but this argument is plainly incorrect.

3   As noted, the text and legislative history of Subsection (d) expressly include book publishing and

4   promotion within the scope of the anti-SLAPP statute.   California courts have also consistently

5   interpreted Subsection (d) expansively to include persons and activities analogous to the "exceptions to

6   the exceptions." *See Ingels,* 129 Cal. App. 4th at 1068 (holding that a radio broadcaster's comments

7   fell within subdivision (d)(2) even though the statute does not specifically list "radio stations");

8   *Foundation for Taxpayer and Consumer Rights v. Garamendi*, 132 Cal. App. 4th 1375, 1391 (2005)

9   (interpreting that subdivision (d)(2) applies to lawsuits based upon the promotion of a work that might

10   be subject to copyright); *Major v. Silna*, 134 Cal. App. 4th 1485, 1495 (2005) (no distinction between

11   "[defendant's] letters and advertisements . . . which advocated support for the candidates on the basis

12   of their political positions . . . and an article or editorial . . . in a newspaper or magazine circulated

13   generally in Malibu.").  *Garamendi* and *Major* rebut Plaintiffs' argument that Subsection (d) is

14   necessarily limited to the publication of news.

15    Plaintiffs argue that Subsection (d) does not offer publishers blanket protection from the anti-

16   SLAPP statute, citing *Dyer v. Childress*, 147 Cal. App. 4th 1273, 1278 (2007), and *Duncan v. Cohen*,

17   2008 U.S. Dist. LEXIS 109342, *8 (N.D. Cal. Jul. 22, 2008).  But *Dyer* and *Duncan* do not interpret

18   Subsection (d) and therefore offer no support for this argument.

19    *Dyer* and *Duncan* are also inapplicable here on their own terms (and appear to be anti-SLAPP

20   outliers).  *Duncan* concluded that state law claims are excluded from coverage under the anti-SLAPP

21   statute when they are asserted in a lawsuit where the gravamen of the complaint is copyright

22   infringement, because copyright claims do not implicate the First Amendment.  *Id.* at *6 (quoting

23   *Harper & Row Publisher, Inc. v. Nation Enters.*, 471 U.S. 539 (1985)).  The copyright exception does

24   not apply here because Plaintiffs have not alleged copyright infringement.

25    *Dyer* involved defamation claims based on plaintiff's alleged portrayal in the otherwise

26   fictional film, *Reality Bites*.  The court concluded that, even though the movie itself was speech on a

27   matter of public interest, defendants' alleged portrayal of plaintiff in the movie was not. *Dyer*, 147

28   Cal. App. 4th at 1280.  Even if specific statements within an otherwise constitutionally protected work

6

1  can be excepted from anti-SLAPP coverage because the statements themselves are not matters of

2  public interest (even though the work, as a whole, is),[3] Penguin's act of publishing Armstrong's

3  allegedly false denials of doping in the Book is clearly a matter of public interest because one aspect of

4  Armstrong's career that interested many people is whether he raced "clean" or not.

5       In sum, the text and legislative history of Subsection (d), and the cases interpreting it, make

6  clear that the anti-SLAPP statute applies to causes of action against publishers for their acts of

7  publishing and promoting books.  Penguin's alleged conduct therefore falls within the heart of

8  Subsection (d) and outside the exceptions for certain class actions and certain commercial speech in

9  Subsections (b) and (c).  But Plaintiffs also fail even to meet the elements of the anti-SLAPP

10 exceptions for class actions and commercial speech.

11        **b.    Plaintiffs Fail to Allege Facts That Even Bring Them Within the**
               **Class Action or Commercial Speech Exceptions**

12

13      Regardless of the applicability of Subsection (d), Plaintiffs' action does not meet the

14 requirements for fitting within the exceptions of Subsections (b) or (c).  Plaintiffs' action does not fit

15 within the class action exception of Subsection (b) because it would not "enforce an important right

16 affecting the public interest," as required by Subsection (b)(2).  CCP § 425.17(b).  The so-called

17 "rights" that Plaintiffs seek to enforce can be variously described as: (1) the right to purchase

18 autobiographies that do not contain any lies; (2) the right to a refund if an autobiography is determined

19 to contain a lie; and (3) the assurance that the words "nonfiction" or "biography" are guaranties that

20 100% of an autobiography's contents are factually accurate and honest.  None of these "rights" even

21 exist, and non-existent rights do not meet the requirements of Subsection (b)(2).  *E.g.*, *Blanchard v.*

22 *DIRECTV, Inc.*, 123 Cal. App. 4th 903, 915 (2004) (rejecting application of Subsection (b)(2) to a

23 lawsuit that sought to enjoin a cable company from sending demand letters to purchasers of cable-

24 pirating devices because the prospective class action "would establish no ringing declaration of the

25

26 _____

27 [3] This conclusion in *Dyer* appears to be inconsistent with the rest of anti-SLAPP jurisprudence.  While
   anti-SLAPP cases have rejected attempts to "abstract" a "public interest" issue from specific (e.g.,
   commercial) statements, we are aware of no case other than *Dyer* that has analyzed a "public interest"

28 work and applied the "public interest" standard to each component of the work.

1  rights of all pirating-device purchasers, nor would it lead to a wholesale change in the practice of

2  sending demand letters").

3       Similarly, Plaintiffs' action does not fit within the commercial speech exception of Subsection

4  (c) because no court has ever concluded that (i) publishers like Penguin are persons "primarily engaged

5  in the business of selling or leasing goods," (ii) "goods" include the contents of books, or (iii)

6  descriptions of books as "nonfiction" or "biography" are "representations of fact" about "goods." CCP

7  § 425.17(c).

8       **3.**    **Penguin's Alleged Speech Was Clearly Speech About Matters of Public**
        **Interest**

9

10       Plaintiffs argue that Penguin's descriptions of the Book do not fall within the scope of the anti-

11  SLAPP statute because they were not speech about a "public issue" or matter of "public interest" under

12  CCP § 425.16(e)(3)-(4).  *See* Dkt. 65 at 15.  This argument fails for two reasons.

13       First, Penguin's alleged speech – describing the Book as "nonfiction" or "biography" – plainly

14  was speech on a matter of "public interest."  The words "nonfiction" and "biography" are descriptions

15  of the contents of the Book, and Plaintiffs do not deny that the contents of the Book – Armstrong's

16  struggle to survive cancer and his cycling career – are matters of public interest.  The descriptions are

17  therefore, by definition, speech about a matter of public interest.  Plaintiffs admit as much when they

18  argue that these descriptions were "material" because they were a "an important and significant cog in

19  an economic machine" that drove the Book up the bestseller list.  Dkt. 65 at 15-16.

20       Second, the cases upon which Plaintiffs rely involved consumer products; and none involved

21  books. *See All One God Faith, Inc. v. Organic and Sustainable Industry Standards, Inc.*, 183 Cal. App.

22  4th 1186, 1209 (2010) (trade association's acts of certifying its member's products as "organic" not a

23  matter of "public interest" under anti-SLAPP statute); *Nagel v. Twin Labs., Inc.*, 109 Cal. App. 4th 39,

24  48 (2003) (advertisements for herbal supplement's ingredients were not speech "in connection with a

25  public issue"); *Consumer Justice Ctr. v. Trimedica Int'l, Inc.*, 107 Cal. App. 4th 595, 602 (2003)

26  (advertisements for herbal supplement's power to augment breast size not a matter of "public interest"

27  under anti-SLAPP statute).  Significantly, these cases recognize that First Amendment protection

28  applies to "advertising speech" when, as here, it "is inextricably intertwined with protected speech

8

1    informing the consuming public and further political debate on a matter of public interest." *All One*

2    *God Faith*, 183 Cal. App. 4th at 1209 (citing *Nagel*, 109 Cal. App. 4th at 50).  In sum, Plaintiffs' cases

3    are not applicable to the type of "speech about speech" at issue here.[4]

4         In a footnote, Plaintiffs also cite *Rezec v. Sony Pictures Entertainment, Inc.*, 116 Cal. App. 4th

5    135 (2004), which concluded that a movie producer who promoted a movie by including in

6    advertisements favorable reviews by a fictitious film critic did not act in furtherance of free speech

7    rights for purposes of the anti-SLAPP statute.  *Rezec* was decided before the 2004 amendments to the

8    anti-SLAPP statute clarified that anti-SLAPP coverage applies to commercial speech by certain media

9    defendants, and it is doubtful that its holding survives the enactment of Subsection (d).[5]  Nevertheless,

10   even on its own terms, *Rezec* is not applicable here for at least the following reasons: (i) the speech in

11   *Rezec* was admitted or proved[6] to be false commercial speech; here, Plaintiffs have not even

12   sufficiently alleged the existence of false commercial speech, much less proved or obtained admissions

13   of its existence; and (ii) the "speech about speech" doctrine did not apply in *Rezec* because the

14   fictitious movie reviews were not inextricably linked to the content of the movie; here, Penguin's

15   alleged descriptions of the Book are so linked.

16        **4.    Mere Allegations of False Commercial Speech Do Not Take a Cause of
          Action Outside the Scope of the Anti-SLAPP Statute**

17

18        Plaintiffs argue that Penguin is alleged to have engaged in false commercial speech, that false

19   commercial speech is not constitutionally protected, and that Penguin's conduct therefore falls outside

20   the scope of the anti-SLAPP statute.  This argument improperly reverses the steps of the anti-SLAPP

21   analysis.  Step 1 of the analysis asks whether a defendant has stated a prima facie case that the action

22

23   _____

24   [4] To the extent these are also Step 2 merits issues, Penguin will further address them *infra* in Argument
     § II.C.3.b.

25   [5] It is also unclear whether *Rezec* would be decided the same way again, given that a dissenting judge
     described the case as "the most frivolous case with which I have *ever* had to deal."  *Rezec*, 116 Cal. .

26   App. 4th at 145 (Ortega, J., dissenting).  Judge Ortega thought the alleged falsehoods were not
     actionable because they were not susceptible of being proven false, not material, and "of so little

27   significance as to have no effect, as a matter of law, upon a reasonable consumer."  *Id.* at 147.

     [6] *Rezec* describes the facts of that case as though they were undisputed, but *Rezec* does not sufficiently

28   describe the procedural posture to clarify whether the facts were stipulated or proved by plaintiffs.

1  arises from an act in furtherance of free speech about a public issue or a matter of public interest. Step

2  2 asks whether a plaintiff sustains its burden of showing a probability of prevailing on the merits. CCP

3  § 425.16(b); *Hilton v. Hallmark Cards,* 599 F.3d 894, 903 (9th Cir. 2010). Here, of course, Penguin

4  has moved to dismiss and strike the Amended Complaint for Plaintiffs' failure to state viable claims,

5  arguing that Plaintiffs have not sufficiently alleged any specific ***statements*** by Penguin that induced

6  their purchases, much less a ***false commercial*** statement. Whether Plaintiffs have met their burden to

7  plead viable claims for false commercial speech is therefore the primary issue in Step 2 of the anti-

8  SLAPP analysis.

9       There is no authority for Plaintiffs' argument that the court must accept as true Plaintiffs'

10 allegations of false commercial speech, in order to determine whether the anti-SLAPP statute even

11 applies at Step 1.[7]  By urging the Court to shift the merits analysis to Step 1 and to make it a

12 "coverage" issue, Plaintiffs are just seeking to avoid the heavy burden imposed on them in Step 2 to

13 demonstrate a probability of success. Incredibly, Plaintiffs argue that Defendants' analysis puts the

14 cart before the horse, Dkt. 65 at 12, when, in fact, this is exactly what Plaintiffs urge the Court to do.[8]

15       **C.   PLAINTIFFS HAVE NOT SHOWN A PROBABILITY THAT THEY HAVE
            STATED OR WILL STATE AND SUBSTANTIATE VIABLE CLAIMS**

16

17       Plaintiffs' opposition devotes scant attention to the all-important Step 2 of anti-SLAPP analysis

18 – demonstrating a probability that Plaintiffs will prevail on the merits. Plaintiffs plainly fail to show

19 that they have stated viable claims against Penguin or that they could possibly do so if they were

20 granted leave to amend or an opportunity to conduct discovery. Plaintiffs fail to address, much less

21 rebut, most of Penguin's arguments. Instead, Plaintiffs have filed reams of documents in aid of

22

23 [7] Not all commercial speech is exempt from anti-SLAPP coverage, so determining whether alleged
   speech is "commercial speech" is not dispositive of the Step 1 coverage issue. *See All One God Faith,*
24 *Inc. v. Organic and Sustainable Industry Standards, Inc.*, 183 Cal. App. 4th 1186 (2010) ("We also
   reject Dr. Bronner's argument that the legislative history makes clear that the Legislature intended to
25 exclude from the anti-SLAPP procedure *all* causes of action targeting commercial speech, as defined
   by *Kasky*...."); *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664 (2010) ("Plaintiffs have not
26 provided us with any authority for the proposition that commercial speech is categorically disentitled
27 to protection under the anti-SLAPP statute.")
   [8] The merits of Plaintiffs' argument that Penguin engaged in false commercial speech are addressed
28 *infra* in Argument § II.C.

1  arguments that they could survive the motion by amendment or through discovery.  But Plaintiffs'

2  supporting materials do not alter the analysis of Penguin's claims.

### 1. Plaintiffs' Supporting Materials Do Not Overcome Fatal Defects in the Amended Complaint

Penguin's dispositive motions demonstrated that Plaintiffs fail to allege that Penguin engaged in any speech, much less false commercial speech, that induced Plaintiffs to buy the Book.  For example, Plaintiffs each devote a paragraph of the Amended Complaint to describing how he or she came to buy the books at issue; but not one Plaintiff identifies any specific speech by Penguin that induced them to buy the Book.  Dkt. 22, ¶¶ 8-12.  These pleadings each fail to meet Rule 9(b) standards for alleging false statements and reliance, which are elements of each of Plaintiffs' claims.

Elsewhere in the Amended Complaint the Plaintiffs collectively blame Armstrong for inducing their decisions to buy each of the books: "Plaintiffs and members of the Class purchased the Armstrong Books and, in particular, *It's Not About the Bike: My Journey Back to Life*, based upon ***Armstrong's*** representations it was a truthful work of nonfiction." *Id.*, ¶ 159; Dkt. 62 at 8 (emphasis added).  This allegation likewise fails to meet Rule 9(b) standards because it does not identify when or where Armstrong made the statements and that Plaintiffs actually saw the statements before buying each of the books; but, even if the Court were to assume this statement is true, it does not allege any misconduct by Penguin.

Plaintiffs also allege that Penguin described the Book as "nonfiction" and "biography" in a variety of media, *e.g.*, Dkt. 22 at ¶ 2; but neither the Amended Complaint nor Plaintiffs' voluminous supporting materials identifies a single specific instance when Penguin used those actual words, much less in the context of a proposed commercial transaction or advertisement.  While two Plaintiffs (Lauria and Reimers) allege that advertisements induced them to buy the books, they do not allege that the advertisements contained the words "nonfiction" or "biography," promoted the Book, or were authored by Penguin.  Dkt. 22, ¶¶ 10-11.  These allegations likewise fail to meet Rule 9(b) standards.

1  In sum, Plaintiffs do not allege any facts to suggest that Penguin uttered the words "nonfiction" or
2  "biography" in a context where such words could be characterized as "commercial speech."[9]

3        Significantly, Plaintiffs' supporting documents do not overcome these defects.  The supporting
4  materials *do not include* any declarations by any of the Plaintiffs attesting that, if given the chance,
5  they could possibly allege that specific statements by Penguin induced them to buy the Book.  The
6  supporting documents *do not include* any of the alleged materials (e.g., book covers, flyleafs, media
7  materials, etc.) where Penguin allegedly touted the Book as "nonfiction" or "biography."  The
8  supporting documents *do not include* any statements by Penguin that are even arguably false
9  commercial speech.

10        Plaintiffs have submitted three DVDs and transcripts of Armstrong appearances on Charlie
11  Rose that Plaintiffs allege were promotions of the Book.  These materials furnish no reason for
12  allowing Plaintiffs to further amend their complaint *against Penguin* because (1) the interviews do not
13  contain any actionable commercial statements of fact about the Book; (2) Penguin neither appeared,
14  nor was mentioned, in any of the interviews; and (3) Plaintiffs allege no facts from which it may be
15  inferred that Armstrong's statements during the interviews about not doping were in any way
16  attributable to Penguin.  Bald, conclusory allegations, unsupported by specific factual allegations that
17  Penguin aided or abetted any alleged conspiracy do not nudge Plaintiffs' claims "across the line from
18  conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quoting *Bell Atlantic Corp. v.*
19  *Twombly*, 550 U.S. 544, 570 (2007). *See also* Fed. R. Civ. P. 8(a); *Hydrick v. Hunter*, 669 F.3d 937,
20  941-42 (9th Cir. 2012).

21      **2.**    **Discovery Cannot Cure the Fatal Defects in the Amended Complaint**
22        The bottom line is that Plaintiffs have not alleged, and cannot allege, key elements of their
23  claims against Penguin.  Discovery from Defendants cannot possibly cure these particular kinds of
24  fatal defects because the information about the statements that Plaintiffs' saw and relied upon in

25  _____

26  [9] Plaintiffs also allege that the entire Book is an advertisement because its flyleaf recommends that
readers visit the websites of Penguin, Armstrong, and Armstrong's foundation for more information,
27  *id.*, ¶ 39; but a book itself does not become an advertisement even when substantial portions of its
contents are advertisements. *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 957-61 (9th Cir.
28  2012).

1    buying the Book – assuming any such statements exist – is necessarily within Plaintiffs' exclusive

2    possession.  Plaintiffs nevertheless argue that they "expect discovery to show that the promotional

3    book tours, including Armstrong's TV appearances . . . were organized and stage managed by the

4    Publisher Defendants" and that "Armstrong was, in fact, acting as the Publisher Defendants' agent or

5    joint venturer when he made promotional appearances for the Armstrong Books and made false and

6    misleading statements." Dkt. 65 at 16 n.11.  This argument confirms that discovery would be futile

7    because – even if the Court were to assume these claims were true, notwithstanding Plaintiffs' failure

8    to plead any facts to support these claims – the prospective discovery would not supply the facts that

9    are critically lacking – namely, the specific statements that each Plaintiff saw and relied upon to

10   purchase the Book.

11        Moreover, Rule 8(a), on which Plaintiffs curiously rely, "does not unlock the doors of

12   discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S.Ct. at 678-79.

13   When a plaintiff's complaint is deficient under Rule 8, as here, he "is not entitled to discovery, cabined

14   or otherwise." *Id.* at 686.  Discovery also cannot overcome Penguin's First Amendment defenses,

15   which are an independent basis for dismissing this action with prejudice.

16        **3.    Penguin's Alleged Speech Is Not Actionable, as It Is Protected by the First
17        Amendment**

18        Plaintiffs allege that the Book contains lies, and descriptions of the Book as "nonfiction" or

19   "biography" are therefore misleading.  The First Amendment defense to this type of claim is

20   elementary.  Autobiographies, like the Book, receive maximum First Amendment protection, *see*

21   *Simon & Schuster v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991); *Geiger v. Dell*

22   *Publishing Co., Inc.*, 719 F.2d 515, 518 (1st Cir. 1983); and, more specifically, false autobiographical

23   statements that cause no harm and are not easily verifiable (like Armstrong's false denials of doping in

24   the Book) receive full First Amendment protection.  *United States v. Alvarez*, 132 S.Ct. 2537 (2012).

25

26

27

28

1    Publishers of books receive special protections from lawsuits based on the contents of books.

2   A publisher owes no duty to verify the accuracy of what it publishes.[10]  *Winter v. G.P. Putnam's Sons*,

3   938 F.2d 1033, 1037 (9th Cir. 1991).  A publisher owes no duty to warn that the contents of a book

4   might be inaccurate or even false.  *Winter*, 938 F.2d at 1037.  No court has required publishers "to

5   guarantee the accuracy of [its] factual assertions" because it would risk "intolerable self-censorship,"

6   *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).  Under the pressure of such a rule, a publisher

7   would "tend to restrict the books he sells to those he has inspected" and First Amendment activity

8   would be chilled.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 278 (1964).

9    Plaintiffs argue that this is really a "product labeling" case involving "false commercial

10   speech" that falls outside the First Amendment.  This argument fails for several reasons, each

11   sufficient to dismiss the action against Penguin with prejudice.

12                    **a.    Penguin Did Not Guarantee the Book's Truth or Accuracy**

13    Plaintiffs essentially ask the Court to infer from Penguin's descriptions of the Book as

14   "nonfiction" or "biography" that Penguin thereby guaranteed to all of the Book's potential readers that

15   100% of the factual statements in the Book were accurate.  The very premise of Plaintiffs' action is

16   both incorrect and implausible.  The only words attributed to Penguin – "nonfiction" and "biography"

17   – are not guaranties, cannot reasonably be construed as such, and never have been construed as such by

18   any court.  To the contrary, at least one federal court has concluded that such terms do not have the

19   meaning that Plaintiffs insist they have.  "The term nonfiction only means that the literature is based on

20   true stories or events, not that every statement is in fact demonstrably true."  *Greenspan v. Random*

21   *House, Inc.*, 859 F.Supp.2d 206, 220 (D. Mass.), *aff'd*, 2012 WL 5188792 (1st Cir. 2012), *cert. denied*,

22   2013 WL 449782 (U.S. 2013).

23

24

25

---

26   [10] The only types of published information that courts have treated as "products" are aeronautical

27   charts, because they are "highly technical tools" analogous to a compass.  *Winter v. G.P. Putnam's Sons*, 938 F.2d at 1035 (citing cases).  Autobiographies like the Book bear no resemblance to

28   aeronautical charts.

1             **b.**    **Penguin's Alleged Speech Is Inextricably Intertwined with, or an**
                   **Adjunct to, Protected Speech Contained in the Books**

2

3       Given that books are fundamentally different from consumer products, speech about books is

4 also treated differently under the law from speech about consumer products. Even the consumer

5 products cases that Plaintiffs themselves cite recognize that their holdings to not apply to "speech

6 about speech." "Speech about speech" receives First Amendment protection from tort actions when, as

7 here, it is "inextricably intertwined" with, or an adjunct to, other protected speech. *All One God Faith,*

8 *Inc. v. Organic and Sustainable Industry Standards, Inc.*, 183 Cal. App. 4th 1186, 1209 (2010); *Rezec*

9 *v. Sony Pictures Entm't, Inc.*, 116 Cal. App. 4th 135, 142 (2004); *Nagel v. Twin Labs., Inc.*, 109 Cal.

10 App. 4th 39, 50 (2003). *See also Guglielmi v. Spelling-Goldman Productions*, 25 Cal.3d 860, 871

11 (1979) (Bird, C.J., concurring).[11] The "speech about speech" doctrine applies even to commercial

12 speech, such as advertisements, *Charles v. City of Los Angeles*, 697 F.3d 1146, 1154 (9th Cir. 2012);

13 *Aldrin v. Topps Company, Inc.*, No. CV 10–09939, 2011 WL 4500013, at *3 (C.D. Cal. Sept. 27,

14 2011). Here, the "speech about speech" doctrine plainly applies to Penguin's alleged descriptions of

15 the Book as "nonfiction" or "biography." The only even arguably contrary case is *Keimer v. Buena*

16 *Vista Books, Inc.*, 75 Cal. App. 4th 1220 (1999), but that case is an outlier that is distinguishable on

17 numerous grounds described more fully in Penguin's motion to dismiss.[12]

18             **c.**    **Penguin's Alleged Descriptions of the Book Do Not Meet the**
                   **Standard for False Commercial Speech**

19

20       Plaintiffs quote at length from *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 952-53, 968 (2002), but

21 they studiously avoid discussion of *Kasky's* standards for determining whether speech is commercial

22 or noncommercial. *Kasky*, 27 Cal. 4th at 954; *see also Central Hudson*, 447 U.S. at 564 n.6. First,

23

24 ───────────────

[11] California courts have recognized that, although Chief Justice Bird wrote a "concurring opinion"

25 addressing the constitutional issues in *Guglielmi*, her opinion was joined by three justices and thus constituted a majority opinion. *Rezec v. Sony Pictures Entertainment, Inc.*, 116 Cal. App. 4th 135, 338

26 n.2 (2004); *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 324 n.4 (1997).
[12] For example, the defendants in *Keimer* conceded that the statements on the book covers were

27 advertisements, *Keimer*, 75 Cal. App. 4th at 1229, that the touted rates of return had not been calculated in the ordinary manner, *id.* at 1225, and that false advertising and unfair business practices

28 had been adequately alleged. 75 Cal. App. 4th at 1226-27.

1    commercial speech is speech that is "*more easily verifiable by its disseminator* than . . . news reporting

2    or political commentary." *Kasky*, 27 Cal. 4th at 955 (quoting *Va. Pharmacy Bd. v. Va. Consumer*

3    *Council*, 425 U.S. at 772, fn. 24 and citing other cases) (emphasis in original). *Accord*, *Central*

4    *Hudson*, 447 U.S. at 564 n.6. Penguin's alleged speech about Armstrong's denials of doping in the

5    Book do not meet this standard. Plaintiffs admit that even the USADA did not verify that Armstrong

6    had doped until June 2012.

7        Second, "commercial speech is *hardier* than noncommercial speech in the sense that

8    commercial speakers, because they act from a profit motive, are less likely to experience a chilling

9    effect from speech regulation." *Kasky*, 27 Cal. 4th at 955 (quoting *Va. Pharmacy Bd. v. Va.*

10   *Consumer Council*, 425 U.S. at 771-72, fn. 24, and citing other cases) (emphasis in original). *Accord*,

11   *Central Hudson*, 447 U.S. at 564 n.6. "Nonfiction" and "biography" do not meet this standard

12   because publishers would likely stop using those words (as defined by Plaintiffs to mean guaranties of

13   factual accuracy) rather than incur the costs and delays of confirming the accuracy of their authors'

14   statements. Even if Plaintiffs could clear these hurdles, Plaintiffs also fail to allege facts establishing

15   that Penguin engaged in "core commercial speech" or actionable advertisements.

16        Further, the alleged statements – "nonfiction" and "biography" – were both literally true and

17   not misleading. The Book is undeniably a "nonfiction biography" because it is a written work based

18   on the life of Lance Armstrong. Those words are not rendered misleading by virtue of the fact that the

19   Book contains a single deliberate falsehood by the author. In any event, "nonfiction" and "biography"

20   are arguably not even statements of fact, but rather opinions about classification of a book's genre.

21   *Long v. Hewlett-Packard Co.*, No. 06-02816, 2007 WL 2994812, at *7 (N.D. Cal. July 27, 2007)

22   (describing a computer as a "notebook" is not an actionable representation as to the product's

23   performance attributes).

24        Other than to cite *Kasky*, *Keimer*, and a few consumer products cases, Plaintiffs do not even

25   address, much less rebut, these First Amendment arguments or explain how discovery could possibly

26   enable them to plead viable claims. Instead, Plaintiffs double down on their allegations that Penguin

27   must be culpable because it did not withdraw the Book from circulation or retract its purported

28

1  descriptions of the Book after the evidence mounted that Armstrong had lied.  Plaintiffs' arguments on

2  this point fail as a matter of law.  Dkt. 65 at 2-5.

3      **4.**    <u>**Penguin Is Not Liable for Failing to Retract the Books or Its Descriptions of**</u>

4  <u>**Them**</u>

5      Plaintiffs argue, without legal authority, that Penguin incurred a "legal duty to correct the

6  mislabeling and advertisements" of the Book at some point between May 2010 and January 2013.  Dkt.

7  65 at 19 n.4.  This argument fails because no court has ever held that a publisher incurs a duty to

8  retract a factual statement upon which grave doubt is cast after publication." *Roberts v. McAfee, Inc.,*

9  660 F.3d 1156, 1166-67 (9th Cir. 2011) (applying California law); *McFarlane v. Sheridan Square*

10  *Press*, 91 F.3d 1501, 1516 (D.C. Cir. 1996); *Lohrenz v. Donnelly*, 223 F.Supp.2d 25, 56 (D.D.C.

11  2002); *D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F.Supp.2d 1270 (C.D. Cal. 2000); *Coughlin v.*

12  *Westinghouse Broad. & Cable, Inc.*, 689 F.Supp. 483, 488 (E.D.Pa.1988).

13      Plaintiffs try to distinguish these cases by arguing that they all concerned defamation claims

14  and are applicable only in that context.   Dkt. 65 at 19 n.5.  This argument fails as a matter of law.

15  California has adopted the single-publication rule.  "The single-publication rule limits tort claims

16  premised on mass communications to a single cause of action that accrues upon the first publication of

17  the communication, thereby 'spar[ing]' the courts from litigation of stale claims' where an offending

18  book or magazine is resold years later."  *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1166-67 (9th Cir.

19  2011) (applying California law) (quoting *Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468 (2009)).

20      California's single-publication rule provides, in pertinent part, that "[n]o person shall have

21  more than one cause of action for damages for libel or slander or invasion of privacy or ***any other tort***

22  founded upon any ***single publication*** or exhibition or utterance, such as any ***one issue of a*** newspaper

23  or ***book*** or magazine . . . ."  Cal. Civ. Code § 3425.3 (emphasis added).  Information is "published"

24  within the meaning of the single-publication rule when it is first offered to the public. *Roberts*, 660

25  F.3d at 1167.   Here, Plaintiffs allege that Penguin published the Book in a hardcopy edition in 2000

26  and in a paperback edition in 2001 and promoted it continuously since that time as a "nonfiction

27  biography." Dkt. 22, ¶ 23.

28

1    Critically, a publisher is not deemed to "republish" information if and when the publisher

2    subsequently receives "substantial indications of falsity." *Roberts*, 660 F.3d at 1167.  The plaintiff in

3    *Roberts* advanced such a "republication" theory, but the Ninth Circuit rejected it:

> The fundamental problem with [this] theory—that a mass communication is republished
> when the defendant fails to retract it after receiving proof of its falsity—is that it
> undermines the single-publication rule. That rule is designed to provide repose to
> defendants by precluding stale claims based on dated but still-lingering mass
> communications.

8    *Id.* at 1168 (citing *Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 399-400 (2004).

9    Under California law, all tort claims (not merely defamation claims) founded upon a mass

10   communication are subject to the single-publication rule and, likewise, the rule that publishers do not

11   incur any duty "to retract a statement upon which grave doubt is cast after publication." *D.A.R.E.*

12   *America v. Rolling Stone Magazine*, 101 F.Supp.2d 1270, 1287 (C.D. Cal. 2000).  *Accord, Roberts*,

13   660 F.3d at 1167-68.

14       Courts have reached similar conclusions regarding fraud claims in other contexts.  For

15   example, in securities fraud cases, courts have "refused to impose an affirmative duty on a corporation

16   to correct misstatements about it by third parties," absent some allegation that the corporation itself

17   supplied the incorrect information.  *Colby v. Hologic, Inc.*, 817 F.Supp. 204, 214 (D. Mass. 1993); *see*

18   *also Electronic Specialty Co. v. International Controls Corp.*, 409 F. 2d 937, 949 (2d Cir. 1969)

19   (defendant with advance knowledge that analysts' column was inaccurate, but who was not the source

20   for the article, had no duty to correct misstatement).  The Second Circuit has gone so far as to say a

21   company's systematic involvement in the preparation of third-party analyst reports fell short of "an

22   implied representation that the information [the corporation] reviewed is true or at least in accordance

23   with the company's views." *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980),

24   *superseded by statute on other grounds*, *Acticon AG v. China North East Petroleum Holdings Ltd.*, 692

25   F.3d 34 (2d Cir. 2012).  The relationship between the third-party speakers and the corporate defendants

26   in these securities fraud cases is analogous to the relationship between the author Armstrong and the

27   Publisher Defendants here – First Amendment law imposes no duty on publishers to verify or guaranty

28

18

1  the factual accuracy of what their authors say and similarly imposes no duty to retract factual

2  statements upon whose accuracy grave doubts were cast after publication.

3      Plaintiffs therefore fail to state claims based on Penguin's failure to retract the Book or its

4  descriptions of them after May 2010.  Even if such claims were not barred as a matter of law, Plaintiffs

5  do not even allege that they themselves purchased the Book after 2011 or 2012.  They therefore lack

6  standing to assert a claim based on such continued publication.  Finally, if it was clear by then that

7  Armstrong had doped, Plaintiffs would be hard pressed to argue that they themselves were deceived by

8  a Book that everyone knew contained false information.

9                    **III.    CONCLUSION**

10      For these reasons and others urged by Defendant Random House,[13] Plaintiffs' claims against

11  Penguin should be dismissed with prejudice, and Penguin should be awarded the relief it seeks under

12  the anti-SLAPP statute.

13                                Respectfully submitted,

14
   Dated:  July 12, 2013          DORSEY & WHITNEY LLP
15

16

17                                By:  /s/  Kent J. Schmidt
                                  _____
18                                Kent J. Schmidt (SBN 195969)
                                  Jonathan M. Herman (admitted *pro hac vice*)
19                                F. Matthew Ralph (admitted *pro hac vice*)

20                                Attorneys for Defendants Penguin Group (USA) Inc.,
                                  G.P. Putnam's Sons, and The Berkley Publishing Group
21

22

23

24

25

26

27  [13] To the extent Random House has asserted arguments in its anti-SLAPP motion reply brief that
    Penguin has not asserted here but that are also applicable to Penguin, Penguin hereby incorporates
28  them by reference.

**CERTIFICATE OF SERVICE**

I, Sarah K. Shaholli, hereby certify and declare as follows:

I am over the age of 18 years and not a party to the within action. My business address is 600 Anton Blvd., Costa Mesa, California 92626. On July 12, 2013, I caused service of the following document(s) on counsel for all parties to this action by electronically filing the document(s) with the Clerk of the District Court using its ECF System which electronically notifies them. The document(s) served include:

**REPLY OF DEFENDANT PENGUIN GROUP (USA) INC., G.P. PUTNAM'S SONS, AND THE BERKLEY PUBLISHING GROUP IN FURTHER SUPPORT OF SPECIAL ANTI-SLAPP MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT (UNDER CCP SEC. 425.16)**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of July, 2013, in Costa Mesa, California.

_____
SARAH K. SHAHOLLI