1
2
3
4
5
6
7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   ROB STUTZMAN, et al.,                    No.  2:13-CV-00116-MCE-KJN

12            Plaintiffs,

13      v.                                    **MEMORANDUM AND ORDER**

14   LANCE ARMSTRONG, et al.,

15            Defendants.

16

17

18        Through this action, Plaintiffs Rob Stutzman, Jonathan Wheeler, Gloria Lauria,

19   David Reimers, and Scott Armstrong (collectively "Plaintiffs") seek redress for violations

20   of California law arising from alleged misrepresentations contained in and related to

21   Defendant Lance Armstrong's books, including It's Not About the Bike: My Journey Back

22   to Life, published by Defendant Penguin Group, and Every Second Counts, published by

     Defendant Random House.[1]  Generally, Plaintiffs allege that Defendant Armstrong and

23   the Publisher Defendants, along with Defendants William Stapleton and Thomas Weisel,

24   misled consumers by representing the Armstrong Books as truthful works of nonfiction

25   biography, when in fact these books were works of fiction containing false and

26   misleading statements.

27   _____

28        [1] Collectively, Defendants Penguin Group and Random House are referred to as "the Publisher
     Defendants."  Collectively, the books at issue are referred to as "the Armstrong Books" or "the Books."

                                                1

1    Plaintiffs, on behalf of themselves and others similarly situated, brought claims for

2    violations of California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.

3    ("CLRA"); California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

4    ("UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.

5    ("FAL"); negligent misrepresentation; and fraud and deceit.  (Pls.' Compl., ECF No. 22.)

6    Each Defendant filed an anti-SLAPP[2] Motion to Strike the First Amended Complaint, or

7    portions thereof, pursuant to California Civil Procedure Code section 425.16.  (Def.

8    Random House Mot. Strike, April 26, 2013, ECF No. 36; Def. Penguin Mot. Strike, April

9    26, 2013, ECF No. 42; Def. Armstrong Mot. Strike, April 26, 2013, ECF No. 47; Def.

10    Weisel Mot. Strike, June 3, 2013, ECF No. 55; Def. Stapleton Mot. Strike, June 3, 2013,

11    ECF No. 57.)  Specifically, Defendants Random House, Penguin, Weisel, and Stapleton

12    filed anti-SLAPP motions to strike each of Plaintiffs' causes of action pursuant to section

13    425.16 (ECF Nos. 36, 42, 55, 57), while Defendant Armstrong moves to strike only

14    Plaintiffs' CLRA, UCL, and FAL claims (ECF No. 47).  Plaintiffs filed a timely opposition

15    to each motion.  (Pls.' Opp'n to Armstrong Mot., June 17, 2013, ECF No. 64; Pls.' Opp'n

16    to Publisher Mots., June 17, 2013, ECF No. 65; Pls.' Opp'n to Defs. Weisel & Stapleton

17    Mots., July 8, 2013, ECF No. 76.)  The Court held oral argument on the Motions to Strike

18    on August 8, 2013, and took the matters under submission.  (See ECF No. 102.)

19    For the reasons set forth below, Defendants' Motions to Strike are GRANTED.

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    _____

[2] The anti-SLAPP (strategic lawsuits against public participation) statute allows for the "early
dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming
28    litigation."  Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 839 (9th Cir. 2001).

1

**BACKGROUND[3]**

2

3    This class action arises from alleged misrepresentations contained in and

4    disseminated about Defendant Lance Armstrong's books, It's Not About the Bike: My

5    Journey Back to Life, published by Defendant Penguin Group beginning in May 2000

6    and sold throughout California since that date, and Every Second Counts, published by

7    Defendant Random House beginning in January 2003 and sold throughout California

8    since that date.  Also at issue are Defendant Lance Armstrong's books The Lance

9    Armstrong Program: 7 Weeks to the Perfect Ride, published beginning in September

10   2000 and sold throughout California since that date; Lance Armstrong: Images of a

11   Champion, published beginning in June 2004 and sold throughout California since that

12   date; and Comeback 2.0: Up Close and Personal, published beginning in December

13   2009 and sold throughout California since that date.  It's Not About the Bike: My Journey

14   Back to Life was a number one best seller on the New York Times' best seller list, was

15   on the hardcover best seller lists for twenty-four weeks, and was on the paperback best

16   seller list for twenty-two weeks.  Every Second Counts was also a best seller.  According

17   to Plaintiffs, the success of Every Second Counts and It's Not About the Bike permitted

18   Armstrong to publish and sell, and thereby profit from, the other three books at issue.

19   Plaintiffs alleged that during the Class Period[4] the books were sold to consumers

20   in hardback, paperback, electronic, and audio book editions.  Throughout the Class

21   Period, Defendants' advertising, marketing, publicity, and other promotional efforts for

22   the books represented these books as truthful and honest works of nonfiction biography

23   or autobiography when, in fact, Defendants knew or should have known that these

24   books were works of fiction.

25   ///

26

27   [3] The following recitation of facts is taken, sometimes verbatim, from Plaintiffs' First Amended
     Complaint.  (ECF No. 22 at 2-10.)
     [4] The Class Period begins at the initial date of publication for each particular book and runs to the
28   present.

3

1   Plaintiffs allege that they were misled by Defendants' statements and purchased the

2   books based upon the false belief that the books were "truthful and honest works of

3   nonfiction biography."  (ECF No. 22 at 3.)  Plaintiffs would not have purchased these

4   books, or would have not paid as much money for the books, had Plaintiffs known the

5   truth concerning Armstrong's lies and misconduct and his admitted involvement in a

6   sports doping scandal that has led to his recent public exposure and fall from glory.

7       Plaintiffs further allege that prior to and during the Class Period, Defendants

8   engaged in a scheme to defraud consumers, including Plaintiffs and Class Members, by

9   creating and perpetuating the Lance Armstrong "brand" to enable Defendants to reap

10  millions of dollars in unlawful profits.  According to Plaintiffs, beginning in 1998, if not

11  earlier, the Lance Armstrong "brand" was created by Defendant Armstrong, his financier

12  and cycling team owner, Defendant Thomas W. Weisel, and his agent-manager,

13  Defendant William J. Stapleton.

14      Plaintiffs allege that an integral part of the "multi-faceted scheme to defraud

15  Plaintiffs" was the publication, advertising, marketing, and sale of the books throughout

16  California.  On the books' covers and flyleaves, as well as in advertisements, marketing,

17  and promotional materials, Defendants portrayed Armstrong as a "regular, hardworking,

18  motivated, complicated, occasionally pissed-off, T-shirt wearing guy," and as a devoted

19  advocate for cancer patients.  (ECF No. 22 at 22.)  Plaintiffs claim that during the period

20  from 1999 through 2012, Defendants knew that if the public believed that Armstrong had

21  used performance enhancing drugs, Defendants would be unable to sell these books

22  and the books would not be best sellers.  Thus, according to Plaintiffs, another integral

23  part of the scheme to defraud Plaintiffs, while maintaining and growing the Lance

24  Armstrong "brand," was to vociferously and publicly deny any charge that Armstrong

25  used performance enhancing drugs.  Both Defendants Armstrong and Stapleton made

26  such public denials from July 1999 through August 2012.  Plaintiffs allege that such false

27  and misleading denials were made during interviews broadcast on television worldwide,

28  in print media, and in sworn testimony.

4

1    Furthermore, Plaintiffs claim that "another part of the scheme was the agreement,

2  tacit or otherwise, on the part of the book publishers" Random House and Penguin "to

3  ignore and/or avoid conducting a careful investigation into the merits of the doping

4  charges that were repeatedly leveled against Armstrong during 1999 through 2012."

5  (ECF No. 22 at 5.)  Plaintiffs allege that the Publisher Defendants refused to make such

6  an investigation so that they could continue advertising, marketing, and selling It's Not

7  About the Bike and Every Second Counts and thereby continue to profit.

8    "Sometime between 2001 and 2003," Plaintiff Stutzman "learned about the book

9  It's Not About the Bike."  (ECF No. 22 at 7.)  Plaintiff Stutzman bought the book and read

10  it cover to cover; he found the book compelling and recommended the book to several

11  friends.  Plaintiff Wheeler followed Defendant Armstrong's early cycling career and his

12  cancer diagnosis and treatment, and purchased a copy of It's Not About the Bike shortly

13  after it was published.  Plaintiff Wheeler purchased the book after "learning through the

14  media about [Defendant] Armstrong's supposedly truthful and inspiring account of his

15  triumphant return to dominate the world of cycling after his devastating bout with

16  testicular cancer."  (Id. at 8.)  Wheeler "was so impressed with It's Not About the Bike . . .

17  that he bought Armstrong's follow-up book, Every Second Counts . . . ."  (Id. at 8-9.)

18  Plaintiff Lauria currently has breast cancer, and "was inspired by advertising featuring

19  reports of Armstrong's successful battle against cancer, which moved her to purchase

20  [Defendant] Armstrong's books."  (Id. at 9.)  Having learned that Armstrong took

21  performance enhancing drugs to win races has left Plaintiff Lauria "bitterly angry," and

22  she would not have purchased either book had she known that Defendant Armstrong

23  had used such drugs.  (Id.)

24  ///

25  ///

26  ///

27  ///

28  ///

Plaintiff Reimers purchased It's Not About the Bike after seeing "advertisements regarding Armstrong's remarkable comeback to 'win' the Tour de France cycling race after conquering testicular cancer . . . ." (Id.)  Finally, Plaintiff Scott Armstrong ("S. Armstrong") followed Defendant Armstrong's career, found Defendant Armstrong's career inspiring, and believed Defendant Armstrong's claims that he did not use performance enhancing drugs.  "Relying on Defendant Armstrong's representations as to his drug-free life and cycling career, [Plaintiff] S. Armstrong purchased and read It's Not About the Bike."  (Id. at 10.)  Because Plaintiff S. Armstrong believed that Defendant Armstrong had told the truth in this book, Plaintiff S. Armstrong recommended the book to his friends.  "[Plaintiff] S. Armstrong also read Every Second Counts due to his belief in Armstrong's false and misleading representations as to his drug-free life and cycling career."  (Id.)  Plaintiff S. Armstrong would not have purchased or read either book had he known that Armstrong's representations regarding his use of performance enhancing drugs were false.

## STANDARD

California's anti-SLAPP (strategic lawsuit against public participation) statute is designed to discourage suits that "masquerade as ordinary lawsuits but are brought to deter common citizens from exercising their political or legal rights or to punish them for doing so."  Batzel v. Smith, 333 F.3d 1018, 1024 (9th Cir. 2003).  The statute provides:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1).  The anti-SLAPP statute "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation."

1  <u>Metabolife Int'l, Inc. v. Wornick</u>, 264 F.3d 832, 839 (9th Cir. 2001).  In particular, the

2  California Legislature found:

3  
> There has been a disturbing increase in lawsuits brought
> primarily to chill the valid exercise of the constitutional rights
4  > of freedom of speech and petition for the redress of
> grievances.  The Legislature finds and declares that it is in
5  > the public interest to encourage continued participation in
> matters of public significance, and that this participation
6  > should not be chilled through abuse of the judicial process.

7  Cal. Civ. Proc. Code § 425.16(a).  The California Legislature specifically provided that

8  the anti-SLAPP statute should be "construed broadly."  <u>Id.</u>; <u>see</u> <u>Briggs v. Eden Council</u>

9  <u>for Hope & Opportunity</u>, 19 Cal. 4th 1106, 1119 (1999).

10      The anti-SLAPP motion is available in federal court.  <u>Thomas v. Fry's Elecs.</u>, Inc.,

11  400 F.3d 1206 (9th Cir. 2005) (per curiam).  The court must evaluate an anti-SLAPP

12  motion in two steps.  First, the defendant moving to strike must make "a threshold

13  showing . . . that the act or acts of which the plaintiff complains were taken 'in

14  furtherance of the [defendant's] right of petition or free speech under the United States or

15  California Constitution in connection with a public issue,' as defined in [subsection (e) of]

16  the statute."  <u>Hilton v. Hallmark Cards</u>, 599 F.3d 894, 903 (9th Cir. 2010) (quoting Cal.

17  Civ. Proc. Code § 425.16(b)(1)).

18      Second, "[i]f the court finds that such a showing has been made, it must then

19  determine whether the plaintiff has demonstrated a probability of prevailing on the

20  claim."  <u>Navellier v. Sletten</u>, 29 Cal.4th 82 (2002); <u>see also</u> <u>U.S. ex rel. Newsham v.</u>

21  <u>Lockheed Missiles & Space Co., Inc.</u>, 190 F.3d 963, 971 (9th Cir. 1999).  "Put another

22  way, the plaintiff must demonstrate that the complaint is both legally sufficient and

23  supported by a sufficient prima facie showing of facts to sustain a favorable judgment if

24  the evidence submitted by the plaintiff is credited."  <u>Wilson v. Parker, Covert & Chidester</u>,

25  28 Cal. 4th 811, 821 (2002) (internal quotation marks omitted); <u>Batzel v. Smith</u>, 333 F.3d

26  1018, 1024 (9th Cir. 2003).

27  ///

28  ///

7

1  "[T]hough the court does not weigh the credibility or comparative probative strength of

2  competing evidence, it should grant the motion if, as a matter of law, the defendant's

3  evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary

4  support for the claim." Wilson, 28 Cal. 4th at 821; Cal. Civ. Proc. Code § 425.16(b)(2).

5  Thus, "[t]he statute 'subjects to potential dismissal only those actions in which the

6  plaintiff cannot state and substantiate a legally sufficient claim.'" Navellier, 29 Cal. 4th

7  at 92.

8          "Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e.,

9  that arises from protected speech or petitioning and lacks even minimal merit—is a

10  SLAPP, subject to being stricken under the statute." Navellier, 29 Cal. 4th at 89.

11

12                                          **ANALYSIS**

13

14          In deciding the instant anti-SLAPP motions to strike, the Court must address three

15  major issues.  First, the Court must determine whether Defendants have met their

16  burden by making a threshold showing that the acts of which Plaintiffs complain were

17  taken in furtherance of Defendants' right of free speech in connection with a public issue.

18  Second, the Court must address Plaintiffs' contention that the First Amended Complaint

19  is exempt from anti-SLAPP motions pursuant to California Civil Procedure Code

20  § 425.17.  Finally, the Court must determine whether Plaintiffs have met their burden of

21  making a threshold showing that Plaintiffs' First Amended Complaint is legally sufficient

22  and supported by a prima facie showing of facts.  Each issue is addressed in turn,

23  below.

24  ///

25  ///

26  ///

27  ///

28  ///

**A.      Defendants' Burden**

      **1.      Protected Conduct**

First, the activity the plaintiff challenges must have been conducted "in furtherance" of the exercise of free speech rights.  <u>Hilton</u>, 599 F.3d at 903.  "By its terms, this language includes not merely actual exercises of free speech rights but also conduct that furthers such rights."  <u>Id.</u> (citing Cal. Civ. Proc. Code § 425.16(e)(4); <u>Navellier</u>, 29 Cal. 4th at 94 ("The [California] [l]egislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law.")).

As used in the anti–SLAPP statute, an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.  <u>Doe v. Gangland Prods., Inc.</u>, 802 F. Supp. 2d 1116, 1119-20 (C.D. Cal. 2011) (quoting Cal. Civ. Proc. Code § 425.16(e)).

Here, each Defendant contends that the activity alleged by Plaintiffs was "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest," thus meeting the fourth type of act in furtherance of the right to free speech in connection with a public issue.  <u>See</u> Cal. Civ. Proc. Code § 425.16(e)(4).

///

1    "Section 425.16 does not define 'public interest' or 'public issue.'  Those terms are

2    inherently amorphous and thus do not lend themselves to a precise, all-encompassing

3    definition."  E Clampus Vitus v. Steiner, 2:12-CV-01381-GEB, 2012 WL 6608612 (E.D.

4    Cal. Dec. 18, 2012) (quoting Cross v. Cooper, 197 Cal. App. 4th 357, 371 (2011)).

5    However, "[t]he California intermediate appellate courts have developed multiple tests to

6    determine whether a defendant's activity is in connection with a public issue."  Hilton,

7    599 F.3d at 906.  In Hilton, the Ninth Circuit applied two tests: one from Rivero v.

8    American Federation of State, County, and Municipal Employees, AFL–CIO, 105 Cal.

9    App. 4th 913 (2003), a case from the Court of Appeal for the First District, and one from

10   Weinberg v. Feissal, 110 Cal. App. 4th 1122 (2003), a case from the Court of Appeal for

11   the Third District.  Id.

12   In Rivero, the Court of Appeal for the First District surveyed the appellate cases

13   and formulated three categories of public issues: (1) statements "concern[ing] a person

14   or entity in the public eye"; (2) "conduct that could directly affect a large number of

15   people beyond the direct participants"; (3) "or a topic of widespread, public interest."

16   Gangland Prods., 802 F. Supp. 2d at 1123 (citing Rivero, 105 Cal. App. 4th at 924;

17   Commw. Energy Corp. v. Investor Data Exch., 110 Cal. App. 4th 26, 33 (2003)

18   (describing Rivero as the first systematic treatment of the "public issue-public interest

19   aspect" of the anti–SLAPP statute)).

20   Here, it is without question that statements concerning Lance Armstrong "concern

21   a person or entity in the public eye" and/or are "a topic of widespread, public interest."

22   Lance Armstrong is a famous cyclist and his career is a topic of interest worldwide.  See

23   Hallmark, 599 F.3d at 907 (finding Paris Hilton a "person in the public eye" and a "topic

24   of widespread, public interest," and she was before the lawsuit began).  The Armstrong

25   Books also attained the status of New York Times Bestsellers.  The Court therefore

26   concludes that the Books, and Defendant Armstrong himself, were a topic of widespread

27   public interest.

28   ///

10

1  See Wallace v. Henderson, CIV 09CV1603-L(WMC), 2010 WL 1290911 (S.D. Cal. Mar.

2  30, 2010) (finding book on New York Times best seller list a topic of widespread public

3  interest) (citing Kronemyer v. Internet Movie Data Base, Inc., 150 Cal. App. 4th 941, 949

4  (2007) (information about the motion picture "My Big Fat Greek Wedding" was a topic of

5  widespread public interest because it was a successful independent motion picture)).

6        In Weinberg, the Court of Appeal for the Third District articulated a "somewhat

7  more restrictive test, designed to distinguish between issues of 'public, rather than

8  merely private, interest.'"  Hilton, 599 F.3d at 906 (quoting Weinberg, 110 Cal. App. 4th

9  at 1132).

> First, "public interest" does not equate with mere curiosity.  Second, a matter of public interest should be something of concern to a substantial number of people.  Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest.  Third, there should be some degree of closeness between the challenged statements and the asserted public interest; the assertion of a broad and amorphous public interest is not sufficient.  Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort to gather ammunition for another round of private controversy.  Finally, . . . [a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people."

17  Hilton, 599 F.3d at 906-07 (quoting Weinberg, 110 Cal. App. 4th at 1132-33).

18        In Hilton, the Ninth Circuit found that it need not decide between these two tests,

19  as both were met.  The same is true here.  As in Hilton, there is no dispute that Lance

20  Armstrong's career, and the Books, which he wrote about his career and which

21  Defendants published, are "something of concern to a substantial number of people."

22  Weinberg, 110 Cal. App. 4th at 1132.  The connection between "the challenged

23  statements"—portions of the Books and the promotional materials concerning the Books,

24  as well as statements Armstrong and other Defendants made publicly denying his use of

25  performance enhancing drugs—and "the asserted public interest"—Armstrong's life,

26  image, cycling career, and doping—is direct.  See Hilton, 599 F.3d at 907.

27  ///

28  ///

11

1   After all, the Books and statements concern Armstrong's public image, career, and the

2   doping issue.  Because there was no preexisting controversy between any of

3   Defendants and Plaintiffs, "the fourth and fifth considerations that the Weinberg court

4   considered are inapposite."  See Hilton, 599 F.3d at 907 (citing Weinberg, 110 Cal. App.

5   4th at 1132-33).

6          In Hilton, the Ninth Circuit emphasized that "'public interest' does not equate with

7   mere curiosity."  599 F.3d at 907 (citing 110 Cal. App. 4th at 1132).  However, the Ninth

8   Circuit observed that "this warning comes in the context of Weinberg's insistence that

9   courts apply the anti-SLAPP statute only to public, not to private matters.  Thus,

10  Weinberg elaborated that "a 'public controversy' does not equate with any controversy of

11  interest to the public."  Id. (quoting 110 Cal. App. 4th at 1132).  Accordingly, the Ninth

12  Circuit "read this to mean that a private controversy, even between famous people, that

13  interests the public is not enough.  Under Weinberg, for the activities of celebrities to be

14  a public issue, the activities, as well as the personages involved must be public."  Id. at

15  907-08 (citing 110 Cal. App. 4th at 1132).

16         This limitation does not apply in this case, however, as the Armstrong Books do

17  not concern only the personal details of Armstrong's life—they concern his public cycling

18  career and cheating in the Tour de France—public activities, "which are the very things

19  that interest people about [him]."  See Hilton, 599 F.3d at 908.  While the Books do

20  address certain aspects of Armstrong's private life, such as his battle with cancer, his

21  marriage, and the birth of his children, the books focus on Armstrong's cycling career

22  and his return to cycling to win the Tour de France.  Thus, Weinberg also supports a

23  finding that the conduct Plaintiffs allege was "in furtherance of the exercise of . . . the

24  constitutional right of free speech in connection with a public issue or an issue of public

25  interest."  Cal. Civ. Proc. Code § 425.16(a), (e)(4).

26  ///

27  ///

28  ///

12

1      As such, under both tests used by the Ninth Circuit, the alleged conduct—

2  including the speech in the Books, about the Books, and the conduct in furtherance of

3  that speech, such as the alleged aiding and abetting by Defendants Weisel and

4  Stapleton—was in furtherance of the exercise of the constitutional right of free speech in

5  connection with a public issue or an issue of public interest.  The alleged conduct

6  therefore meets the requirements of California Civil Procedure Code section

7  425.16(e)(4).  As such, Defendants meet their threshold burden under the anti-SLAPP

8  statute.

9      Defendants also argue that the actions at issue are written or oral statements or

10  writings made in a place open to the public or in a public forum in connection with an

11  issue of public interest, thus meeting the requirements of section 425.16(e)(3).

12  However, the Court need not analyze whether the requirements of subsection (e)(3) are

13  satisfied, as the requirements of subsection (e)(4) are met.  See supra.

14

15          2.    **Illegal Conduct**

16

17      Plaintiffs contend that California's anti-SLAPP statute does not provide a shield

18  for speech made in furtherance of Armstrong's illegal activity.  (ECF No. 64 at 15.)  It is

19  true that "the anti-SLAPP statute cannot be invoked by a defendant whose assertedly

20  protected activity is illegal as a matter of law, and for that reason, not protected by

21  constitutional guarantees of free speech and petition."  Lauter v. Anoufrieva, 642 F.

22  Supp. 2d 1060, 1108 (C.D. Cal. 2009) (citing Flatley v. Mauro, 39 Cal. 4th 299, 317

23  (2006)).  However, under California state law, conduct that would otherwise come within

24  the scope of the anti-SLAPP statute does not lose its coverage simply because it is

25  alleged to have been unlawful or unethical.  Id. (citing Birkner v. Lam, 156 Cal. App. 4th

26  275, 285 (2007)).  The question of whether a defendant's underlying conduct was illegal

27  as a matter of law is preliminary, and unrelated to the second prong question of whether

28  the plaintiff has demonstrated a probability of prevailing.

1   Id. (citing Flatley, 39 Cal. 4th at 320).  The asserted protected speech or petition activity

2   loses protection only if it is established through defendant's concession or by

3   uncontroverted and conclusive evidence that the conduct is illegal as a matter of law.  Id.

4   at 1109 (citing Flatley, 39 Cal. 4th at 320; Salma v. Capon, 161 Cal. App. 4th 1275, 1287

5   (2008)).

6           In this case, there are two issues with respect to Plaintiffs' argument that the

7   criminal exception to the anti-SLAPP statute applies.  First, Plaintiff argues that the Court

8   must accept as true Plaintiffs' allegations that Armstrong's underlying conduct is illegal.

9   (ECF No. 64 at 16.).  However, Plaintiffs fail to provide conclusive evidence that the

10  conduct at issue—Armstrong's statements that he did not dope, the content of the book,

11  and the promotional materials for the book—is criminally illegal.  Second, the so-called

12  "criminal exception" applies only if the underlying protected conduct at issue is itself

13  criminal.  Plaintiffs focus on Armstrong's illegal conduct in smuggling or trafficking drugs.

14  (ECF No. 64 ("[T]here is already evidence of USADA's uncontested charges of drug

15  trafficking and criminal conspiracy against Armstrong . . . and a national TV interview in

16  which Armstrong confessed to years of lies.").)  However, drug trafficking and criminal

17  conspiracy is simply not the conduct at issue in this case.  The conduct at issue is the

18  speech about the book and Armstrong's speech about whether he used drugs.

19  Armstrong's lies about his use of drugs are simply not criminal conduct.

20          Thus, Plaintiffs' argument that Defendants are not entitled to the protection of the

21  anti-SLAPP statute because the underlying conduct is illegal is without merit.

22

23      **B.      Statutory Exemptions**

24

25          In 2003, the California Legislature enacted section 425.17 to curb the "disturbing

26  abuse" of the anti-SLAPP statute.  Cal. Civ. Proc. Code § 425.17(a).  "This exception

27  statute covers both public interest lawsuits, under subdivision (b), and "commercial

28  speech," under subdivision (c)."

1   Club Members For An Honest Election v. Sierra Club, 45 Cal. 4th 309, 316 (2008).  In

2   this case, Plaintiffs contend that both section 425.17(b) and (c) exempt Plaintiffs' First

3   Amended Complaint from an anti-SLAPP motion.  However, Defendants respond that

4   even if these statutory exemptions apply, Defendants meet the statutory exception to the

5   exemptions, set out in section 425.17(d).

6           Under California Civil Procedure Code section 425.17(b), the anti-SLAPP

7   procedure "does not apply to any action brought solely in the public interest or on behalf

8   of the general public."  Cal. Civ. Proc. Code § 425.17(b).  The exemption of section

9   425.17(b) applies only if each of the following conditions is met:

10                      (1) the plaintiff does not seek any relief greater than or
                        different from the relief sought for the general public or a
11                      class of which the plaintiff is a member;

12                      (2) the action, if successful, would enforce an important right
                        affecting the public interest, and would confer a significant
13                      benefit, whether pecuniary or nonpecuniary, on the general
                        public or a large class of persons; and
14
                        (3) private enforcement is necessary and places a
15                      disproportionate financial burden on the plaintiff in relation to
                        the plaintiff's stake in the matter.
16

17   Cal. Civ. Proc. Code § 425.17(b).  To be exempt, the action must be "brought solely in

18   the public interest or on behalf of the general public" and meet the three conditions set

19   forth in section 425.17(b).  Strathmann v. Acacia Research Corp., 210 Cal. App. 4th 487,

20   499 (2012).  "[T]he term 'public interest' is used to define suits brought for the public's

21   good or on behalf of the public."  Id. (quoting Club Members, 45 Cal. 4th at 318).  The

22   term "solely" as used in section 425.17(b) "expressly conveys the Legislative intent that

23   section 425.17(b) not apply to an action that seeks a more narrow advantage for a

24   particular plaintiff."  Id. (quoting Club Members, 45 Cal. 4th at 316–17).

25   ///

26   ///

27   ///

28   ///

1    California Civil Procedure Code section 425.17(c) lays out the so-called

2  "commercial speech exemption" to the anti-SLAPP procedure.  Cal. Civ. Proc. Code

3  § 425.17(c); see also TYR Sport Inc. v. Warnaco Swimwear Inc., 679 F. Supp. 2d 1120,

4  1142 (C.D. Cal. 2009); Weiland Sliding Doors & Windows, Inc. v. Panda Windows &

5  Doors, LLC, 814 F. Supp. 1033, 1036 (S.D. Cal. 2011).  Under subsection (c), causes of

6  action arising from commercial speech are exempt from the anti-SLAPP law when:

7              1) The cause of action is against a person primarily engaged
             in the business of selling or leasing goods or services;
8

9              2) The cause of action arises from a statement or conduct by
             that person consisting of representations of fact about that
10             person's or a business competitor's business operations,
             goods, or services;

11             3) The statement or conduct was made either for the purpose
             of obtaining approval for, promoting, or securing sales or
12             leases of, or commercial transactions in, the person's goods
             or services or in the course of delivering the person's goods
13             or services; and

14             4) The intended audience is an actual or potential buyer or
             customer, or a person likely to repeat the statement to, or
15             otherwise influence, an actual or potential buyer or customer.

16  Weiland Sliding Doors & Windows, Inc., 814 F. Supp. at 1037 (citing Simpson Strong-Tie

17  Co. v. Gore, 49 Cal. 4th 12, 30 (2010)).

18    The exemptions of sections 425.17(b) and (c) do not apply to "any person

19  engaged in the dissemination of ideas or expression in any book or academic journal,

20  while engaged in the gathering, receiving, or processing of information for

21  communication to the public."  Cal. Civ. Proc. Code § 425.17(d)(1).  Likewise,

22  subdivisions (b) and (c) do not apply to "[a]ny action against any person or entity based

23  upon the creation, dissemination, exhibition, advertisement, or other similar promotion of

24  any dramatic, literary, musical, political, or artistic work, including, but not limited to, a

25  motion picture or television program, or an article published in a newspaper or magazine

26  of general circulation."  Cal. Civ. Proc. Code § 425.17(d)(2).  Thus, claims falling within

27  the parameters of subsection (d) are "excepted from the section 425.16 exemption" of

28  subsections (b) and (c).

1  Ingels v. Westwood One Broadcasting Services, Inc., 129 Cal. App. 4th 1050, 1067

2  (2005); see also Club Members, 45 Cal. 4th at 320 n.9.

3       Few cases have dealt with the application of subsection (d), and the parties

4  present no cases determining whether subsection (d) applies to publishers and

5  individuals connected with the creation and distribution of a published book.  Where

6  there is no binding authority, a court must undertake to ascertain the meaning of the

7  statute by use of statutory interpretation.  See, e.g., Tello v. McMahon, 677 F. Supp.

8  1436, 1441 (E.D. Cal. 1988).  Thus, the issue before the Court is the proper

9  interpretation of this statute.  Major v. Silna, 134 Cal. App. 4th 1485, 1493 (2005) (citing

10  R&P Capital Resources, Inc. v. Cal. State Lottery, 31 Cal. App. 4th 1033, 1036 (1995)).

11  More specifically, the question before the Court is the scope of subsection (d)(2).

12       "Statutes must be interpreted, if possible, to give each word some operative

13  effect."  Walters v. Metro Educ. Enters., Inc., 519 U.S. 202, 209 (1007).  In the Ninth

14  Circuit, a federal court applying state law must utilize the tools of statutory interpretation

15  prescribed by the relevant state supreme court.  See Or. Advocacy Ctr. v. Mink, 322

16  F.3d 1101, 1114 n.7 (9th Cir. 2003) (applying interpretive framework announced by

17  Oregon Supreme Court to Oregon statute); Nike, Inc. v. McCarthy, 379 F.3d 576, 581 n.

18  4 (9th Cir. 2004) (same).  The California Supreme Court has set forth the following

19  principles of statutory construction:

20
21
22
23
24
25
26
27
> Under settled canons of statutory construction, in construing
> a statute we ascertain the Legislature's intent in order to
> effectuate the law's purpose.  We must look to the statute's
> words and give them their usual and ordinary meaning. The
> statute's plain meaning controls the court's interpretation
> unless its words are ambiguous.  If the words in the statute
> do not, by themselves, provide a reliable indicator of
> legislative intent, statutory ambiguities often may be resolved
> by examining the context in which the language appears and
> adopting the construction which best serves to harmonize the
> statute internally and with related statutes. [...]  If the statute
> is ambiguous, we may consider a variety of extrinsic aids,
> including legislative history, the statute's purpose, and public
> policy.

28  ///

17

1    People v. Arias, 45 Cal.4th 169, 177 (2008) (internal citations and quotations omitted).

2    "To determine the most reasonable interpretation of a statute, we look to its legislative

3    history and background."  Goodman v. Lozano, 47 Cal.4th 1327, 1332 (2010).

4

5              **1.      Plain Meaning**

6

7          The Court's interpretation begins with the text of the statute.  Campbell, 6642 F.3d

8    at 826 (citing Martinez, 109 Cal.Rptr.3d 514; Jimenez v. Quarterman, 555 U.S. 113, 129

9    (2009)).   The statute's words must be assigned their "usual and ordinary meanings" and

10   evaluated in context.  Id.  (quoting Martinez, 109 Cal. Rptr. 3d 514).  "If this plain

11   meaning is unambiguous, the inquiry ends there and we need not consider further

12   interpretive aids (e.g., drafting history)."  Id.

13         Here, the questions the Court must resolve in interpreting the statute is the

14   meaning of the word "work" as it is used in subsection (d)(2), and whether the Armstrong

15   Books are included within that meaning.  In interpreting subsection (d)(2), the Second

16   District for the California Court of Appeal stated that "[t]he word 'work,' as ordinarily

17   understood, means 'something produced or accomplished by effort, exertion, or exercise

18   of skill,' or 'something produced by the exercise of creative talent or expenditure of

19   creative effort.'"  Major, 134 Cal. App. 4th at 1494 (quoting Merriam–Webster's

20   Collegiate Dict. (10th ed. 1995)) (analyzing whether (d)(2) applies to actions against

21   individuals engaged in the distribution of political literature during an election campaign).

22         Under the plain meaning of the word "work," that the Books at issue are "works"

23   within the meaning of the statute.  Both It's Not About the Bike and Every Second

24   Counts are books—literature—produced by the efforts and exercise of literary skill of

25   Sally Jenkins and Lance Armstrong.  Likewise, the Books were produced by the exercise

26   of their authors' creative talent or expenditure of their creative effort.

27   ///

28   ///

1   This description fits the literary works at issue regardless of Plaintiffs' allegations that the

2   Books are in fact works of fiction, since works of fiction, like works of non-fiction or

3   biography, involve the expenditure of creative effort.

4          However, because the Legislature has accompanied the word 'work' with

5   descriptive terms and illustrative examples, the Court's analysis does not end at

6   considering the meaning of the word "work."  Rather, the doctrine of ejusdem generis[5]

7   must guide the Court's inquiry into the scope of the word 'work' as it is used in this

8   statute.  Id. The California Supreme Court explained in Kraus v. Trinity Management

9   Services, Inc., 23 Cal.4th 116, 141 (2000), that "[e]jusdem generis applies whether

10  specific words follow general words in a statute or vice versa. In either event, the general

11  term or category is restricted to those things that are similar to those which are

12  enumerated specifically."  Id. (quoting Kraus).  "The canon presumes that if the

13  Legislature intends a general word to be used in its unrestricted sense, it does not also

14  offer as examples peculiar things or classes of things since those descriptions then

15  would be surplusage."  Id.

16         Subdivision (d)(2) includes "any dramatic, literary, musical, political, or artistic

17  work, including, but not limited to, a motion picture or television program, or an article

18  published in a newspaper or magazine of general circulation."  Cal. Civ. Proc. Code

19  § 425.17(d)(2).  "The phrase 'including, but not limited to' is a term of enlargement, and

20  signals the Legislature's intent that subdivision (d)(2) applies to items not specifically

21  listed in the provision."  Major, 134 Cal. App. 4th at 1495.

22  ///

23  ///

24  ///

25  ///

26  ///

27         [5] "Meaning literally, 'of the same kind,' the doctrine of ejusdem generis is of ancient vintage."
    Major, 134 Cal. App. 4th at 1495 (quoting Engelmann v. State Bd. of Educ., 2 Cal. App. 4th 47, 56, n.11
28  (1991)).

1    Viewed in the context of the anti-SLAPP statute, the Armstrong Books are no

2  different from the illustrative examples listed in subsection (d)(2).  These books are

3  "literary works" within the meaning of the statute; although "books" are not specifically

4  listed in subsection (d)(2), books are similar to those things that are specifically

5  enumerated in the statute—"a motion picture or television program, or an article

6  published in a newspaper or magazine of general circulation."  Cal. Civ. Proc. Code

7  § 425.17(d)(2); Kraus, 23 Cal.4th at 141 (definition of ejusdem generis).  Indeed, a book

8  is "conduct in furtherance of the exercise of . . . the constitutional right of free speech"

9  just as is a motion picture, television program, or newspaper or magazine article.  Cal.

10  Civ. Proc. Code § 425.16(e)(4).

11    Other cases analyzing the scope of subsection (d)(2) have reached results that

12  support the Court's conclusion.  In Ingels v. Westwood One Broadcasting Services, Inc.,

13  the Court of Appeal for the Second District concluded that subsection (d)(2)

14  encompassed an action against a radio broadcasting corporation and its employees

15  based on allegations that the plaintiff had been improperly excluded from participating in

16  a call-in talk show.  129 Cal. App. 4th at 1067-68.  The Ingels court held that "radio

17  stations," although not specifically listed in subsection (d), are included in the group of

18  "news media and other media defendants" listed therein.  Id. at 1068.  The court noted

19  that the radio show at issue "is designed and produced to elicit viewpoints from members

20  of the public on issues of public interest which are contemporaneously aired to the public

21  at large.  We see no distinction in this and the gathering and dissemination of news by

22  other media organizations which are identified in the exception."  Id.  In Major v. Silna,

23  discussed above, the Court of Appeal for the Second District held that letters and

24  advertisements, mailed by the defendant, which advocated support for certain political

25  candidates on the basis of their political positions, and which were distributed by mail in

26  Malibu, were "political works" within the meaning of subsection (d)(2).  134 Cal. App. 4th

27  at 1495.

28  ///

1   Accordingly, under the plain meaning of the statute, this case falls within the ambit

2   of subsection (d)(2).

3

4   **2.   Legislative History and Public Policy**

5

6   An examination of the legislative history further supports the Court's conclusion

7   that this action is within the ambit of section 425.17(d).  The California Senate bill

8   analysis includes the following explanation for subsection (d):

9       Proposed subdivision (d) of newly added section 425.17
        would exempt the news media and other media defendants
10      (such as the motion picture industry) from the bill when the
        underlying act relates to news gathering and reporting to the
11      public with respect to the news media or to activities involving
        the creation or dissemination of any works of a motion picture
12      or television studio.  For claims arising from these activities,
        the current SLAPP motion would remain available to these
13      defendants.

14   Ingels, 129 Cal. App. 4th at 1067-68 (quoting Sen. Com. on Judiciary, Analysis of Sen.

15   Bill No. 515 (2003–2004 Reg. Sess.)).  "[T]he reason for these exemptions is simple.

16   Newspapers and other media are in the business of disseminating information to the

17   public."  Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.)

18   In the Assembly Committee on the Judiciary hearing analyzing the proposed

19   subsection (d) amendment, the Assembly Committee stated:

20      [t]he bill exempts, and thereby continues to allow, the anti-
        SLAPP motion to be used by all persons and entities
21      engaged in the press or broadcast media, publishing of books
        and journals, and all those who are sued for protected
22      activities based upon creative and promotional activities
        regarding dramatic, literary, musical, political, or artistic
23      works.

24   Assembly Com. on Judiciary, Anti-SLAPP Motions: Ensuring Appropriate Use of the

25   Procedure, Sen. Bill No. 789 (2001-2002 Reg. Sess.).  The Assembly Committee on the

26   Judiciary's analysis also states:

27   ///

28   ///

21

> In order to preserve the anti-SLAPP motion for the protection of those frequent targets it was intended to protect, this bill excludes from the foregoing exemptions [subsections (b) and (c)] specified persons and entities, such as those engaged in speech-related activities, specified nonprofits, and actions against persons or entities based on the creation or promotion of constitutionally protected artistic works and the like.

Assembly Com. on Judiciary, Anti-SLAPP Motions: Appropriate Use of the Procedure, Sen. Bill No. 515 (2003-2004 Reg. Sess.).

This legislative history makes clear that subsection (d) was intended to ensure that anti-SLAPP motions remained available to persons or entities engaged in the "publishing of books" and "all those . . . sued for protected activities based upon creative and promotional activities regarding . . . literary . . . works."  Assembly Com. on Judiciary, Anti-SLAPP Motions: Ensuring Appropriate Use of the Procedure, Sen. Bill No. 789 (2001-2002 Reg. Sess.).  Although the legislative history specifically discusses the motion picture industry as a "media defendant," this statement does not preclude publishers from being counted as "media defendants," as Plaintiffs suggest.  Indeed, the legislative history from the Assembly Committee on the Judiciary makes clear that those engaged in publishing books are considered media defendants for purposes of this statute.  As such, the Publisher Defendants are protected from the application of subsections (b) and (c), and may still bring an anti-SLAPP motion.  Likewise, the individual Defendants in this case—Armstrong, Stapleton, and Weisel—are "sued for [their] protected activities based upon creative and promotional activities regarding . . . literary . . . works."  Id.  More specifically, Defendant Armstrong is sued based on his creative and promotional activities regarding the Armstrong Books, which are literary works under the meaning of the statute, while Defendants Stapleton and Weisel are sued for their alleged promotional activities regarding these literary works.

///

///

///

22

1    Public policy also weighs in favor of allowing Defendants to bring an anti-SLAPP

2  motion.  As the legislative history notes, these Defendants are specifically the type of

3  defendants that the Legislature sought to protect by enacting subsection (d)—"those

4  engaged in speech-related activities."  See supra.

5    Thus, the instant action is an "action" against "person[s] or entit[ies] based upon

6  the creation, dissemination, . . . advertisement, or other similar promotion of" a "literary"

7  "work."  Cal. Civ. Proc. Code § 425.17(d)(2).  As such, the Court need not determine

8  whether the action also falls within the ambit of subsections (b) and (c), as the action is

9  exempt from these statutory exemptions to the anti-SLAPP statute.  Defendants are

10  therefore entitled to bring an anti-SLAPP motion, and have met their initial burden under

11  the statutory framework.[6]

12

13    **C.    Plaintiffs' Burden**

14

15    "[T]he [anti-SLAPP] statute does not bar a plaintiff from litigating an action that

16  arises out of the defendant's free speech or petitioning; it subjects to potential dismissal

17  only those actions in which the plaintiff cannot state and substantiate a legally sufficient

18  claim."  Hilton, 599 F.3d at 908 (quoting Navellier, 29 Cal. 4th 82).  Accordingly, "[o]nce it

19  is determined that an act in furtherance of protected expression is being challenged, the

20  plaintiff must show a 'reasonable probability' of prevailing in its claims for those claims to

21  survive dismissal."  Metabolife Int'l, 264 F.3d at 840 (citing § 425.16(b)).  "To do this, the

22  plaintiff must demonstrate that 'the complaint is legally sufficient and supported by a

23  prima facie showing of facts to sustain a favorable judgment if the evidence submitted by

24  the plaintiff is credited.'"  Id. (quoting Wilcox, 33 Cal. Rptr. 2d at 454).

25    _____

26    [6] Contrary to Plaintiffs' contention, Defendants do not argue, and the Court does not hold, that
because subsection (d) applies, Defendants may bypass the first step of the Anti-SLAPP analysis.  The
fact that this action falls within the meaning of subsection (d) merely allows Defendants to bring the anti-
SLAPP motion; it's application does not exempt Defendants from meeting the requirements of section

27  425.16. However, as set forth in Section A of the Court's Order, Defendants have met the requirements of
section 425.16(e)(4).  Thus, the burden shifts to Plaintiffs to show a reasonable probability of prevailing on

28  their claims.

1   Thus, a defendant's anti-SLAPP motion should be granted when a plaintiff presents an

2   insufficient legal basis for the claims or "when no evidence of sufficient substantiality

3   exists to support a judgment for the plaintiff."  Metabolife Int'l, 264 F.3d at 840 (citing

4   Wilcox, 33 Cal. Rptr.3d at 457).  "At this second step of the anti-SLAPP inquiry, the

5   required probability that [Plaintiffs] will prevail need not be high."  Hilton, 599 F.3d at 908.

6   "The California Supreme Court has sometimes suggested that suits subject to being

7   stricken at step two are those that 'lack even minimal merit.'"  Id. (quoting Navellier,

8   29 Cal. 4th 82).

9        Here, because Defendants have met their initial burden under the anti-SLAPP

10   statute, and because the action is not subject to a statutory exemption, the burden shifts

11   to Plaintiffs to show a reasonable probability of prevailing on their claims.  Defendant

12   Armstrong contends only that Plaintiffs cannot establish a probability of proving their

13   UCL, FAL, and CLRA claims.  All other Defendants move to strike each of Plaintiffs'

14   claims.

15

16        **1.      UCL, FAL, and CLRA Claims**

17

18        Defendants raise the First Amendment as a defense to Plaintiffs UCL, FAL, and

19   CLRA claims, arguing that their alleged conduct is protected by the First Amendment.

20   "California's consumer protection laws, like the unfair competition law, govern only

21   commercial speech."  Rezec v. Sony Pictures Entm't, Inc., 116 Cal. App. 4th 135, 140

22   (2004) (discussing UCL, FAL, and CLRA claims) (citing Kasky, 27 Cal.4th at 953–956,

23   962, 969–970; Keimer v. Buena Vista Books, Inc., 75 Cal. App. 4th 1220, 1230–31

24   (1999); O'Connor v. Super. Ct., 177 Cal. App. 3d 1013, 1018–20 (1986)).

25   "Noncommercial speech is beyond their reach."  Id.  Thus, "lawsuits premised on section

26   17200 are subject to being stricken because they are barred by the First Amendment

27   where the speech complained of is not commercial speech."  New.Net, Inc. v. Lavasoft,

28   356 F. Supp. 2d 1090, 1110 (C.D. Cal. 2004).

1    "As a general matter, the First Amendment means that government has no power

2    to restrict expression because of its message, its ideas, its subject matter, or its content."

3    Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 65 (1983) (quoting Police Dep't v.

4    Mosley, 408 U.S. 92, 95 (1972)).  The Supreme Court has repeatedly held that civil

5    liability for speech, even in the context of private civil litigation, is an interference with

6    speech and therefore must meet First Amendment scrutiny.  See New York Times v.

7    Sullivan, 376 U.S. 254 (1964).  "The First Amendment affords protection to both

8    commercial and noncommercial speech."  Dex Media W., Inc. v. City of Seattle, 696 F.3d

9    952, 956-67 (9th Cir. 2012) (citing Bigelow v. Virginia, 421 U.S. 809 (1975)).  However,

10   the strength of First Amendment protection afforded "depends on whether the activity

11   sought to be regulated constitutes commercial or noncommercial speech."  Bolger, 463

12   U.S. at 65; Dex Media, 696 F.3d at 957.  Commercial speech that is false or misleading

13   is afforded no First Amendment protection at all.  Hoffman v. Capital Cities/ ABC, Inc.,

14   255 F.3d 1180, 1184 (9th Cir. 2011) (citing Florida Bar v. Went For It, Inc., 515 U.S. 618,

15   623-24 (1995)).

16        The Ninth Circuit has adopted a three-pronged analysis based on Supreme Court

17   precedent to determine whether speech is commercial.  First, the court considers

18   whether the publication fits within the "core notion of commercial speech."  Dex Media,

19   696 F.3d at 957.  "Core" commercial speech is "speech which does no more than

20   propose a commercial transaction."  Id. at 957 (quoting Bolger, 463 U.S. at 66).

21        If speech does more than propose a commercial transaction, but contains "mixed

22   content"—that is, both commercial and non-commercial elements—the Ninth Circuit

23   applies the Supreme Court's Bolger test.  Dex Media, 696 F.3d at 957.  In Bolger, "the

24   Supreme Court held that speech could properly be characterized as commercial when

25   (1) the speech is admittedly advertising, (2) the speech references a specific product,

26   and (3) the speaker has an economic motive for engaging in the speech."

27   ///

28   ///

25

1   Am. Acad. of Pain Mgmt. v. Joseph, 353 F.3d 1099, 1106 (9th Cir. 2004) (citing Bolger,

2   463 U.S. at 66-67; Assoc. of Nat'l. Advertisers, Inc. v. Lungren, 44 F.3d 726, 728 (9th

3   Cir. 1994) (stating Bolger factors)).  The Supreme Court made clear that these three

4   factors are not dispositive, but the "combination of all these characteristics . . . provides

5   strong support for the . . . conclusion that the [publication at issue is] properly

6   characterized as commercial speech."  Dex Media, 696 F.3d at 958 (quoting Bolger, 463

7   U.S. at 67).

8          Finally, even if the publication meets this threshold commercial speech

9   classification, courts must determine whether the speech still receives full First

10   Amendment protection, because the commercial aspects of the speech are "inextricably

11   intertwined" with otherwise fully protected speech, such that the publication sheds its

12   commercial character and becomes fully protected speech.  Id. at 958 (citing Riley v.

13   Nat'l Fed'n of the Blind, 487 U.S. 781, 796 (1988)).  "In other words, the inextricably

14   intertwined test operates as a narrow exception to the general principle that speech

15   meeting the Bolger factors will be treated as commercial speech."  Id.

16          In this case, the speech at issue can be divided into three types or categories.

17   The first type includes those statements contained within the Books themselves.  The

18   second type includes statements relating to the Books, including promotional statements

19   made by Defendants about the book and the statements contained on the flyleaves and

20   covers of the Books.  The third type contains those statements made by Armstrong and

21   Stapleton relating to Armstrong's use of performance enhancing drugs, but which do not

22   specifically reference the Books or promote the Books.

23          Statements Contained Within the Books

24          First, the Court must ask whether the statements contained within the Armstrong

25   Books fit within the "core notion of commercial speech."  Dex Media, 696 F.3d at 957.  It

26   is obvious that the statements contained within the book do more than propose a

27   commercial transaction.

28   ///

1   The content of the Armstrong Books is not an advertisement for a product; rather, the

2   statements are Armstrong's account, albeit partially untruthful, of his life and cycling

3   career.  The Books discuss, among other things, Defendant Armstrong's childhood, his

4   personal relationships, his battle with cancer, and his cycling career.  The Court need not

5   go further in analyzing the commercial nature of this speech, as the first prong of the

6   Ninth Circuit's analysis is not met, and the statements contained within the Books are not

7   "mixed content."  See Dex Media, 696 F.3d at 957.

8       Indeed, as the Court of Appeal noted in Keimer v. Buena Vista Books, Inc., which

9   Plaintiffs heavily relied upon in both their briefs and oral argument, "no one involved in

10  modern jurisprudence can reasonably dispute [that] the content of [the] books is entitled

11  to the full protection of the First Amendment."  75 Cal. App. 4th 1220, 1231 (1999).

12  Keimer reached this conclusion although it found that the statements made about the

13  book in promotional materials were unprotected commercial speech.  See id. at 1230-31.

14      While Plaintiffs in this case do not go so far as to ignore "modern jurisprudence"

15  and dispute that the content of the Books is entitled to full First Amendment protection,

16  they come quite close.  During oral argument, the Court asked Plaintiffs' counsel a very

17  basic and direct question about whether, in general, a book standing alone is entitled to

18  the protections of the First Amendment.  Plaintiffs' counsel either could not or would not

19  answer the Court's question as to whether in general, a book is entitled to full First

20  Amendment protection.  Plaintiffs' counsel chose instead to avoid answering the Court's

21  direct question with a direct answer, and said instead: "Your hypothetical is interesting,

22  but the fact of the matter is that's not how books are sold nowadays."  (Mot. Hr'g Tr. 33,

23  Aug. 8, 2013.)  As defense counsel then observed, "[The Court's] hypothetical and the

24  way it was responded to [by Plaintiffs] is telling because you get the same tap dance that

25  we got in the papers."  (Id. at 37.)  Defense counsel is correct; Plaintiffs' inability to

26  respond to a direct and very basic question from the Court on the First Amendment

27  illuminates the glaring lack of merit in Plaintiffs' position on this point.

28  ///

1    Thus, the Court concludes, despite Plaintiffs' allegations that the Armstrong

2  Books contained false and misleading statements, that the content of the Books is

3  afforded full First Amendment protection.  As stated in Keimer, "no one involved in

4  modern jurisprudence can reasonably dispute" this conclusion.  75 Cal. App. 4th at

5  1231.  The Court reaches this conclusion in keeping with the strong protections afforded

6  of the First Amendment, by which courts give "near absolute protection . . . to false but

7  nondefamatory statements of fact outside the commercial realm."  See United States v.

8  Alvarez, 638 F.3d 666, 670 (9th Cir. 2011) (Smith, J., concurring in denial of rehearing

9  petition) (quoting Elena Kagan, Private Speech, Public Purpose: The Role of

10  Governmental Motive in First Amendment Doctrine, 63 U. Chi. L. Rev. 413, 477 (1996)).

11    Accordingly, with respect to the statements contained within the Books, the

12  analysis ends here—the speech is not commercial, and is afforded full First Amendment

13  protection.  The UCL, FAL, and CLRA claims targeted at this speech therefore fail as a

14  matter of law, and Plaintiffs cannot show a likelihood of success on these claims.

15    Statements About Defendant Armstrong's Use of Performance Enhancing Drugs

16    Likewise, the statements related to Defendant Armstrong's use of PEDs do more

17  than propose a commercial transaction.  Simply put, these statements propose no

18  commercial transaction at all.  As such, under the Ninth Circuit's analysis, the inquiry

19  should end here.

20    However, assuming, for the sake of thorough analysis, that the statements

21  contain "mixed content"—that is, contain both commercial and non-commercial

22  elements—the Court must next consider the three Bolger factors.  First, Armstrong's and

23  other Defendants' public statements regarding his use of performance enhancing drugs

24  are clearly not advertisements, and do not refer to a specific product.  While it appears

25  that Plaintiffs ask the Court to find that Lance Armstrong himself is a "brand" or "product"

26  (see ECF No. 22), the Court declines to stretch the meaning of "product" this far.

27  ///

28  ///

1   *Cf. Bolger*, 463 U.S. at 66 ("products" referred to were contraceptives available at drug

2   stores); Hunt v. City of L.A., 638 F.3d 703, 714-15 (9th Cir. 2011) ("products" referred to

3   by speech at issue were shea butter and incense). Thus, the first two Bolger factors

4   weigh against finding that the speech, outside of the book, related to Defendant

5   Armstrong's use of performance enhancing drugs, is commercial. However, Armstrong

6   and the other individual defendants quite likely had underlying economic motives when

7   making comments denying that Armstrong used performance enhancing drugs. To this

8   end, Plaintiffs allege that Defendants financially benefitted from convincing the public

9   that Armstrong did not use performance enhancing drugs. Thus, at best, these public

10   statements satisfy only one of the three Bolger factors, which is insufficient to meet the

11   threshold commercial speech classification.

12       Accordingly, the Court finds that Defendants' public statements regarding

13   Armstrong's use of performance enhancing drugs do not constitute commercial speech.

14   Thus, the UCL, FAL, and CLRA claims targeted at this speech fail as a matter of law,

15   and Plaintiffs therefore fail to show a likelihood of success on these claims as to this

16   particular type of speech.

17       Promotional Statements Relating to the Armstrong Books

18       Finally, the Court must assess the commercial nature of the statements on the

19   flyleaves, covers, and book jackets of the Armstrong Books, as well as other promotional

20   materials for the Books. According to Plaintiffs, Defendants made promotional

21   statements about the Armstrong Books, including the representations that each of the

22   Books is a "nonfiction 'biography'" about the "Tour De France Winner" or the "Five Time

23   Tour de France Winner." (ECF No. 22 at 17-18.) Plaintiffs allege that these "false and

24   misleading statements" were made "in media press kits, during television and newspaper

25   interviews, on Internet websites, and at personal appearances made by Armstrong." (Id.

26   at 18.)

27   ///

28   ///

1    The speech at issue does more than merely propose a commercial transaction,

2    because it describes the contents of the Books, the Books' classification as a biography,

3    and describes one of the Books' authors, Lance Armstrong.  Given that the speech does

4    more than propose a commercial transaction, the Court must consider whether the

5    speech contains mixed content—that is, both commercial and non-commercial elements.

6    Dex Media, 696 F.3d at 957.  In this case, it is readily apparent that the promotional

7    statements regarding the Armstrong Books, along with the flyleaves to the Armstrong

8    Books, contain components of both commercial and noncommercial speech, as these

9    materials and statements both seek to inform and seek to promote the Books for sale.

10    Thus, the Court examines these statements under the three Bolger factors.  First,

11    the statements on the flyleaves and other promotional materials made by Defendants

12    about the Books are by no means "admittedly an advertisement."  Am. Acad. of Pain

13    Mgmt., 353 F.3d at 1106.  Indeed, Defendants vehemently deny that these statements

14    constitute advertisements or commercial speech.  The first prong of the Bolger analysis

15    is therefore not met.  Second, these promotional statements reference specific products,

16    as they clearly refer to, and describe, the Armstrong Books.  Accordingly, the second

17    Bolger factor is met.  Third, these promotional statements have an underlying economic

18    motive—while Defendants contend that these statements are made merely to inform

19    readers about the Armstrong Books, these statements are also undoubtedly made to sell

20    the Books.  That being said, the Court is mindful that the fact that "books, newspapers,

21    and magazines are published and sold for profit does not prevent them from being a

22    form of expression whose liberty is safeguarded by the First Amendment."  Joseph

23    Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952).  Indeed, "economic motive in itself is

24    insufficient to characterize a publication as commercial . . . ."  Dex Media, 696 F.3d at

25    960 (citing Bolger, 463 U.S. at 67).  Thus, while the third Bolger factor is satisfied, the

26    Court, in order to balance the concerns of the First Amendment, does not afford this

27    factor great weight.

28    ///

1       The Court therefore assumes that two of the three Bolger factors are met, which

2  weighs in favor of finding that this speech is commercial speech.  Bolger, 463 U.S. at 67

3  (the "combination of all these characteristics provides strong support for the . . .

4  conclusion that the [speech is] properly characterized as commercial speech.").

5  However, the Court need not decide whether the speech at issue is definitively

6  commercial speech under the Bolger test, as the third prong of the Bolger analysis

7  operates to afford these promotional statements full protection.  See infra.

8       The third prong of the Bolger framework requires the Court to examine whether

9  this speech may "still receive[] full First Amendment protection because the commercial

10  aspects of the speech are 'inextricably intertwined' with otherwise fully protected speech,

11  such that [it] sheds its commercial character and becomes fully protected speech."  Dex

12  Media, 696 F.3d at 958 (citing Riley, 487 U.S. at 795-96 (finding that speech does not

13  "retain its commercial character when it is inextricably intertwined with otherwise fully

14  protected speech.")).

15       Here, the commercial aspects of the book, and the promotional statements made

16  about the book, are inextricably bound to the non-commercial contents of the books.

17  See Riley, 487 U.S. at 796 (refusing to separate commercial components of charitable

18  speech from the fully protected whole); Dex Media, 696 F.3d at 963 (finding yellow

19  pages' commercial content inextricably intertwined with noncommercial content).  In Dex

20  Media, the Ninth Circuit stated that "[t]he full First Amendment protection of newspapers,

21  magazines, television shows, radio programs, and the like demonstrates that the

22  inclusion of commercial material does not support treating those publications and

23  broadcasts as commercial speech entitled to less First Amendment protection."

24  696 F.3d at 963.  Although the Ninth Circuit was concerned in that case with the

25  economic reality that advertising is required to keep newspapers, magazines, and

26  telephone directories afloat, the same is true of books and publishers.  See id.

27  ///

28  ///

1   In short, the economic reality in this age of technology is that publishing companies and

2   authors must promote the books they publish and write in order to sell them, if publishing

3   houses are to continue to operate and books are to continue to be sold in paper and

4   hard copies.  As Plaintiffs themselves suggested at oral argument, it is nearly impossible

5   to separate the promotional materials for the Books from the Books themselves.[7]  (Mot.

6   Hr'g Tr. 33, Aug. 8, 2013.)

7          As such, the promotional materials relating to the Books are inextricably

8   intertwined with the Books' contents, which is non-commercial speech.  Thus, these

9   promotional materials are also entitled to full First Amendment protection as non-

10   commercial speech.  As set forth above, UCL, FAL, and CLRA claims targeting non-

11   commercial speech fail as a matter of law.  Plaintiffs therefore cannot show a likelihood

12   of success on the merits as to these causes of action.

13          Defendants' anti-SLAPP motions to strike Plaintiffs' UCL, FAL, and CLRA claims

14   are therefore GRANTED.

15

16          **2.    Fraud**

17

18          The Publisher Defendants, Stapleton, and Weisel also move to strike Plaintiffs'

19   fraud claims.  Under California law, the elements of fraud are: "(a) misrepresentation

20   (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or

21   'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and

22   (e) resulting damage."  Tom Trading, Inc. v. Better Blue, Inc., 26 F. App'x 733, 736 (9th

23   Cir. 2002) (citing Lovejoy v. AT & T Corp., 92 Cal. App. 4th 85, 93 (2001)).

24          The Publisher Defendants contend that there is no misrepresentation on their

25   part, as the only statements specifically attributed to the Publisher Defendants are that

26   the book is a "biography" and "nonfiction" and Armstrong is the Tour de France "winner."

27          [7] When asked whether the Books, standing alone, were entitled to full First Amendment protection,
Plaintiffs' counsel responded, "The fact of the matter is that's not how books are sold nowadays."  (Mot.

28   Hr'g Tr. 33, Aug. 8, 2013.)

1   Defendants contend that these statements are in fact true—Defendant Armstrong did

2   win the Tour de France, even though these victories were later taken away from him,

3   and the book is a biography and nonfiction, even though it is now apparent that the book

4   contains false statements.

5       Other courts have held that "the term nonfiction only means that the literature is

6   based on true stories or events, not that every statement is in fact demonstrably true."

7   Greenspan v. Random House, Inc., 859 F. Supp. 2d 206, 220 (D. Mass. 2012), aff'd,

8   2012 WL 5188792 (1st Cir. 2012).  Indeed, "[s]peaking about oneself is precisely when

9   people are most likely to exaggerate, obfuscate, embellish, omit key facts, or tell tall

10  tales."  Alvarez, 638 F.3d at 674 (Kozinski, C.J., concurring in denial of rehearing

11  petition).  Plaintiffs here provide absolutely no authority for the notion that the words

12  "biography" and "nonfiction" are guarantees that the work contains only statements that

13  are one hundred percent factual, and the Court is aware of none.  Plaintiffs therefore

14  have not shown that they can meet even the first prong of the fraud analysis as to the

15  Publisher Defendants.  Thus, Plaintiffs fail to satisfy the second prong of the anti-SLAPP

16  procedure, and the fraud claims against the Publisher Defendants are stricken.

17      As to Defendants Stapleton and Weisel, the Court addresses only the most

18  glaring issue at this point.  First, nowhere do Plaintiffs plead that they relied on

19  Stapleton's allegedly fraudulent statements in purchasing the Books.  Moreover,

20  Plaintiffs do not allege a single statement by Defendant Weisel, much less allege that

21  Plaintiffs relied on a statement by Defendant Weisel in purchasing the Books.  Plaintiffs

22  instead allege that Plaintiff Stutzman "learned about the book It's Not About the Bike"

23  "sometime between 2001 and 2003."  (ECF No. 22 at 7.)  Plaintiff Wheeler alleges that

24  he purchased the book after "learning through the media about [Defendant] Armstrong's

25  supposedly truthful and inspiring account of his triumphant return to dominate the world

26  of cycling after his devastating bout with testicular cancer."  (ECF No. 22 at 8.)  Wheeler

27  "was so impressed with It's Not About the Bike . . . that he bought Armstrong's follow-up

28  book, Every Second Counts . . . ."  (Id. at 8-9.)

1   Plaintiff Lauria "was inspired by advertising featuring reports of Armstrong's successful

2   battle against cancer, which moved her to purchase [Defendant] Armstrong's books."

3   (Id. at 9.)  Plaintiff Reimers purchased It's Not About the Bike after seeing

4   "advertisements regarding Armstrong's remarkable comeback to 'win' the Tour de

5   France cycling race after conquering testicular cancer . . . ."  (Id.)  Plaintiff S. Armstrong

6   "rel[ied] on Defendant Armstrong's representations as to his drug-free life and cycling

7   career, [and] purchased and read It's Not About the Bike."  (Id. at 10.)  "[Plaintiff] S.

8   Armstrong also read Every Second Counts due to his belief in Armstrong's false and

9   misleading representations as to his drug-free life and cycling career."  (Id.)

10          Reliance must be pled to state a claim for fraud.  Tom Trading, Inc., 26 F. App'x at

11   736.  As set forth above, Plaintiffs make no allegations that in purchasing the Books,

12   they relied on Defendant Stapleton's statements about Defendant Armstrong or the

13   Armstrong Books.  Plaintiffs therefore fail to state a claim for fraud.

14          Finally, Plaintiffs make only vague allegations regarding Defendants Weisel and

15   Stapleton.  Plaintiffs allege that Defendant Stapleton, along with Defendant Weisel,

16   "counseled, assisted, and encouraged . . . Armstrong" for the purpose of "building and

17   maintaining the Lance Armstrong 'brand' that this trio conceived during 1997-1999."

18   (ECF No. 22 at 22.)  Plaintiffs cite to interviews that Defendant Stapleton gave in which

19   he discusses the Lance Armstrong brand.  However, these interviews do not discuss the

20   Armstrong Books.  Plaintiffs make the generalized, repeated allegation that Defendants

21   Armstrong, Weisel, and Stapleton "built, expanded, maintained, and defended" the

22   "Lance Armstrong brand."  (ECF No. 22 at 24.)  Plaintiffs also allege that Defendant

23   Weisel conspired with, or aided and abetted, his co-Defendants in writing, publishing,

24   and marketing the Armstrong Books.  The majority of the allegations regarding

25   Defendant Weisel individually concern Defendant Weisel's involvement with the United

26   States Postal Service cycling team as a financial backer.

27   ///

28   ///

1    Plaintiffs fail to allege sufficient facts showing that Defendants Weisel or Stapleton

2    engaged in any fraudulent conduct.  Under Federal Rule of Civil Procedure 9(b), a

3    plaintiff pleading a claim of fraud, or any claim that is "grounded in fraud" must "state with

4    particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule

5    9(b) requires the plaintiff to set forth with particularity the "who, what, when, where, and

6    how of the misconduct charged."  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106

7    (9th Cir. 2003).  The Rule 9(b) standard applies to assessing claims under an anti-

8    SLAPP motion.  Tuck Beckstoffer Wines LLC v. Ultimate Distributors, Inc., 682 F. Supp.

9    2d 1003, 1019 (N.D. Cal. 2010).  Because Plaintiffs fail to state a legally cognizable

10   claim against Defendants Stapleton and Weisel, their motions to strike Plaintiffs' fraud

11   claims are GRANTED.

12

13                    **3.    Negligent Misrepresentation**

14

15    California's cause of action for "negligent misrepresentation" requires: (1) "a

16   misrepresentation of a past or existing material fact"; (2) "without reasonable grounds for

17   believing it to be true"; (3) "with intent to induce another's reliance on the fact

18   misrepresented"; (4) "justifiable reliance thereon by the party to whom the

19   misrepresentation was directed"; and (5) "damages."  Petersen v. Allstate Indem. Co.,

20   281 F.R.D. 413, 417 (C.D. Cal. 2012).

21    The Publisher Defendants assert that Plaintiffs cannot state a viable claim against

22   them for negligent misrepresentation because the Ninth Circuit has held that publishers

23   "owe[] no duty to investigate the accuracy of the contents of the books it publishes."

24   Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1037 (9th Cir. 1991) (finding that claims

25   of copyright, libel, misrepresentation, negligent misrepresentation, negligence, and

26   mistake failed because publisher had no duty to investigate the accuracy of book on

27   mushrooms) (citing numerous cases holding publishers not required to guarantee truth

28   or accuracy of books).

1   Other courts have observed that "[t]o require a book publisher to check, as a matter of

2   course, every potentially defamatory reference might raise the price of nonfiction works

3   beyond the resources of the average man.  This result would, we think, produce just

4   such a chilling effect on the free flow of ideas as First Amendment jurisprudence has

5   sought to avoid."  Barden v. Harpercollins Publishers, Inc., 863 F. Supp. 41, 45 (D.

6   Mass. 1994).  Similarly, in Lacoff v. Buena Vista Publishing, Inc., the court stated that

7   "[t]o promote society's overriding interest in the untrammeled dissemination of

8   knowledge and free expression, the First Amendment strictly limits the imposition of

9   liability on publishers for the contents of books."  705 N.Y.S.2d 183 (Sup. Ct. 2000).

10  Indeed, to protect the right to free speech and the free flow of ideas that the First

11  Amendment seeks to guard, even some falsehoods—including those published in a

12  book—must be protected.  See id. (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 340

13  (1974)); see also Sullivan, 376 U.S. at 278-79 ("If the bookseller is criminally liable

14  without knowledge of the contents . . . he will tend to restrict the books he sells to those

15  he has inspected . . . and the bookseller's burden would become the public's burden, for

16  by restricting him the public's access to reading matter would be restricted.")

17          Thus, "the gentle tug of the First Amendment and the values embodied therein . .

18  . remind us of the social cost" were the Court to create such a duty for publishers, and

19  allow publishers to be held liable for allegedly false statements contained within a book.

20  Winter, 938 F.2d at 1037.  To this end, although Plaintiffs assert that the public interest

21  in this case weighs in favor of protecting consumers from books that contain false

22  statements, the case law makes clear that the public interest swings in the opposite

23  direction, towards closely guarding the right to free speech and the free flow of ideas that

24  the First Amendment seeks to protect.

25          As such, Plaintiffs cannot show that they have a probability of success on their

26  claim for negligent misrepresentation against the Publisher Defendants.  Thus, the

27  Publisher Defendants' anti-SLAPP motion to strike the claim for negligent

28  misrepresentation is GRANTED.

1    Plaintiffs also fail to state a legally cognizable negligent misrepresentation claim

2   against Defendants Weisel and Stapleton.  As set forth above, Plaintiffs do not allege a

3   single statement made by Defendant Weisel.  Rather, Plaintiffs make conclusory

4   allegations that Defendant Weisel aided and abetted the actions of the other

5   Defendants.  Defendant Weisel therefore has made no "misrepresentation of a past or

6   existing material fact."  Petersen, 281 F.R.D. at 417.  Plaintiffs likewise make no prima

7   facie showing of facts to even suggest that this element of the claim is met as to

8   Defendant Weisel.

9    Moreover, the First Amended Complaint is devoid of allegations that Plaintiffs

10   relied on misrepresentations by either Defendant Weisel or Defendant Stapleton.  See

11   supra (discussing allegations by Plaintiffs regarding their motives for purchasing the

12   Armstrong Books).  Plaintiffs therefore fail to plead "justifiable reliance thereon by the

13   party to whom the misrepresentation was directed . . . ."  See Petersen, 281 F.R.D. at

14   417.

15    Therefore, it is clear that Plaintiffs have not shown a likelihood of success on this

16   claim against either Defendant Weisel or Defendant Stapleton.  As such, their motion to

17   strike Plaintiffs' claim for negligent misrepresentation is GRANTED.

18

19    **D.   Leave to Amend**

20

21    The Ninth Circuit has clearly stated that "granting a defendant's anti-SLAPP

22   motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend

23   would directly collide with Federal Rule of Civil Procedure 15(a)'s policy favoring liberal

24   amendment."  Verizon Del., Inc. v. Covad Commc'ns Co., 377 F.3d 1081, 1091 (9th Cir.

25   2004).  Accordingly, Plaintiffs are granted leave to amend their complaint.

26   ///

27   ///

28   ///

Each Defendant has requested attorneys' fees and costs incurred in bringing their respective anti-SLAPP motions.  California's anti-SLAPP statute provides a mechanism for a defendant to strike civil actions or claims brought primarily to chill the exercise of free speech. Cal. Civ. Proc. Code § 425.16(b)(1).  In order to deter such chilling, "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." Id. § 425.16(c).  However, when a plaintiff is granted leave to amend the complaint, a defendant whose anti-SLAPP motion is granted is not a "prevailing party" for purposes of the anti-SLAPP statutory framework.  See Thornbrough v. W. Placer Unified Sch. Dist., 2:09-CV-02613-GEB, 2010 WL 3069321 (E.D. Cal. Aug. 3, 2010) (citing Brown v. Electronic Arts, Inc., 2010 WL 2757774, at *6-8 (C.D. Cal. July 13, 2010) (holding that defendant was not a prevailing party where anti-SLAPP motion was granted but plaintiff was provided leave to amend complaint)).

Accordingly, Defendants' requests for attorneys' fees are DENIED.

**CONCLUSION**

For the reasons set forth above, it IS HEREBY ORDERED THAT:

1. Defendant Random House's Anti-SLAPP Motion Strike is GRANTED as to each of Plaintiffs' causes of action (ECF No. 36);

2. Defendant Penguin's Anti-SLAPP Motion to Strike is GRANTED as to each of Plaintiffs' causes of action (ECF No. 42);

3. Defendant Armstrong's Anti-SLAPP Motion to Strike is GRANTED as to Plaintiffs' First, Second, Third, Fourth, Fifth, and Sixth causes of action (ECF No. 47);

4. Defendant Weisel's Anti-SLAPP Motion to Strike is GRANTED as to each of Plaintiffs' causes of action (ECF No. 55);

5. Defendant Stapleton's Anti-SLAPP Motion to Strike is GRANTED as to each of Plaintiffs' causes of action (ECF No. 57);

6.      The pending Motions to Dismiss by Defendant Random House (ECF
        No. 37), Defendant Penguin (ECF No. 41), Defendant Weisel (ECF
        No. 53), and Defendant Stapleton (ECF No. 56) are DENIED AS MOOT;

7.      The pending Motion to Dismiss by Defendant Lance Armstrong (ECF
        No. 46) is DENIED AS MOOT as to Plaintiffs' First, Second, Third, Fourth,
        Fifth, and Sixth causes of action; and

8.      Plaintiffs may file an amended complaint within twenty-one (21) days of the
        date of this Memorandum and Order.  If no amended complaint is filed, the
        causes of action stricken by this Order shall be dismissed with prejudice
        without further notice to the parties.

IT IS SO ORDERED.

Dated:  September 9, 2013


MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT